1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
         – and –
6   ROBBINS GELLER RUDMAN
      & DOWD LLP
7   DARREN J. ROBBINS (168593)
    LUKE O. BROOKS (212802)
8   ERIKA L. OLIVER (306614)
    JACK ABBEY GEPHART (345398)
9   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
10  Telephone:  619/231-1058
    619/231-7423 (fax)
11  darrenr@rgrdlaw.com
    lbrooks@rgrdlaw.com
12  eoliver@rgrdlaw.com
    jgephart@rgrdlaw.com
13
    Attorneys for Plaintiffs

14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17  TIAA-CREF INVESTMENT MANAGEMENT, LLC, TEACHERS ADVISORS, LLC, NUVEEN ASSET 18  MANAGEMENT, LLC, NUVEEN FUND ADVISORS, LLC, CREF EQUITY INDEX 19  ACCOUNT, CREF STOCK ACCOUNT, NUVEEN LARGE-CAP SELECT FUND, 20  CREF GLOBAL EQUITIES ACCOUNT, TIAA-CREF S&P 500 INDEX FUND, TIAA-21  CREF EQUITY INDEX FUND, TIAA-CREF GROWTH & INCOME FUND, NUVEEN 22  ESG LARGE-CAP VALUE ETF, NUVEEN ESG MID-CAP GROWTH ETF, NUVEEN 23  ESG MID-CAP VALUE ETF, TIAA-CREF LIFE GROWTH & INCOME FUND, CREF 24  SOCIAL CHOICE ACCOUNT, TIAA SEPARATE ACCOUNT VA-1, TIAA-CREF 25  LARGE-CAP GROWTH INDEX FUND, | Case No.   3:24-cv-00478  COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

26   [Caption continued on following page.]

<u>DEMAND FOR JURY TRIAL</u>

27

28

TIAA-CREF LARGE-CAP VALUE INDEX )
FUND, TIAA-CREF SOCIAL CHOICE LOW )
CARBON EQUITY FUND, CREF CORE )
BOND ACCOUNT, TIAA-CREF LIFE )
INSURANCE COMPANY, TIAA-CREF )
BOND INDEX FUND, TIAA-CREF CORE )
PLUS BOND FUND, TIAA-CREF CORE )
IMPACT BOND FUND, NUVEEN GLOBAL )
HIGH INCOME FUND, NUVEEN )
PREFERRED & INCOME OPPORTUNITIES )
FUND on behalf of itself and as successor in )
interest to NUVEEN PREFERRED & )
INCOME SECURITIES FUND and NUVEEN )
PREFERRED AND INCOME FUND, )
NUVEEN PREFERRED AND INCOME )
TERM FUND, NUVEEN MULTI-ASSET )
INCOME FUND on behalf of itself and as )
successor in interest to NUVEEN TAX- )
ADVANTAGED TOTAL RETURN )
STRATEGY FUND, NUVEEN CORE PLUS )
IMPACT FUND, NUVEEN VARIABLE )
RATE PREFERRED & INCOME FUND, )
NUVEEN PREFERRED SECURITIES AND )
INCOME FUND, NUVEEN ENHANCED )
YIELD U.S. AGGREGATE BOND ETF, )
NUVEEN ESG U.S. AGGREGATE BOND )
ETF, TEACHERS INSURANCE AND )
ANNUITY ASSOCIATION OF AMERICA, )
NUVEEN U.S. CORE IMPACT BOND )
FUND, and TIAA-CREF LIFE SOCIAL )
CHOICE EQUITY FUND, )

                       Plaintiffs, )

    vs. )

GREGORY W. BECKER, DANIEL J. BECK, )
KAREN HON, ROGER F. DUNBAR, )
BEVERLY KAY MATTHEWS, ERIC A. )
BENHAMOU, ELIZABETH BURR, JOHN S. )
CLENDENING, RICHARD D. DANIELS, )
ALISON DAVIS, JOEL P. FRIEDMAN, )
JEFFREY N. MAGGIONCALDA, MARY J. )
MILLER, KATE D. MITCHELL, JOHN F. )
ROBINSON, GAREN K. STAGLIN, BofA )
SECURITIES, INC., and GOLDMAN SACHS )
& CO. LLC, )

                     Defendants. )

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ......................................................................................1

II.   JURISDICTION AND VENUE ................................................................6

III.  PARTIES AND RELEVANT NON-PARTIES ........................................6

      A.   Plaintiffs.........................................................................................6

      B.   Defendants .....................................................................................9

      C.   Relevant Non-Parties ...................................................................13

IV.   SUMMARY OF THE OFFICER DEFENDANTS' SCHEME AND
      WRONGFUL COURSE OF BUSINESS ...............................................14

      A.   SVB's Efforts to Avoid Regulations that Would Have Prevented SVB's
           Collapse........................................................................................14

      B.   The Officer Defendants Conceal Their Failure to Implement Appropriate
           Governance and Risk Management Frameworks ....................................16

      C.   The Officer Defendants Bet the Bank on Long-Duration Held-to-Maturity
           Securities in Order to Fuel SVB's Short-Term Profits and Their Own
           Compensation While Concealing Substantial Interest Rate Risk
           Management Deficiencies................................................................24

      D.   The Officer Defendants Manipulate Additional Modeling Assumptions to
           Conceal SVB's Rapidly Deteriorating Liquidity ............................37

      E.   The Officer Defendants Caused SVB to Misclassify Tens of Billions of
           Dollars in Investment Securities as Held-to-Maturity in Violation of
           Generally Accepted Accounting Principles .............................................42

      F.   As the Relevant Truth About the Financial Impact of SVB's Deficient
           Governance and Risk Controls Was Revealed, Investors Suffer Substantial
           Damages.........................................................................................47

V.    THE OFFICER DEFENDANTS' FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS .................................................................................51

      A.   Misrepresentations and Omissions Concerning SVB's Internal Controls
           and Preparedness for Large Financial Institution Status.......................51

      B.   Misrepresentations and Omissions Concerning SVB's Liquidity
           Management...................................................................................58

      C.   Misrepresentations and Omissions Concerning SVB's Interest Rate Risk
           Management...................................................................................64

      D.   Misrepresentations and Omissions Concerning SVB's AFS and HTM
           Securities.......................................................................................73

Page

VI.     ADDITIONAL SCIENTER ALLEGATIONS ...................................................77

        A.      The Officer Defendants' Personal Involvement in and Knowledge of
                SVB's Risk Management Issues Establishes Their Scienter ...............................77

        B.      The Officer Defendants Had Motive to Commit the Fraud ...................................84

                1.      SVB's Compensation Structure Incentivized the Officer
                        Defendants to Commit Fraud ...................................................................84

                2.      The Officer Defendants Engaged in Suspicious Stock Sales During
                        the Relevant Period ...................................................................................86

VII.    LOSS CAUSATION .....................................................................................................87

VIII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON
        THE MARKET ..............................................................................................................91

COUNT I ......................................................................................................................................92

        For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against the Officer
                Defendants ...................................................................................................................92

COUNT II ....................................................................................................................................94

        For Violation of §20(a) of the Exchange Act Against the Individual Defendants ...........94

IX.     SECURITIES ACT ALLEGATIONS ..........................................................................95

        A.      The Relevant Offerings ...............................................................................................95

        B.      The Offering Materials Contained Untrue Statements of Material Fact
                and/or Omitted Facts Necessary to Make the Statements Made Therein
                Not False or Misleading ...............................................................................................99

                1.      Untrue Statements and Omissions About SVB's Internal Controls ..........99

                2.      Untrue Statements and Omissions About SVB's Liquidity Risk
                        Management .............................................................................................104

                3.      Untrue Statements and Omissions About SVB's Interest Rate Risk
                        Management .............................................................................................108

                4.      Untrue Statements and Omissions About SVB's Designation of
                        Investment Securities as Held-to-Maturity .............................................114

X.      CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .........................................118

COUNT III ..................................................................................................................................118

        For Violation of §11 of the Securities Act Against All Defendants .................................118

COUNT IV ..................................................................................................................................120

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

For Violation of §15 of the Securities Act Against the Individual Defendants...............120

PRAYER FOR RELIEF ..............................................................................................121

JURY DEMAND ......................................................................................................122

Plaintiffs[1], by their counsel Robbins Geller Rudman & Dowd LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[2]

# I.    INTRODUCTION

1.    This action asserts violations of the federal securities laws on behalf of TIAA, in connection with TIAA's purchases of SVB securities between November 5, 2020 and March 10, 2023 (the "Relevant Period"), including securities traceable to multiple public offerings completed between January 2021 and April 2022.  This action is brought against certain of SVB's executive officers, directors, and underwriters of the public offerings, and asserts violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and §§11 and 15 of the Securities Act of 1933 ("Securities Act").

---

[1]    "Plaintiffs" and "TIAA" refer collectively to Teachers Insurance and Annuity Association of America and its following subsidiaries, funds, and accounts: (i) TIAA-CREF Investment Management, LLC; (ii) Teachers Advisors, LLC; (iii) Nuveen Asset Management, LLC; (iv) Nuveen Fund Advisors, LLC; (v) CREF Equity Index Account; (vi) CREF Stock Account; (vii) Nuveen Large-Cap Select Fund; (viii) CREF Global Equities Account; (ix) TIAA-CREF S&P 500 Index Fund; (x) TIAA-CREF Equity Index Fund; (xi) TIAA-CREF Growth & Income Fund; (xii) Nuveen ESG Large-Cap Value ETF; (xiii) Nuveen ESG Mid-Cap Growth ETF; (xiv) Nuveen ESG Mid-Cap Value ETF; (xv) TIAA-CREF Life Growth & Income Fund; (xvi) CREF Social Choice Account; (xvii) TIAA Separate Account VA-1; (xviii) TIAA-CREF Large-Cap Growth Index Fund; (xix) TIAA-CREF Large-Cap Value Index Fund; (xx) TIAA-CREF Social Choice Low Carbon Equity Fund; (xxi) CREF Core Bond Account; (xxii) TIAA-CREF Life Insurance Company; (xxiii) TIAA-CREF Bond Index Fund; (xxiv) TIAA-CREF Core Plus Bond Fund; (xxv) TIAA-CREF Core Impact Bond Fund; (xxvi) Nuveen Global High Income Fund; (xxvii) Nuveen Preferred & Income Opportunities Fund on behalf of itself and as successor in interest to Nuveen Preferred & Income Securities Fund and Nuveen Preferred and Income Fund; (xxviii) Nuveen Preferred and Income Term Fund; (xxix) Nuveen Multi-Asset Income Fund on behalf of itself and as successor in interest to Nuveen Tax-Advantaged Total Return Strategy Fund; (xxx) Nuveen Core Plus Impact Fund; (xxxi) Nuveen Variable Rate Preferred & Income Fund; (xxxii) Nuveen Preferred Securities and Income Fund; (xxxiii) Nuveen Enhanced Yield U.S. Aggregate Bond ETF; (xxxiv) Nuveen ESG U.S. Aggregate Bond ETF; (xxxv) Teachers Insurance and Annuity Association of America; (xxxvi) Nuveen U.S. Core Impact Bond Fund; and (xxxvii) TIAA-CREF Life Social Choice Equity Fund.

[2]    Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of SVB Financial Group ("SVB" or the "Company") senior management's conferences with investors and analysts; (iii) releases and media reports issued about and disseminated by the Company; (iv) analyst reports issued about SVB; (v) other public information and data regarding the Company; and (vi) documents cited herein.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      During the Relevant Period, SVB operated as a diversified financial services company.  SVB was the parent company of Silicon Valley Bank (the "Bank"), a California state-chartered bank founded in 1983, which primarily provided diversified banking and financial services in the technology and life science/healthcare industries as well as to global private equity ("PE") and venture capital ("VC") clients.  During the Relevant Period, SVB common stock traded in the United States on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "SIVB."

3.      In 2015, as SVB was approaching $50 billion in total assets, the threshold that would subject the Company to strict stress testing and capital requirements, Defendant Gregory W. Becker ("Becker") – SVB's longtime Chief Executive Officer ("CEO") – began lobbying Congress to pass the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA").  Passed a few years later, the EGRRCPA exempted banks with assets less than $250 billion (like SVB) from the strictest requirements and oversight by the Federal Reserve System (the "Federal Reserve"), which included measuring a bank's ability to withstand economic downturns or shocks.  This loosening was impeccably timed for SVB.  The low interest rate environment that predominated in 2019-2021 fueled substantial VC activity and, by extension, liquidity for the Bank's clients.  This in turn drove significant deposit growth for the Bank, with its deposits swelling from $60 billion in fourth quarter of 2019 to nearly $200 billion in fourth quarter of 2021.[3]

4.      Unbeknownst to investors, however, the Company suffered from significant governance and risk control defects in the years leading into and throughout the Relevant Period.  As the Federal Reserve would describe it, SVB "failed to establish a risk-management and control infrastructure suitable for the size and complexity of SVB[] when it was a $50 billion firm, *let*

---

[3]   SVB's fiscal year ("FY") runs concurrent with the calendar year.  Thus, the first quarter ("Q1") of a fiscal year comprises the three months ended March 31 of the calendar year, the second quarter ("Q2") comprises the three months ended June 30, the third quarter ("Q3") comprises the three months ended September 30, and the fourth quarter ("Q4") comprises the three months ended December 31.

1   *alone* when it grew to be a $200 billion firm."[4]   SVB did not have a credible line of defense

2   framework, the *sine qua non* of risk management for any banking organization, nor did it have in

3   place up-to-date plans for contingency funding in times of stress or policies for managing interest

4   rate risk.   Indeed, in violation of federal regulations, SVB operated for most of 2022 without a

5   Chief Risk Officer, the executive who is primarily responsible for risk management.   As a result,

6   oversight of and challenges to SVB management during the Relevant Period were virtually

7   nonexistent.

8        5.       Unchecked and unchallenged, Becker and Defendant Daniel J. Beck ("Beck")

9   (together, the "Officer Defendants") implemented increasingly risky strategies to boost SVB's

10   income and returns and, by extension, their own compensation.   Typically, a bank earns its income

11   by making loans to its clients.   But the Bank's cash-flush clients were not taking loans, and the

12   Bank's lending activity fell markedly behind its deposit growth.   Instead, SVB dumped tens of

13   billions of dollars into its securities portfolio.   So, in order to earn a (marginally) higher yield, the

14   Officer Defendants bet the Bank by locking the vast majority of those investments in long-dated

15   (10+ year) debt securities that the Company classified as held-to-maturity ("HTM").   By

16   classifying over $90 billion of SVB's investments as held-to-maturity, Becker and Beck inherently

17   – and misleadingly – confirmed that SVB had appropriate risk controls in place to allow them to

18   reliably and accurately confirm that the Company had both the positive intent and ability to hold

19   *all* HTM securities to maturity.

20        6.       In truth, and unknown to depositors and investors alike, SVB had neither.   In

21   addition to general risk management deficiencies, SVB suffered from several weaknesses in both

22   liquidity risk and interest rate risk management that called into serious question "the reliability of

23   [SVB's] liquidity buffer" and the adequacy of its "liquidity buffer under stress."   These included

24   that the Company was unable to generate real time (or even weekly) updates about what was

25   happening to its securities portfolio and the response of its portfolio to rising interest rates and

26   broader macroeconomic conditions.   Moreover, the Officer Defendants utilized unsupported limits

27

28   ─────────────
    [4]    Citations are omitted and emphasis is added unless otherwise noted.

1    and assumptions in SVB's models that were intended to test the Company's liquidity during times

2    of stress and exposure to interest rate increases.  As a result, SVB management could not reliably

3    and accurately assess whether the Company was under liquidity stress or its exposure to interest

4    rate changes.

5        7.    The Individual Defendants (defined below) were well aware of these deficiencies,

6    as the Bank's examiners had privately and repeatedly raised deficiencies in SVB's governance,

7    risk management, and liquidity to the Officer Defendants and SVB's Board of Directors ("Board")

8    in a series of meetings and reports.  Those shortcomings resulted in dozens of supervisory findings

9    identifying deficiencies relating to SVB's governance, liquidity, and interest rate risk management

10   and requiring SVB's remediation.  The Federal Reserve ultimately concluded these deficiencies

11   were "linked directly" to SVB's ultimate collapse at the end of the Relevant Period.  At the time

12   the Bank failed, SVB and the Bank had a total of 31 unresolved supervisory findings, *29* of which

13   related to capital planning, liquidity risk management, governance, and risk control deficiencies.

14       8.    Notwithstanding these systemic issues, every quarter of the Relevant Period,

15   Becker and Beck reassured investors that SVB had robust and reliable internal controls and that

16   the Company was, *inter alia*, "well equipped to manage [changing] conditions" given its "strong

17   liquid balance sheet with healthy levels of capital, recession-tested management, [and] a resilient

18   client base."  Becker and Beck also told investors repeatedly that they were "bullish" about the

19   prospect of interest rate increases, as SVB was poised to "benefit significantly from increasing

20   rates."  They confirmed that "[w]hile rising rates benefit [SVB] from a revenue perspective, they

21   also highlight the effectiveness of [SVB's] proactive interest rate risk management."

22       9.    Contrary to the Officer Defendants' representations, SVB was not "well equipped"

23   for, nor was it positioned to "benefit significantly" from, rising interest rates.  Instead, the rising

24   rate environment posed an existential risk to SVB.  Becker and Beck were aware of this, as SVB's

25   internal models provided warnings beginning in 2020 and continuing through 2022 that higher

26   interest rates would have a devastating impact on future earnings and that SVB would be short

27   billions of dollars in liquidity in the event of a stress event.  Instead of addressing the actual risks

28   facing SVB, *the Officer Defendants simply altered the models* SVB used to assess the impact of

changes in interest rates and to stress test the Company's liquidity buffer.  A former employee has confirmed that Beck pushed for the manipulation of the interest rate risk model.[5]

10.    By mid-2022, in the face of the Officer Defendants' failure to remediate dozens of known governance and risk management deficiencies, the Federal Reserve decided to, and privately informed the Officer Defendants and SVB's Board on August 17, 2022 that it would, institute an enforcement action against SVB to hold its "board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."  The planned enforcement action was driven by the "significant deficiencies in [SVB's] and the Bank's oversight by their respective boards of directors and senior management and the Firm's risk management program, information technology program, liquidity risk management program, third-party risk management program, and internal audit program."

11.    Beginning on July 21, 2022, the relevant truth began to leak into the market as SVB disclosed financial results at odds with the Officer Defendants' earlier assurances about SVB's controls around risk management, liquidity, and interest rate risk management.  Throughout the remainder of 2022, SVB's financial condition further deteriorated as the other defendants continued to correct the full scope of SVB's control deficiencies.  Ultimately, after market hours on March 8, 2023, SVB announced that, to shore up liquidity, the Company needed to both (i) sell its entire $21 billion available-for-sale securities portfolio at a staggering $1.8 billion loss; and (ii) raise an additional $2.25 billion in cash.  This further revelation of SVB's failures in controls over risk management, interest rate risk management, and liquidity prompted a run on the bank, as customers attempted to pull $42 billion worth of deposits from the Bank in a single day.  On March 9, 2023, SVB's stock price declined by over 60% before trading was halted.  After trading resumed on March 28, 2023, SVB's stock price immediately dropped 99.85%.  On March 10, 2023, with Bank deposit requests totaling $100 billion, the Federal Deposit Insurance Corporation ("FDIC") seized control of the Bank.  One week later, on March 17, 2023, SVB filed for bankruptcy.

---

[5]    *See* Daniel Gilbert, Todd C. Frankel & Joseph Menn, *Silicon Valley Bank's red model flashed red. So its executives changed it.*, Wash. Post (Apr. 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

12.     Congress, the U.S. Department of Justice ("DOJ"), the SEC, and other regulators have since commenced investigations into SVB's collapse and the Officer Defendants' insider trading.  Indeed, while SVB shares were trading at artificially inflated prices, CEO Becker and CFO Beck profited handsomely by dumping more than $35 million of their SVB stock at prices as high as $700 per share.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) because SVB's headquarters were located within this District during the Relevant Period, the statements by the Individual Defendants alleged herein to be actionable were prepared and reviewed in and disseminated from this District, and Defendants conducted substantial economic activity in this District.  As such, substantial acts in furtherance of the alleged misconduct have occurred in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

17.     Plaintiff Teachers Insurance and Annuity Association of America was founded in 1918 and is a joint stock life insurance company incorporated in New York with its headquarters in New York.  Teachers Insurance and Annuity Association of America offers traditional annuities, as well as variable annuities that invest, among other things, in real estate and in mutual funds that

1    invest in equities and fixed income investments.  CREF, a companion organization to Teachers

2    Insurance and Annuity Association of America, is a not-for-profit membership corporation

3    incorporated in New York with its principal place of business in New York.  Together, Teachers

4    Insurance and Annuity Association of America and CREF constitute a Fortune 100 financial

5    services organization that forms the principal retirement system for the nation's education and

6    research communities and one of the largest retirement systems in the world based on assets under

7    management.  As of December 31, 2022, Teachers Insurance and Annuity Association of America

8    served more than 4.7 million individuals and managed over $1.2 trillion in assets.

9           18.    Plaintiffs TIAA-CREF Investment Management, LLC, Teachers Advisors, LLC,

10   Nuveen Asset Management, LLC, and Nuveen Fund Advisors, LLC are wholly owned subsidiaries

11   of Teachers Insurance and Annuity Association of America.

12          19.    Plaintiffs CREF Equity Index Account, CREF Stock Account, Nuveen Large-Cap

13   Select Fund, CREF Global Equities Account, TIAA-CREF S&P 500 Index Fund, TIAA-CREF

14   Equity Index Fund, TIAA-CREF Growth & Income Fund, Nuveen ESG Large-Cap Value ETF,

15   Nuveen ESG Mid-Cap Growth ETF, Nuveen ESG Mid-Cap Value ETF, TIAA-CREF Life Growth

16   & Income Fund, CREF Social Choice Account, TIAA Separate Account VA-1, TIAA-CREF

17   Large-Cap Growth Index Fund, TIAA-CREF Large-Cap Value Index Fund, TIAA-CREF Social

18   Choice Low Carbon Equity Fund, and TIAA-CREF Life Social Choice Equity Fund each

19   purchased SVB common stock.  The entities listed in ¶¶18-19 are collectively referred to herein

20   as the "Exchange Act Plaintiffs."

21          20.    Plaintiffs Teachers Insurance and Annuity Association of America, CREF Social

22   Choice Account, TIAA-CREF Core Impact Bond Fund, TIAA-CREF Bond Index Fund, Nuveen

23   U.S. Core Impact Bond Fund, and Nuveen Enhanced Yield U.S. Aggregate Bond ETF each

24   purchased 1.800% Senior Notes due 2031 traceable to the January 2021 1.8% Senior Notes

25   Offering Materials in the January 2021 1.8% Senior Notes Offering (both terms defined *infra*,

26   ¶¶251 and 255).

27          21.    Plaintiffs CREF Social Choice Account, TIAA-CREF Core Plus Bond Fund, CREF

28   Core Bond Account, Nuveen Preferred & Income Opportunities Fund, Nuveen Preferred &

1  Income Securities Fund, Nuveen Preferred Securities and Income Fund, TIAA-CREF Core Impact

2  Bond Fund, Nuveen Global High Income Fund, Nuveen Multi-Asset Income Fund, Nuveen

3  Preferred and Income Fund, Nuveen Preferred and Income Term Fund, and Nuveen Tax-

4  Advantaged Total Return Strategy Fund each purchased Depositary Shares, representing 1/100th

5  ownership interest in a share of SVB Series B Non-Cumulative Perpetual Preferred Stock traceable

6  to the January 2021 Series B Depositary Shares Offering Materials in the January 2021 Series B

7  Depositary Shares Offering (both terms defined *infra*, ¶¶251 and 256).

8      22.   Plaintiffs TIAA-CREF Life Insurance Company, TIAA-CREF Core Impact Bond

9  Fund, CREF Social Choice Account, TIAA-CREF Bond Index Fund, Nuveen U.S. Core Impact

10  Bond Fund, Nuveen Enhanced Yield U.S. Aggregate Bond ETF, and Nuveen ESG U.S. Aggregate

11  Bond ETF each purchased 2.100% Senior Notes due 2028 traceable to the May 2021 2.1% Senior

12  Notes Offering Materials in the May 2021 2.1% Senior Notes Offering (both terms defined *infra*,

13  ¶¶251 and 257).

14      23.   Plaintiffs Nuveen Preferred Securities and Income Fund, Nuveen Core Plus Impact

15  Fund, Nuveen Variable Rate Preferred & Income Fund, Nuveen Preferred & Income Opportunities

16  Fund, CREF Social Choice Account, Nuveen Preferred and Income Term Fund, TIAA-CREF Core

17  Impact Bond Fund, Nuveen Multi-Asset Income Fund, TIAA-CREF Core Plus Bond Fund, and

18  Nuveen Preferred and Income Fund each purchased Depositary Shares, representing 1/100th

19  ownership interest in a share of SVB Series C Non-Cumulative Perpetual Preferred Stock traceable

20  to the May 2021 Series C Depositary Shares Offering Materials in the May 2021 Series C

21  Depositary Shares Offering (both terms defined *infra*, ¶¶251 and 258).

22      24.   Plaintiffs TIAA-CREF Bond Index Fund and Nuveen ESG U.S. Aggregate Bond

23  ETF each purchased 1.800% Senior Notes due 2026 traceable to the October 2021 1.8% Senior

24  Notes Offering Materials in the October 2021 1.8% Senior Notes Offering (both terms defined

25  *infra*, ¶¶251 and 259).

26      25.   Plaintiff Nuveen Preferred & Income Securities Fund purchased Depositary Shares,

27  representing 1/100th ownership interest in a share of SVB Series D Non-Cumulative Perpetual

28

Preferred Stock traceable to the October 2021 Series D Depositary Shares Offering Materials in the October 2021 Series D Depositary Shares Offering (both terms defined *infra*, ¶¶251 and 260).

26.     Plaintiffs Nuveen Preferred Securities and Income Fund, Nuveen Variable Rate Preferred & Income Fund, Nuveen Preferred & Income Opportunities Fund, Nuveen Preferred and Income Term Fund, and Nuveen Preferred and Income Fund each purchased Depositary Shares, representing 1/100th ownership interest in a share of SVB Series E Non-Cumulative Perpetual Preferred Stock traceable to the October 2021 Series E Depositary Shares Offering Materials in the October 2021 Series E Depositary Shares Offering (both terms defined *infra*, ¶¶251 and 261).

27.     Plaintiffs TIAA-CREF Bond Index Fund and Nuveen Enhanced Yield U.S. Aggregate Bond ETF each purchased 4.345% Senior Notes due 2028 traceable to the April 2022 Offering Materials in the April 2022 Offering (both terms defined *infra*, ¶¶251 and 262).

28.     Plaintiffs Teachers Insurance and Annuity Association of America and TIAA-CREF Bond Index Fund each purchased 4.570% Senior Notes due April 29, 2033 traceable to the April 2022 Offering Materials in the April 2022 Offering (both terms defined *infra*, ¶¶251 and 262).

29.     The entities listed in ¶¶18 and 20-28 are collectively referred to herein as the "Securities Act Plaintiffs."

30.     The Exchange Act Plaintiffs and Securities Act Plaintiffs are collectively referred to herein as "Plaintiffs."

31.     During the Relevant Period, Plaintiffs purchased SVB securities and suffered damages as a result of the securities law violations alleged herein.

**B.     Defendants**

32.     Defendant Gregory W. Becker was, throughout the Relevant Period, SVB's CEO and a member of SVB's Board.  Becker joined the Company and Bank in 1993.  As SVB's CEO, Becker routinely spoke publicly about the Company's purported controls around risk management, interest rate risk, and liquidity, as well as the Company's intent and ability to hold its HTM securities to maturity.  Becker signed and certified each of SVB's quarterly and annual SEC filings during the Relevant Period, including that they complied with Generally Accepted Accounting

1  Principles ("GAAP") and contained no material false statements or omissions.  As SVB's CEO

2  and a director on the Board, Becker had the opportunity to and did review, approve, and sign the

3  Registration Statement (defined *infra*, ¶253).  During the Relevant Period, Becker sold nearly

4  60,000 shares of SVB common stock for proceeds of nearly $30 million.

5    33.    Defendant Daniel J. Beck was, throughout the Relevant Period, SVB's CFO.  As

6  SVB's CFO, Beck also routinely spoke publicly about SVB's purported controls around risk

7  management, interest rate risk, and liquidity, as well as the Company's intent and ability to hold

8  its HTM securities to maturity.  Beck signed and certified each of SVB's quarterly and annual SEC

9  filings during the Relevant Period, including that they complied with GAAP and contained no

10 material false statements or omissions.  As SVB's CFO, Beck had the opportunity to and did

11 review, approve, and sign the Registration Statement.  During the Relevant Period, Beck sold more

12 than 12,000 shares of SVB common stock for proceeds of over $6.5 million.

13   34.    Defendants Becker and Beck are collectively referred to herein as the "Officer

14 Defendants."

15   35.    The Officer Defendants, because of their positions with the Company, possessed

16 the power and authority to control the contents of SVB's quarterly reports, shareholder letters,

17 releases, and presentations to securities analysts, money and portfolio managers, and institutional

18 investors, *i.e.*, the market.  The Officer Defendants were provided with copies of SVB's reports

19 and press releases alleged herein to be misleading prior to or shortly after their issuance and had

20 the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

21 their positions with the Company and their access to material, non-public information available to

22 them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed

23 to and were being concealed from the public, and knew that the positive representations being

24 made were then materially false.

25   36.    Defendant Karen Hon ("Hon") was, throughout the Relevant Period, SVB's Chief

26 Accounting Officer ("CAO").  As SVB's CAO, Hon had the opportunity to review and did approve

27 and sign the Registration Statement.  Hon signed SVB's Forms 10-K filed with the SEC for FY

28 2020, FY 2021, and FY 2022.

37.     Defendant Roger F. Dunbar ("Dunbar") served as the Chairman of SVB's Board during the Relevant Period until April 21, 2022.  Dunbar signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020 and FY 2021.

38.     Defendant Beverly Kay Matthews ("Matthews") served as a Director on the Board throughout the Relevant Period, and as the Chairman of the Board starting on April 21, 2022.  Matthews signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

39.     Defendant Eric A. Benhamou ("Benhamou") served as a Director on the Board throughout the Relevant Period.  Benhamou signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

40.     Defendant Elizabeth Burr ("Burr") served as a Director on the Board during the Relevant Period starting on November 8, 2021.  Burr signed SVB's Forms 10-K filed with the SEC for FY 2021 and FY 2022.

41.     Defendant John S. Clendening ("Clendening") served as a Director on the Board during the Relevant Period until April 21, 2022.  Clendening signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020 and FY 2021.

42.     Defendant Richard D. Daniels ("Daniels") served as a Director on the Board throughout the Relevant Period.  Daniels signed SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

43.     Defendant Alison Davis ("Davis") served as a Director on the Board throughout the Relevant Period.  Davis signed SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

44.     Defendant Joel P. Friedman ("Friedman") served as a Director on the Board throughout the Relevant Period.  Friedman signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

45.     Defendant Jeffrey N. Maggioncalda ("Maggioncalda") served as a Director on the Board throughout the Relevant Period.  Maggioncalda signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

46. Defendant Mary J. Miller ("Miller") served as a Director on the Board throughout the Relevant Period. Miller signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

47. Defendant Kate D. Mitchell ("Mitchell") served as a Director on the Board throughout the Relevant Period. Mitchell signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

48. Defendant John F. Robinson ("Robinson") served as a Director on the Board during the Relevant Period until April 21, 2021. Robinson signed the Registration Statement and SVB's Form 10-K filed with the SEC for FY 2020.

49. Defendant Garen K. Staglin ("Staglin") served as a Director on the Board throughout the Relevant Period. Staglin signed the Registration Statement and SVB's Forms 10-K filed with the SEC for FY 2020, FY 2021, and FY 2022.

50. Defendants Dunbar, Matthews, Benhamou, Burr, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, Robinson, and Staglin are collectively referred to herein as the "Director Defendants."

51. The Officer Defendants, Hon, and the Director Defendants are collectively referred to herein as the "Individual Defendants."

52. Defendant BofA Securities, Inc.'s ("BofA") principal executive address is One Bryant Park, New York, New York 10036. BofA underwrote more than $3.6 billion in SVB securities during the Relevant Period. BofA served as an underwriter of the following SVB offerings (defined *infra*, ¶251):

- January 2021 1.8% Senior Notes Offering;
- January 2021 Series B Depositary Shares Offering;
- May 2021 Series C Depositary Shares Offering;
- May 2021 2.1% Senior Notes Offering;
- October 2021 1.8% Senior Notes Offering;
- October 2021 Series D Depositary Shares Offering;
- October 2021 Series E Depositary Shares Offering; and

1                    •     April 2022 Offering.

2          53.    Defendant Goldman Sachs & Co. LLC's ("Goldman Sachs") principal executive

3  address is 200 West Street, New York, New York 10282.  Goldman Sachs underwrote more than

4  $1.5 billion in SVB securities during the Relevant Period.  Goldman Sachs served as an

5  underwriter of the following SVB offerings (defined *infra*, ¶251):

6                    •     January 2021 1.8% Senior Notes Offering;

7                    •     January 2021 Series B Depositary Shares Offering;

8                    •     May 2021 Series C Depositary Shares Offering;

9                    •     May 2021 2.1% Senior Notes Offering; and

10                   •     April 2022 Offering.

11         54.    Defendants BofA and Goldman Sachs are collectively referred to herein as the

12  "Underwriter Defendants."

13         55.    The Underwriter Defendants and Individual Defendants are collectively referred to

14  herein as "Defendants."

15         **C.    Relevant Non-Parties**

16         56.    Relevant Non-Party SVB Financial Group was a diversified financial services

17  company, as well as a bank holding company and a financial holding company.  SVB was

18  incorporated in the state of Delaware in March 1999 and had its principal executive offices in

19  Santa Clara, California.  On March 17, 2023, SVB filed for bankruptcy protection under Chapter

20  11 of the U.S. Bankruptcy Code.

21         57.    Relevant Non-Party Silicon Valley Bank was the Company's principal subsidiary

22  through which SVB offered commercial and private banking products and services.  Founded in

23  1983, the Bank primarily served technology and life sciences companies, venture capitalists, and

24  private equity firms.  Following its collapse, on March 26, 2023, Silicon Valley Bank was

25  purchased by First Citizens Bank.

26         58.    Relevant Non-Party SVB Securities LLC ("SVB Securities") f/k/a SVB Leerink

27  LLC, is an indirect, wholly owned subsidiary of SVB, and served as an underwriter for certain of

28  SVB's offerings.

59.     SVB, Silicon Valley Bank, and SVB Securities are not named as defendants.

**IV.     SUMMARY OF THE OFFICER DEFENDANTS' SCHEME AND WRONGFUL COURSE OF BUSINESS**

**A.     SVB's Efforts to Avoid Regulations that Would Have Prevented SVB's Collapse**

60.     Prior to its March 10, 2023 collapse, SVB operated as a diversified financial services company, bank holding company, and financial holding company.   Through its subsidiaries and divisions, SVB offered banking and financial products and services to clients across the United States and abroad in key innovation markets.   SVB's core business was commercial banking.   SVB's principal subsidiary was Silicon Valley Bank, a California state-chartered bank founded in 1983 and a member of the Federal Reserve System.   The Bank primarily catered to the technology, life science/healthcare, private equity/venture capital, and premium wine industries.   By October 2022, the Bank served nearly one-half of the venture-backed technology and life sciences companies in the United States.

61.     In 2008, the United States experienced the worst economic decline since the Great Depression.   U.S. stock markets nosedived, wiping out nearly $7 trillion in value between late 2007 and 2009, as unemployment climbed to 10% in October 2009 and Americans saw over $3 trillion of household equity disappear as home values plummeted.   In response to the Great Recession and the widespread public outrage over the role that banks and other financial institutions played in causing the economic crisis, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") was passed in 2010.   The Dodd-Frank Act was designed to address many of the problems that had contributed to the financial crisis, such as insufficient regulation of financial institutions and the lack of transparency in the financial sector. To that end, the Dodd-Frank Act imposed enhanced prudential standards to bank holding companies with $50 billion in total assets, including higher capital requirements, stress testing, and increased reporting and disclosure requirements.   These regulations were designed to enhance bank safety.

62.     These new checks on financial institutions were met with opposition from banks arguing that the regulations placed undue burdens on them and limited their ability to innovate and

1   compete, SVB chief among them.  In 2015, as SVB was approaching the $50 billion threshold,

2   Becker lobbied federal lawmakers to raise the enhanced prudential standards threshold to as high

3   as $250 billion, testifying ominously to the Senate on March 24, 2015 that the Dodd-Frank Act's

4   enhanced prudential standards would impose "significant burdens" that "reduce our ability to

5   provide the banking services our clients need."  Becker claimed that such a "significant" diversion

6   of resources would not result in "any meaningful corresponding reduction in risk."  Becker

7   justified this pronouncement by emphasizing SVB's focus on risk management even without

8   enhanced prudential standards, including that the Company had substantially invested in its risk

9   systems, hired additional risk professionals, established an independent Risk Committee, and

10   already "conduct[ed] a range of different stress tests designed to measure and predict the risks

11   associated with our business in different economic scenarios."  Thus, Becker told the Senate that

12   he believed SVB was "effectively managing the risks of our business and reasonably planning for

13   possible unfavorable future business scenarios."

14        63.     Becker's efforts were rewarded in May 2018 when the EGRRCPA was signed into

15   law – and he received a 35% pay increase.  Among other things, the EGRRCPA raised the

16   threshold for stricter bank oversight under the Dodd-Frank Act from $50 billion to Becker's

17   proposed $250 billion threshold.  However, the EGRRCPA provided the Federal Reserve with

18   discretion to apply enhanced prudential standards to bank holding companies with total assets

19   between $100 billion and $250 billion.  In October 2019, the Federal Reserve finalized a rule that

20   revised the thresholds for applying enhanced prudential standards to large domestic and foreign

21   banks and tailored the stringency of those standards based on a bank's risk profile.  Consistent

22   with the EGRRCPA, this tailoring rule raised the enhanced prudential standards threshold for

23   certain heightened standards from $50 billion in total assets to $100 billion in total assets.

24        64.     Under the new tailoring rules, the Federal Reserve established four categories by

25   which to classify financial institutions with $100 billion or more in assets.  Financial institutions

26   of the requisite size fell into one of the four classifications, known as Category I, Category II,

27   Category III, and Category IV, based on their risk profile, with Category I being the most stringent

28   and Category IV being the least.  The category to which a bank was assigned was based on several

factors, including asset size, cross-jurisdictional activity, reliance on weighted short-term wholesale funding, non-bank assets, and off-balance sheet exposure.

65. As a Category IV firm as of Q3 2022, SVB was subject to the following requirements under the tailoring rules:

- SVB's Board was required to approve, on an annual basis, and review, on a semi-annual basis, the level of risk that SVB could assume, as well as review SVB's liquidity risk policies and procedures;

- SVB's Risk Committee was required to approve SVB's contingency funding plans outlining SVB's strategy for dealing with liquidity needs during a stress event;

- SVB was required to conduct cash flow projections, implement contingency funding plans, and establish an independent review function tasked with assessing the effectiveness of its liquidity risk management framework; and

- SVB was required to conduct quarterly internal liquidity stress tests that included an overnight, 30-day, 90-day, and one-year time frame and hold a buffer of highly liquid assets to meet its projected net stressed cash flow over a 30-day period.

66. Notably, Category IV institutions were exempt from additional requirements that would have otherwise applied under the Dodd-Frank Act, including:

- Mandated performance of company-run stress tests, or Dodd-Frank Stress Tests, to determine whether the firm had sufficient capital, on a consolidated basis, to absorb losses in baseline and severely adverse economic conditions; and

- The requirement for bank holding companies with $100 billion or more in average total consolidated assets to submit to the Federal Reserve and FDIC a plan for rapid and orderly resolution in the event of material financial distress or failure.

67. In short, under this new regulatory regime, SVB was subject to less stringent standards when it reached the $100 billion threshold than would have applied to the Company prior to 2019.

**B.    The Officer Defendants Conceal Their Failure to Implement Appropriate Governance and Risk Management Frameworks**

68. Freed from the Dodd-Frank Act's oversight and capital requirements, and under the leadership of the Company's new CFO, Beck, SVB was able to grow unfettered for years in the

wake of unprecedented private equity and venture capital activity.  Its total assets doubled twice in a four-year period, from just over $50 billion at the start of 2018 to over $100 billion in 2020 and then to more than $200 billion by 2021, becoming the 16th largest bank in the United States. During this period, SVB was one of the fastest growing banks in the world, outpacing the banking industry's growth by nearly a factor of ten.

69.     From a risk perspective, this rapid growth should have been cause for concern for Defendants.  As Office of the Comptroller of the Currency guidance warns:

> Uncontrolled, rapid, or significant growth can be a sign of risk management weaknesses and can increase a bank's risk exposure, stretch the expertise of bank management, and strain the bank's resources, which, in turn, can lead to numerous and sometimes sudden bank failures as sectoral economic conditions change . . . . [6]

70.     Risk management weaknesses are a concern for any bank.  If a firm's deposits are not securely kept and its risks are not properly managed, the bank's customers can lose confidence in the bank's controls and pull their deposits.  A large number of customers withdrawing their deposits can threaten the bank's liquidity by prompting more and more of a bank's customers to withdraw their funds, resulting in a run on the bank.  To prevent such a bank run, a banking firm must establish and maintain depositor confidence that it has effective risk management, liquidity, and interest rate risk controls.

71.     The need for customer confidence was especially pointed for Silicon Valley Bank. Self-described as the "financial partner of the innovation economy," SVB's client base was concentrated in the private equity and venture capital sector, with the 25 largest depositors representing 12.6% of total deposits by the end of August 2018.  This concentration left the Company uniquely susceptible to the fluctuations in its clients' business cycles and potential volatility on short notice.

---

[6]   Office of the Comptroller of the Currency, *Examination Process: Problem Bank Supervision Version 1.0* (Sept. 2021), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/problem-bank-supervision/pub-ch-problem-bank-supervision.pdf.

72.     This concentration risk was compounded by the fact that the vast majority of the Bank's deposits were uninsured, with approximately 94% of deposits uninsured at year-end 2022.[7] In contrast, only 41% of SVB's peer banking organizations' total deposits were uninsured. Uninsured deposits are significantly volatile in times of stress and expose banks to significant flight risk, as uninsured depositors are more likely to move their cash elsewhere.

73.     The Officer Defendants were well aware of the unique risks that SVB's client and uninsured deposit base posed.  Just prior to the Relevant Period, on December 20, 2018 and March 6, 2019, Federal and California bank examiners advised SVB's management and Board, respectively, that SVB "management has not formally addressed the risk of these funding concentrations or developed a supportable level of operating cash commensurate with the variability of large depositors and operating cash needs."

74.     This unchecked deposit growth quickly pushed SVB towards the $100 billion threshold that would qualify the Bank as a large financial institution (sometimes referred to herein as "LFI") in 2021 and subject it to heightened Federal Reserve supervision.  As the Bank grew, Becker and Beck repeatedly stressed to investors that they were actively preparing for the elevation to LFI status, with Becker telling investors on April 22, 2021 that SVB had seen that coming and "started preparing for it last year," further assuring investors on July 22, 2021 that "[w]e had working groups and plans that we're building around that."

75.     Indeed, in each quarterly and annual report filed with the SEC during the Relevant Period, the Officer Defendants confirmed that SVB "ha[d] implemented a risk management framework to identify and manage our risk exposure," which they touted as "effective."  According to the Officer Defendants, this framework comprised "various processes, systems and strategies, and [wa]s designed to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks."  Quarter after quarter, Becker and Beck personally attested to the adequacy of SVB's internal

---

[7]     The FDIC insures deposits up to at least $250,000 per depositor, per FDIC-insured bank, per ownership category.  Any deposit beyond this limit is considered an uninsured deposit.

1  controls.  They also portrayed the alternative – that SVB's risk management framework was not

2  effective – as only hypothetical.  As the Officer Defendants explained it, SVB could be subject to

3  regulatory consequences "[i]f" its "risk management framework is not effective."  The Officer

4  Defendants' representations left the market with the misleading impression that SVB maintained

5  controls that were effective to manage and mitigate its risks, including specifically those related to

6  the Bank's concentration risks, rapid growth in deposits, and supervisory requirements.

7       76.     These statements were each false when made.  As the Federal Reserve would later

8  confirm in its April 28, 2023 post-mortem report following Silicon Valley Bank's failure, the

9  Officer Defendants had "failed to establish a risk-management and control infrastructure suitable

10 for the size and complexity of SVB[] when it was a $50 billion firm, let alone when it grew to be

11 a $200 billion firm."  Indeed, the Officer Defendants' utter failure to initially develop and execute

12 SVB's transition to LFI status resulted in them being required to re-do SVB's LFI transition plan

13 two years later.

14      77.     As an insured depository institution, the Bank was subject to annual examinations

15 jointly conducted by the Federal Reserve and the California Department of Business Oversight

16 (together, the "Examiners").  These examinations focused on evaluating and rating the Bank's

17 capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk.  As

18 the holding company, SVB was also subject to an annual inspection, which focused on assessing

19 the organization's overall risk management and consolidated financial condition.

20      78.     Before Q2 2021, SVB was supervised as part of the Federal Reserve's Regional

21 Banking Organization ("RBO") portfolio.  RBO supervision is reserved for U.S. banks with total

22 assets between $10 billion and $100 billion.  Once SVB reached four consecutive quarters

23 averaging $100 billion in total consolidated assets in Q2 2021, the Company was transitioned to

24 heightened supervision under the Federal Reserve's Large and Foreign Banking Organization

25 ("LFBO") portfolio.

26      79.     Even with the lower bar at the RBO level, the Examiners repeatedly flagged and so

27 advised SVB's Board and management of fundamental deficiencies in SVB's governance and risk

28 controls every year beginning in 2016, going so far as calling shortcomings with corporate

governance and internal controls "a thematic issue" in an April 13, 2020 report.  These findings were concealed from investors.

80.    Notably, leading into and throughout the Relevant Period, the Examiners found that all three of SVB's lines of defenses and SVB's Board's oversight suffered from critical weaknesses during the Relevant Period.  As its name suggests, a three lines of defense framework comprises three separate lines of defense.  The first line is responsible for designing and implementing the bank's risk controls.  A bank's management team or decision makers (*i.e.*, the Officer Defendants) are responsible for the first line.  The second line is responsible for independently evaluating the bank's risk controls and providing corporate oversight and ongoing monitoring to ensure risk exposures are within prudent risk limits.  The second line is headed up by the bank's chief risk officer and comprises functions such as Financial Risk Management and Model Risk Management.  The third line has the responsibility of objectively and independently assessing the first and second lines and reporting its findings to the bank's board of directors.  The third line serves as a critical check on the first and second line and is led by bank's internal audit department.  In addition to the three lines of defense, a bank's board of directors provides oversight of all three lines.

81.    As the Examiners confirmed, SVB's critical second line of defense was particularly lacking.  The Examiners found that SVB's Chief Risk Officer ("CRO") lacked the baseline experience needed to fulfill the role of chief risk officer, with evidence dating back to 2017 that she was not appropriately overseeing or challenging business decisions with respect to interest rate risk management.  Nevertheless, SVB permitted the CRO to hold the position for years until April 2022, after which SVB operated without a CRO for eight months, in direct violation of §252.33(b) of Regulation YY governing enhanced prudential standards.[8]  The Officer Defendants concealed from investors until March 3, 2023 that SVB lacked a CRO for much of 2022.  Retaining an inexperienced and ineffectual CRO for years and then deciding to leave the seat empty for the better part of a year left a gaping hole in SVB's already inadequate risk management systems.

---

[8]    "A bank holding company [with total consolidated assets of $50 billion or more] must appoint a chief risk officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms."  17 C.F.R. §252.33(b)(1).

82.     The Examiners' observations and findings concerning SVB's governance and risk control deficiencies, as transmitted to the Officer Defendants, only became more pointed when SVB was transitioned to the LFBO portfolio in Q2 2021.  SVB's first examinations under LFBO supervision occurred in March 2022, which examinations were specifically focused on the Board's effectiveness and SVB's risk management program.   The examinations highlighted profound weaknesses in SVB's risk management.  Following those examinations, the Examiners discussed the results with SVB management (including Becker and Beck) on May 27, 2022 and SVB's Board (of which Becker was a Director) on July 21, 2022.  The Examiners also memorialized the results in letters sent to SVB's Board on May 31, 2022 and August 27, 2022.  Thus, the Officer Defendants were well aware of their failures to design, implement, and oversee effective governance and risk management processes.  In particular:

(a)     SVB still had not designed and implemented a sound three lines of defense risk management program – despite deficiencies with the framework first being flagged four years earlier and reiterated annually.  The Examiners found that the risk management framework was not comprehensive, did not incorporate coverage for all risk stripes, did not address foundational enterprise risk management matters, and was not commensurate with SVB's size and complexity. These deficiencies had a ripple effect, undermining SVB's ability to monitor risk and resulting in policies and standards that did not clearly define ownership, reporting, escalation, and approval of risk limits.  The Examiners found that the Risk Committee was advisory in nature, did not make decisions, was not required to have charters, and did not include a clear path of escalation for all risk stripes.  The Risk Committee was criticized for relying heavily on the first line of defense – *i.e.*, Defendants Becker and Beck – for risk management decisions.  Moreover, the Examiners found the second line independent risk function to be either lacking or ineffectively using its authority and stature to challenge management and first line business units.  The second line also lacked critical leadership from SVB's CRO, who the Examiners found was ineffective and failed to "h[o]ld executive sessions" with its Risk Committee.  The deficiencies with SVB's inadequate risk management framework and policies "resulted in inconsistent core risk management activities and ultimately a reactive/patched, rather than holistic/integrated, approach to risk management."

1    Indeed, the Examiners seriously questioned SVB's "ability to self-identify internal control

2    weaknesses and manage risks proactively."

3            (b)    SVB's internal audit was also ineffective, missing several key areas relevant

4    to SVB's LFI transition and foundational risk management.  Despite indicators of deficiencies in

5    second line independent risk management, SVB's internal audit did not provide sufficient coverage

6    of this area in its 2020 or 2021 audit plans.  SVB's internal audit also failed to provide sufficient

7    information to allow the Audit Committee to fulfill its oversight responsibilities.  The Examiners

8    were particularly critical of SVB's internal audit for "exhibit[ing] a slow and reactive approach."

9            (c)    Finally, SVB's Board did not effectively oversee SVB management's

10   implementation of LFI readiness initiatives or even "the foundational risk management program

11   principles applicable for all banks, irrespective of size."  This included failing to take into

12   consideration risk management deficiencies in evaluating management's performance and

13   compensation.  The Board also failed to "adequately challenge management to provide substantive

14   updates on the effectiveness of the Firm's risk management" and, through its Audit Committee,

15   failed to "effectively challenge the [Chief Auditor] on the adequacy of [internal audit] coverage,"

16   including areas with "known weaknesses."  The Federal Reserve also found that SVB's Board

17   lacked the requisite "depth and experience," as it failed to include members with relevant large

18   financial institution risk management experience."   Ineffective Board oversight, the Federal

19   Reserve determined, directly "resulted in the Firm missing several elements of a sound three lines

20   of defense risk management program."

21           83.    The Examiners also informed the Officer Defendants that SVB failed to prepare

22   appropriate risk appetite metrics.  These metrics measure "the aggregate level and types of risk"

23   that a bank will accept to "achieve [its] strategic business objectives, consistent with applicable

24   capital, liquidity, and other requirements and constraints."[9]  The Examiners found, as stated in

25   their May 31, 2022 letter to SVB's Board, that SVB's risk management "framework d[id] not

26

27   _____

      [9]  Federal Reserve, *Large Financial Institution Rating System* (Feb. 2019),
28   https://www.federalreserve.gov/supervisionreg/srletters/SR1903a1.pdf.

1     incorporate sufficient [risk appetite] metrics for model risk, third party management risk, and

2     human capital risk," which caused significant deficiencies in SVB's risk management.[10]

3          84.     They also found that the Officer Defendants failed to set appropriate risk limits,

4     *i.e.*, "thresholds that constrain risk-taking so that the level and type of risks assumed remains

5     consistent with the firm-wide risk appetite." According to the Examiners, SVB's "program

6     framework poorly define[d] standards for setting/approving risk limits and reporting/escalating

7     internal control exceptions," which further impaired SVB's risk management.

8          85.     The Examiners summarized these results to SVB's Board and management on

9     August 17, 2022 as "thematic, root cause deficiencies related to ineffective board oversight, the

10     lack of effective challenge by the second line independent risk function, insufficient third line

11     internal audit coverage of the independent risk management function, and ineffective risk

12     reporting." While SVB's management and Board knew of these findings no later than May 27,

13     2022 and August 17, 2022, respectively, the Examiners' findings were concealed from investors

14     until April 2023 – after the Bank collapsed and SVB filed for bankruptcy.

15          86.     Because of these "thematic, root cause deficiencies," the Federal Reserve issued

16     three supervisory findings called Matters Requiring Immediate Attention (or "MRIAs") to SVB

17     on May 31, 2022, requiring the Company to address Board effectiveness, the risk management

18     program, and internal audit effectiveness. Defendants Becker and Beck received these MRIAs.

19     MRIAs are supervisory findings that are issued for matters of significant importance and urgency

20     that a banking organization must address immediately. MRIAs are reserved for the most egregious

21     types of issues, such as:

22          (1) matters that have the potential to pose significant risk to the [banking]
23          organization's safety and soundness; (2) matters that represent significant

---

24   [10]   Model risk is "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports." Federal Reserve, *Supervisory Guidance on Model Risk*

25   *Management* (Apr. 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/ sr1107a1.pdf. Third-party management risk concerns risks involved during the life cycle of third-

26   party relationships, such as planning, due diligence and third-party selection, contract negotiation, ongoing monitoring, and termination. Federal Reserve, *Agencies issue final guidance on third-*

27   *party risk management* (June 6, 2023), https://www.federalreserve.gov/newsevents/pressreleases/ bcreg20230606a.htm. And human capital risk is the gap between a firm's human capital

28   requirements and its existing workforce.

noncompliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the [banking] organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm.[11]

87.     These MRIAs advised SVB's Board that it was required to develop a plan for effective oversight of senior management and SVB's internal audit that it was required to complete comprehensive gap assessments against regulatory and industry standards for LFIs, all by August 31, 2022.  In light of the severity of the shortcomings, the Examiners informed SVB's Board on August 17, 2022 that they were initiating a non-public enforcement action "to hold SVBFG/SVB's board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."  However, SVB failed to remediate the noted deficiencies, causing the Bank's regulators to issue yet another report on December 27, 2022, which emphasized yet again the numerous "material weaknesses" with SVB's internal audit function that had existed throughout the Relevant Period.  The Bank failed before the enforcement action could commence.

**C.      The Officer Defendants Bet the Bank on Long-Duration Held-to-Maturity Securities in Order to Fuel SVB's Short-Term Profits and Their Own Compensation While Concealing Substantial Interest Rate Risk Management Deficiencies**

88.     With the surge in VC activity providing a dramatic increase in liquidity to SVB's clients, the Bank's deposits soared from $49 billion in 2018 to $175 billion by the end of 2022. This fevered growth far outstripped SVB's lending activity, and as a result, the Bank was awash with excess deposits.  As a commercial bank, Silicon Valley Bank was required to repay its customers the amount deposited, plus interest, upon the client's demand.  Because it was obligated to return deposited money, SVB accounted for deposits as balance sheet liabilities.  SVB would use its clients' deposits to fund income-producing assets, for example, making loans to other clients or investing in securities.  Such loans and investments are treated as balance sheet assets.

---

[11]   *SVB and SVB Governance and Risk Management Target Supervisory Letter* (May 21, 2022), at 2 n.2.

89.     The majority of SVB's earnings were derived from "net interest income" or "NII." NII is income generated from the difference between the interest rates received on interest-earning assets, such as loans extended to clients and securities held in SVB's fixed income securities portfolio, and the interest rates that SVB paid on interest-bearing liabilities, such as deposits and borrowings.[12]

90.     A relatively low proportion of SVB's NII was generated from its lending activity, as SVB's VC and PE clients historically did not borrow significant amounts.  Thus, SVB's loan-to-deposit ratio – a typical indicator of a bank's financial health which measures the ratio of loans a bank makes to the deposits it receives – was relatively modest compared to banking peers, which indicated the Bank was not earning as much as it could.  In the wake of the red hot VC industry in 2019-2020, the Bank's lending activity was left further behind.  As a result, SVB's loan-to-deposit ratio declined from almost 54% at year-end 2019 to below 43% at year-end 2022.

91.     In order to put new deposits to work and generate income despite loan origination failing to keep up with deposit growth, the Officer Defendants relied on another key method of income generation for banks: investment securities.  SVB's investment securities portfolio primarily consisted of: (i) an available-for-sale ("AFS") securities portfolio; (ii) a held-to-maturity securities portfolio; and (iii) a non-marketable and other equity securities portfolio.[13]  Throughout the Relevant Period, SVB's AFS and HTM securities portfolios constituted the vast majority of the investment securities portfolio.

92.     SVB's AFS and HTM portfolios both consisted of interest-earning fixed income investment securities.  These included U.S. Treasury bonds and agency-issued mortgage-backed securities.  The difference between the two debt securities portfolios was how they were treated on SVB's balance sheet.  Under Accounting Standards Codification ("ASC") 320, securities can

---

[12]   SVB also earned non-interest income, which was primarily generated from fee-based services and gains on its investments and derivative securities.

[13]   The non-marketable and other equity securities portfolio represented primarily investments managed as part of SVB's funds management business, investments in qualified affordable housing projects, and public equity securities held as a result of exercised equity warrant assets.

be treated as available for sale or held to maturity.[14]  AFS securities are typically shorter in duration and purchased with the intent to hold for some time but sell before maturity.  A bank could do so for a variety of reasons, including to reinvest at more attractive rates or to raise cash.  Given that they are typically of shorter duration, AFS debt securities typically pay a lower fixed rate, but offer the flexibility (and liquidity) of being easy to monetize in times of stress.  Because they can be sold before maturity, AFS securities are required to be reported at market value.  Thus, their book value is adjusted periodically to reflect changes in their market value, such as due to interest rate fluctuations.  In other words, as the market value of AFS securities rises (or falls), assets and book equity also rise (or fall).

93.     In contrast, HTM securities are those held with the intent and ability to hold until they mature.  Because HTM securities are intended to be held until maturity, they are accounted for at amortized cost on the balance sheet (*i.e.*, at the initial loan amount adjusted for any fees or costs, reduced by the principal payments made over time), and fluctuations in their market value do not affect book equity or a bank's regulatory capital.[15]  In contrast to gains and losses in the value of AFS securities, gains and losses on HTM securities are unrealized and do not flow through to the bank's balance sheet or equity so long as the HTM classification is maintained.  But while the HTM designation reduces the volatility of *measured* regulatory capital, it does not reduce the fundamental risks of the securities in the bank's portfolio.

94.     Because their book value does not change with fluctuations in market value, HTM securities are typically longer duration and are accompanied by higher interest rates when compared to shorter-duration AFS securities.  Thus, HTM securities tend to be more attractive than AFS securities from an income-producing perspective.  However, to qualify for HTM status, a bank must have both the positive intent ***and*** ability to hold the ***full*** HTM portfolio to maturity,

---

[14]   They can also be treated as held for trading ("HFT"), referring to securities that are intended to be sold within a short period of time.  SVB did not have any HFT securities during the Relevant Period.

[15]   Regulatory capital is the minimum level of equity that banks must hold to comply with regulatory rules.

*i.e.*, the bank cannot sell **any** portion of an HTM portfolio prior to maturity.  If any portion of an HTM securities portfolio is sold, the entire portfolio must immediately be "marked to market," or valued at current market value.  In addition, accounting rules require evaluation at each filing period of an entity's classification of its securities as held-to-maturity, with each filing constituting a new representation that the entity still has both the positive intent and ability to hold the HTM securities to maturity.  Thus, if the HTM securities had suffered large unrealized losses, selling HTM securities would require the bank to recognize those losses as well as the losses on the remaining HTM portfolio.

95.     In the low interest rate environment that fueled VC and PE activity and SVB's deposit growth, the Officer Defendants put SVB's new deposits to work via heavy investments in AFS and HTM securities.  At year-end 2018, SVB's debt investments totaled $23.8 billion, with HTM securities accounting for almost 25% of SVB's total assets.  At year-end 2021, SVB's debt investments had skyrocketed to over $125 billion, with HTM securities constituting a whopping 46% of SVB's total assets.  Thus, not only did SVB's total investments increase, but it shifted its portfolio to strongly favor longer-term HTM securities.  By year-end 2021, SVB's HTM portfolio was more than $90 billion, representing nearly 80% of SVB's debt investments at year-end 2021.  This shift to heavy reliance on long-duration HTM investments broke course with SVB's historical stance of "focus[ing] on controlling market risk by maintaining low portfolio duration."[16]

96.     Early in this shift, Becker was told by the Examiners that the growing and lengthening HTM portfolio posed significant risk to SVB's liquidity.  During a December 20, 2018 meeting with the Examiners, memorialized in a March 6, 2019 letter to SVB's Board, Becker was advised that "an increasing proportion of the investment securities portfolio has been designated as HTM to mitigate the regulatory capital implications of its extending duration."  At that time, SVB had invested only $12.7 billion in HTM securities, representing a little more than half of SVB's debt investments.  Even at those levels, the Examiners expressly warned the Officer

---

[16]   *See* March 7, 2017 Letter to Board of Directors re: Transmittal of Joint Safety and Soundness Report of Examination.

Defendants "to consider how the Bank's contingent liquidity profile could be impacted by restricted or lack of access" to funding sources in periods of severe stress.

97.     Despite these warnings and the obvious risk to liquidity posed by tying up tens of billions of dollars in long-duration securities that they were required to hold to maturity, Becker and Beck maintained in SVB's April 22, 2021 (Q1 2021) and July 22, 2021 (Q2 2021) earnings releases and on the corresponding earnings calls that the strong shift to long-duration HTM investments was justified, as those investments "protect[ed] tangible book value against fluctuations in other comprehensive income and provide[d] additional balance sheet flexibility." Indeed, the first question posed to the Officer Defendants during the Q1 2021 earnings call concerned SVB's "very large increase in the held-to-maturity securities portfolio," with securities analysts asking Becker and Beck to "talk about why [they classified the securities as] held to maturity versus available for sale." In response, Beck assured the market that the HTM securities were properly designated, and that SVB was "comfortable being able to put some of that money to work in longer duration in the held-to-maturity category."

98.     The Officer Defendants also assured investors that notwithstanding the lengthening duration of its investments, SVB's securities portfolio was still poised to benefit significantly from higher rates due to the addition of interest rate swaps. Market analysts credited these assurances. For instance, Evercore ISI and Stephens analyst reports dated April 22 and 23 2021, respectively, noted that "interest rate hikes developing slower than anticipated" represented a *risk* to SVB's performance, and an April 23, 2021 Stephens analyst report similarly opined that "[s]hould interest rates increases ultimately be slower or less impactful than expected, the Company's valuation could be pressured." An April 23, 2021 J.P. Morgan analyst report credited the Officer Defendants' actions as having "position[ed] the securities portfolio for rising rates[,]" and a BofA analyst report the same day likewise noted that SVB management took "actions to position the bond book for rising interest rates."

99.     The Officer Defendants' representations were important to the market, as regulators and market commentators alike were particularly focused on the risks associated with changes in interest rates in 2021, when interest rate increases were widely expected, and continuing into 2022

1    when the Federal Reserve began increasing rates.  In fact, just weeks before SVB's Q2 2021 call,

2    on June 16, 2021, Federal Reserve Chairman Jerome Powell gave widely reported remarks

3    regarding, among other things, future interest rate hikes.  He also discussed future action that the

4    Federal Reserve would be willing to take to combat inflation, including raising interest rates.  Beck

5    and Becker were well aware of the importance of their (mis)representations to the market,

6    acknowledging in SVB's annual reports filed with the SEC during the Relevant Period that its

7    regulators "view[ed] the adequacy and effectiveness of a bank's interest rate risk management

8    process and the level of its interest rate exposures as critical factors in the evaluation of the bank's

9    capital adequacy."

10        100.    In the short term, the maneuver to heavily invest in HTM securities bolstered SVB's

11   reported earnings.  SVB's return on equity increased from 12.4% in 2017 to more than 16% in

12   every year from 2018 through 2021, an increase of more than 25%.  The Company's stock price

13   responded accordingly, jumping from about $190 at year-end 2018 to nearly $700 by the end of

14   2021.

15        101.    However, the investment maneuver did not "protect[] tangible book value" and

16   SVB was not poised to benefit from increasing rates.  Rather, the Officer Defendants had bet the

17   Bank.  SVB's massive HTM investments at record-low interest rates ensured that SVB would not

18   be able to invest at more attractive rates as interest rates rose, pressuring NII and putting SVB's

19   equity – and solvency – at substantial risk.

20        102.    Market interest rates and bond prices generally move in opposite directions because

21   debt investors are not willing to accept the lower fixed interest payments paid by a bond in a higher

22   rate environment, thus requiring that a fixed rate bond be sold at lower prices as interest rates

23   increase.  In other words, as market interest rates rise, the price of a fixed-rate bond falls.  For

24   SVB, this would have a devastating impact.  During the Relevant Period, the fair value of SVB's

25   HTM securities fell tremendously as interest rates rose, as had been long expected.  Indeed, by the

26   end of 2022 alone, SVB's HTM portfolio lost more than $15 billion in fair value.  Without the

27   benefit of the "held-to-maturity" classification, the Officer Defendants would have been obligated

28   to recognize this $15 billion loss in SVB's financial reports.  If SVB recognized these losses at the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                              - 29 -

time, by year-end 2022, 89% of SVB common equity tier 1 capital would have been wiped out, threatening the Company's required capitalization under regulatory requirements.[17]  Recognizing the losses on these securities at the time would have also eliminated virtually all of SVB's shareholder equity, another important metric frequently used by analysts to assess a bank's financial health.

103.    Defendants were well aware of these manifest risks to SVB's solvency.  In October 2020, SVB hired BlackRock to analyze the potential impact of various risks on its securities portfolio, later expanding the directive to review SVB's risk systems, processes, and people in its treasury department, which was responsible for managing SVB's investments.  BlackRock analyzed how SVB's securities portfolios would respond to various factors, including rising interest rates and broader macroeconomic conditions, and how that would affect the Bank's capital and liquidity.  Notably, SVB selected the scenarios to be tested.  The review was completed by June 2021, and BlackRock issued its risk control report in January 2022.  Its work was presented to SVB's senior leadership.  BlackRock advised SVB that the Company lagged behind peer banks on 11 out of 11 factors considered and was "substantially below" them on 10 out of 11.  SVB rebuffed BlackRock's offer to do follow-up work.

104.    Defendants Becker and Beck's willingness to ignore these manifest risks was a direct result of SVB's compensation structure, which directly tied their ability to earn incentive compensation (and the amount thereof) to SVB's current return on equity.  In 2018, Becker and Beck were capped at incentive compensation awards amounting to 100% and 75% of their base pay, respectively.  But by 2022, that incentive compensation had increased to 225% and 150% of their base pay, respectively.  Nor was there any penalty for risk management deficiencies, as risk management issues were not meaningfully considered in SVB's incentive compensation program. In other words, the Officer Defendants were incentivized by SVB's compensation structure to take undue risks to chase short-term profitability, as there were no personal ramifications for their risk management failures.  Indeed, as *The Financial Times* explained in a March 23, 2023 investigative

---

[17]   Common equity tier 1 capital refers to the liquid holdings of a bank, such as cash and stock.

report following SVB's collapse, Beck "'usually opted' to do the opposite" when "given the option of shortening the duration of the bank's assets" because SVB's purchase of longer-term securities generated short-term yields and, thus, boosted his and Becker's compensation.  According to a former SVB employee's statement to *The Financial Times*, "'[Beck] wasn't unaware of the risk'" presented by SVB's accumulation of tens-of-billions of long-duration securities, but opted to disregard it nonetheless.

105.    The Federal Reserve made good on Chairman Powell's June 2021 remarks, raising interest rates 11 times between March 2022 and July 2023.  In this rising rate environment, SVB's core customer base of startups and VC firms were no longer able to raise money at anywhere near the rate they had been just before and during the COVID-19 pandemic.  The impact of that inability to continue to raise money resulted in SVB's customers slowing deposits into their accounts at the Bank.  At the same time, with VC activities slowing and customer liquidity faltering, customers were drawing down on their deposits to fund business operations, sparking a significant decline in deposits.

106.    Internally, SVB management discussed ideas at monthly meetings in 2022 as to how they would stem the deposit outflows, including by implementing targeted actions like pricing promotions to attract and retain deposits.  Non-interest-bearing deposits fell from $125 billion to $81 billion by 2022, the majority of which were replaced by interest-bearing deposits, which increased from $63 billion to $92 billion.  This led to a significant increase in costs that SVB had to pay on its deposits.  To shore up liquidity, SVB also had to increase its wholesale borrowing, which rose from $121 *million* in Q1 2022 to $18.4 *billion* just six months later in Q3 2022.  These increased expenses pressured SVB's interest rate spread and resulting net interest income.  Meanwhile, rising interest rates caused massive unrealized losses to SVB's HTM securities portfolio.  Thus, rising interest rates were not benefitting SVB, as the Officer Defendants publicly touted, but rather were negatively impacting the Company's deposit growth, sizeable investment portfolio, and net interest margin.

107.    In addition, rising rates were putting SVB's long-term viability at risk.  Throughout the Relevant Period, SVB utilized an Asset Liability Management Model (or "ALM Model") to

measure the impact of various interest rate movement scenarios on key interest rate risk (sometimes referred to herein as "IRR") measurements: net interest income and economic value of equity ("EVE").  In addition to being SVB's primary source of income, NII is also a key IRR metric that captures short-term exposure to interest rate movements.  In contrast, EVE represents the present value of expected cash flows on assets minus the present value of expected cash flows on liabilities, plus or minus the present value of expected cash flows on off-balance sheet instruments. [18]  EVE is often viewed as a longer-term measure of interest rate risk.  In other words, NII captures the short-term impact of interest rate shocks on earnings while EVE captures the long-term impact of rate changes on equity.

108.    From 2016 through 2018, the ALM Model indicated that both NII and EVE would benefit from a rising rate environment, *i.e.*, that both metrics were asset sensitive.  However, as SVB shifted to longer-duration HTM securities, SVB's ALM model simulated increasingly substantial risk to EVE with interest rate increases of 200 basis points ("bps").  EVE at risk with respect to a 200 bps interest rate increase jumped dramatically from -2.5% at year-end 2019 up to -27.7% at year-end 2021.  Defendants reported these raw figures, assuring investors that the model was "based on historical balance and [interest] rate observations" and that, as part of SVB's "ongoing governance structure," its "models and assumptions [we]re periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors."  They also contemporaneously represented SVB's balance sheet to be "strong" and "highly liquid."  However, the Officer Defendants concealed from investors that: (i) SVB's reported EVE at risk was calculated using unrealistic scenarios and assumptions, and (ii) even when using unrealistic scenarios and assumptions, the reported EVE at risk had for years repeatedly breached SVB's internal policy limits.

109.    Beginning in March 2022, in order to boost short-term profits, Defendants doubled down, unwinding the hedges SVB implemented in 2021 to protect its equity in a rising rate

---

[18]    Stated another way, the EVE metric is a discounted cash flow approach that estimates the present value (PV) of balance sheet cash flows to estimate economic equity (PV of assets – PV of liabilities = economic value of equity).

environment.  At the time, Beck falsely assured investors that SVB had no plans to do so in light of the "risk of short rates moving higher from here."  Despite acknowledging, "there's still, I think, a lot of risk of short rates moving higher from here," SVB unwound ***all*** of the hedges by June 2022, while misleadingly spinning the move as a positive development that yielded millions in short-term profits despite the rising rate environment:

In truth, according to the Federal Reserve in a September 25, 2023 report, the removal of these interest rate hedges was a "red flag" of SVB's defective risk management practices.  By removing the hedges, SVB caused the EVE metric to worsen in upward rate shock scenarios throughout 2022, even as Beck reassured investors on July 21, 2022 that "I think we're still well positioned to the upside for higher rates."

110.    Unknown to investors at the time, SVB's interest rate risk management "exhibited many weaknesses" throughout the Relevant Period – a fact that the Federal Reserve told the Officer Defendants privately, but that they kept well hidden from investors.  SVB's interest rate risk policy was the Company's governing policy for IRR management and measurement.  This policy, however, did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, model back-testing requirements, how limits were set and calibrated, or ongoing reporting requirements for threshold breaches over prolonged periods.  Moreover, as

1   BlackRock determined and reported to SVB, SVB was unable to generate real time or even weekly

2   updates about what was happening to its securities portfolio.

3       111.    In addition, SVB's touted ALM Model failed to include basic and fundamental

4   components.  For example:

5       (a)    SVB's model had limited sensitivity testing that modeled only parallel

6   interest rate curve changes, leaving untested the sensitivity of the portfolio to different movements

7   in the shape of the yield curve.  This meant that SVB modeled only economic conditions where

8   the interest rate for all of its securities changed by the same number of basis points at the same

9   time, as opposed to realistic conditions where yields across different maturities shifted by different

10   amounts.  This unrealistic testing did not capture "the sensitivity of the portfolio to different

11   movements in the shape of the yield curve."[19]

12       (b)    SVB's interest rate risk modeling also "only used the most basic [interest

13   rate risk] measurement," net interest income.[20]  As a result, SVB's interest rate risk modeling

14   "ignored potential longer-term negative impacts to earnings highlighted by the EVE metric,"[21]

15   which provided a longer-term view of interest rate risk by estimating the present value of balance

16   sheet cash flows.  SVB's approach of using only the "most basic measurement" for interest rate

17   modeling ignored, among other things, that SVB's assets would decrease in value as interest rates

18   increased.

19       112.    Notwithstanding these fundamental risk management defects known by the Officer

20   Defendants, as the Federal Reserve has explained, "since at least 2018," it was "not apparent that

21   [SVB's model] limits had been reviewed for potential recalibration or that the current level of the

22   limits had been supported," and SVB's "policies" failed even to define "how limits [for its interest

---

[19]   Federal Reserve, *Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank* (Apr. 28, 2023), at 62, https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf (the "April 2023 Federal Reserve Report").

[20]   *Id.*

[21]   *Id.* at 61.

rate risk models] were set and calibrated."[22]  In other words, SVB failed to review its model limits for at least the five years leading up to the Bank's collapse.  This failure was particularly egregious, given SVB's dramatic growth in total assets and HTM securities between 2018 and 2023, which materially impacted SVB's exposure to interest rate risk.  Thus, the Officer Defendants' repeated assurances to investors throughout the Relevant Period were misleading, as, with regard to interest rate risk, Becker and Beck did not "monitor[] on an ongoing basis" "[r]elevant metrics and guidelines," and did not "review our interest rate risk position and sensitivity to market interest rates regularly."

113.    Rather than address or report SVB's actual financial position, in April 2022 the Officer Defendants simply manipulated SVB's ALM Model to manufacture a reduced risk calculation.  This change assumed (without support) that cash flow from deposits would stay consistent for longer, which artificially decreased the negative impact of projected interest rate hikes on EVE.  That is, "the change reduced the mismatch of durations between assets and liabilities and gave the appearance of reduced IRR; however, no risk had been taken off the balance sheet."[23]  This change substantially reduced the simulated EVE at risk, as evidenced by SVB's reporting of EVE at risk as of December 31, 2021.  Before the change, SVB reported in its Q1 2022 Form 10-Q that EVE at risk resulting from a 200 bps hike as -27.7%:

| (Dollars in millions) | Estimated EVE | Estimated Increase/(Decrease) in EVE | | Estimated NII | Estimated Increase/(Decrease) in NII | |
|---|---|---|---|---|---|---|
| | | Amount | Percent | | Amount | Percent |
| **March 31, 2022:** | | | | | | |
| +200 | $ 12,380 | $ (5,401) | (30.4) % | $ 5,777 | $ 1,004 | 21.0 % |
| +100 | 14,863 | (2,918) | (16.4) | 5,262 | 489 | 10.2 |
| - | 17,781 | - | - | 4,773 | - | - |
| -100 | 20,621 | 2,840 | 16.0 | 4,378 | (395) | (8.3) |
| -200 | 22,392 | 4,611 | 25.9 | 4,287 | (486) | (10.2) |
| | | | | | | |
| **December 31, 2021:** | | | | | | |
| +200 | $ 14,950 | $ (5,722) | (27.7) % | $ 5,258 | $ 981 | 22.9 % |
| +100 | 17,799 | (2,873) | (13.9) | 4,745 | 468 | 10.9 |
| - | 20,672 | - | - | 4,277 | - | - |
| -100 | 21,904 | 1,232 | 6.0 | 4,002 | (275) | (6.4) |
| -200 | 21,308 | 636 | 3.1 | 3,911 | (366) | (8.6) |

---

[22]  *Id.* at 62.  Model limits articulate and control for the amount of interest rate risk acceptable to a firm and take into account the size, complexity, and financial condition of the organization.

[23]  *Id.* at 63.

114.    After the assumption alteration, this risk was reduced six-fold to -4.2% (as reported in SVB's August 8, 2022 Q2 2022 Form 10-Q):

| (Dollars in millions) | Estimated EVE | Estimated Increase/(Decrease) in EVE | | | | Estimated NII | Estimated Increase/(Decrease) in NII | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Amount | | Percent | | | Amount | | Percent |
| **June 30, 2022:** | | | | | | | | | |
| +200 | $ 15,320 | $ | (4,542) | (22.9) | % | $ 6,381 | $ | 760 | 13.5 % |
| +100 | 17,339 | | (2,523) | (12.7) | | 6,000 | | 379 | 6.7 |
| - | 19,862 | | - | - | | 5,621 | | - | - |
| -100 | 22,347 | | 2,485 | 12.5 | | 5,047 | | (574) | (10.2) |
| -200 | 23,923 | | 4,061 | 20.4 | | 4,482 | | (1,139) | (20.3) |
| **December 31, 2021:** | | | | | | | | | |
| +200 | $ 24,476 | $ | (1,073) | (4.2) | % | $ 5,258 | $ | 981 | 22.9 % |
| +100 | 25,140 | | (409) | (1.6) | | 4,745 | | 468 | 10.9 |
| - | 25,549 | | - | - | | 4,277 | | - | - |
| -100 | 24,042 | | (1,507) | (5.9) | | 4,002 | | (275) | (6.4) |
| -200 | 21,410 | | (4,139) | (16.2) | | 3,911 | | (366) | (8.6) |

115.    Externally, the Individual Defendants assured investors that SVB's ALM Model, its assumptions, and its results were grounded in fact, "based on historical balance and rate observations" and that "the underlying models and assumptions are subject to regular performance testing and calibration" to ensure that the models "are representative of our understanding of existing behaviors."  Indeed, at the time of the manipulation, the Officer Defendants asserted in the May 6, 2022 Q1 2022 Form 10-Q that "the underlying models and assumptions" were not just truthful and accurate, but were "subject to regular performance testing and recalibration."  After the manipulation was implemented, Becker and Beck claimed in the August 8, 2022 Q2 2022 Form 10-Q that the resultant reduction in EVE risk was "[c]onsistent with our expectations."

116.    In truth, the assumption change was "***unsubstantiated*** given recent deposit growth, lack of historical data, rapid increases in rates that shorten deposit duration, and the uniqueness of SVB[]'s client base."[24]  And in fact, SVB's internal audit – the supposed third line of defense in SVB's risk management framework – had itself identified serious deficiencies in the Bank's models, including findings related to incorrect data inputs, inadequate governance of interest rate risk models, and inaccurate NII position dating back to December 2020.  On November 15, 2022, the Examiners confirmed to the Officer Defendants that SVB's Asset Liability Management Model simulations were "unreliable" and forecasting results that were "directionally inconsistent with

---

[24]  *Id.* at 63.

1  internal projections."  According to a former employee, as reported by *The Washington Post* on

2  April 2, 2023, Beck pushed for this manipulation.  The change temporarily relieved the modeled

3  EVE at risk, bringing the risk back within SVB's inner limit:



Note: Data as of October 2022.
Source: SVBFG internal material, December 16, 2022.

117.    But this artifice did nothing to actually address SVB's massive unrealized losses

and risk posed to EVE at a 200 bps rate hike.  Thus, even with the manipulated metric, SVB's

situation continued to deteriorate, and EVE at risk at a 2% interest rate hike plummeted to -29.5%

in Q3 2022.  SVB thereafter ***stopped reporting the EVE metric altogether***, instead showing in its

February 24, 2023 FY 2022 Form 10-K – filed with the SEC on February 24, 2023, less than two

weeks before the Bank's collapse – only that rising rates would ***benefit*** NII (and SVB's earnings).

### D.    The Officer Defendants Manipulate Additional Modeling Assumptions to Conceal SVB's Rapidly Deteriorating Liquidity

118.    For each quarter of the Relevant Period, the Officer Defendants maintained that

they "regularly assess[ed] the amount and likelihood of projected funding requirements" and

"routinely conduct[ed] liquidity stress testing as part of our liquidity management practices."  As

the Federal Reserve Bank has explained, banks "are especially sensitive to funding liquidity risk"

and, accordingly, it is crucial that "senior management is responsible for developing and

implementing a liquidity risk management strategy."[25]  SVB's outside auditor has likewise acknowledged that "liquidity and funding risks are one of the fundamental categories of risk facing any bank."[26]

119.    Effective liquidity management is necessary to ensure that a bank has funds available to pay its depositors in a timely manner.  Poor liquidity management may lead to unnecessary costs and disruption, including by forcing a bank to quickly raise capital or hastily sell its assets at substantial losses.  Worse yet, a bank's poor liquidity management – once publicly known – may cause depositors to make simultaneous and substantial withdrawals of their deposits, triggering a bank run.

120.    Contrary to the Officer Defendants' representations, and as the Federal Reserve would later confirm, SVB's "liquidity risk-management practices were fundamentally flawed across multiple standards and were a direct contributing factor to SVB[]'s failure."[27]  Just prior to being transitioned to the LFBO portfolio, the Bank was subjected to its annual examination by the Bank's examiners from November 30, 2020 through December 17, 2020.  The Officer Defendants were informed of the results of that examination on February 4, 2021.  Notably, the Examiners found, and so informed the Officer Defendants, that SVB's "liquidity stress test time horizons do not currently provide short term insight into the interim of one to 30 days," meaning that they did not provide information concerning periods 30 days or less.

121.    SVB attained a four-consecutive-quarter average of $100 billion in total consolidated assets in Q2 2021, thereby subjecting SVB to enhanced prudential standards and officially transitioning it to the LFBO portfolio.  The Federal Reserve examiners started a liquidity target examination of SVB in August 2021, the results of which were discussed with SVB

---

[25]  Federal Reserve Bank of San Francisco, *What is Liquidity Risk?* (Oct. 24, 2008), https://www.frbsf.org/economic-research/publications/economic-letter/2008/october/liquidity-risk/.

[26]  KPMG, *Liquidity & funding risks: Turbulent times* (Apr. 2023), https://kpmg.com/xx/en/home/insights/2023/03/liquidity-and-funding-risks-turbulent-times.html.

[27]  April 23 Federal Reserve Report at 52.

management on October 22, 2021 and memorialized in a letter to Becker dated November 2, 2021. The examination confirmed "foundational shortcomings" at SVB in key areas, such as internal liquidity stress testing, liquidity limits framework, and contingency funding plans, and determined that SVB's liquidity risk management practices were inadequate.  In particular:

        (a)    SVB's internal liquidity stress testing did "not adequately address both market and idiosyncratic risks," did "not sufficiently stress [SVB]'s liquidity exposures," and did "not reflect a forward-looking assessment of the firm's risk."  Worst yet, the key assumptions underlying SVB's stress tests were based on "incomparable peer benchmarks," consisting of retail deposit banks that (unlike SVB) were subject to FDIC insurance coverage.  Additionally, SVB's stress tests lacked the "velocity and severity of stress factors" necessary to properly analyze liquidity stress "over the shorter time horizons of a defined liquidity event."  SVB's liquidity stress tests also improperly assumed that all of the Bank's deposits would behave similarly under stress, which the Federal Reserve determined – with prescience – was "unrealistic" and "understate[d] outflows under stress."  Indeed, the Examiners noted that the Officer Defendants themselves "acknowledged the outflows of its commercial deposits would vary in stress."

        (b)    SVB's contingency funding plan (sometimes referred to herein as "CFP") improperly lacked: a "projection and evaluation of expected funding needs and funding capacity" during a stress event; "a realistic assessment" of how contingency fund sources "would behave under stress"; and a means to accurately identify the amounts of contingent funding actually available, including by improperly assuming more funding from certain sources was available. The CFP also failed to tailor early warning indicators for SVB's contingency funding plan to the Company's specific liquidity risk profile.[28]  This included SVB's failure to account for its billions of unfunded loan commitments (contractual obligations made by SVB to customers for future funding) or its concentration of private equity and venture capital clients.  The Examiners warned the Officer Defendants that the weaknesses in SVB's contingency funding plan "negatively

---

[28]   "Early warning indicators" are the alert mechanisms that activate a bank's contingency funding plan in stress scenarios.

1  affect[ed] management's ability to assess whether the firm is under liquidity stress, what funding

2  is available in varying levels of stress, and its ability to respond quickly to a real stress event."

3          (c)     The Examiners also found, and so advised the Officer Defendants, that SVB

4  suffered from a host of weaknesses in liquidity risk management controls, including that: SVB's

5  governance and controls did not "clearly link[]" to liquidity risk management; SVB did not

6  prioritize model risk management for liquidity; SVB's liquidity risk model used an inappropriate

7  time horizon and improper data sources and scenarios; and SVB's internal audit failed to review

8  SVB's contingency funding plan since 2019, despite significant changes in SVB's liquidity risk

9  profile.

10       122.    The Examiners confirmed that the weaknesses identified indicated that SVB's

11  liquidity risk management project plan to meet enhanced prudential standards was inadequate and

12  that SVB's independent review functions did not provide effective oversight.  These deficiencies

13  resulted in the issuance of two MRIAs and four MRAs on November 2, 2021.  Among other things,

14  these citations required the Officer Defendants to enhance the Bank's internal liquidity stress

15  testing scenario design.  The Federal Reserve cautioned that, as a result of these deficiencies, the

16  Bank's current internal liquidity stress testing did "not sufficiently stress SVB[]'s liquidity

17  exposures" and that "[w]ithout sufficiently designed assumptions and scenarios, the firm's

18  liquidity buffer under stress may be insufficient."  While these warnings and supervisory findings

19  were known to the Officer Defendants, they were concealed from investors.

20       123.    SVB revised its internal liquidity stress testing (sometimes referred to herein as

21  "ILST") in Q3 2022, and the results were damning.  Pursuant to Regulation YY, SVB was required

22  to maintain a 30-day liquidity buffer based on ILST results.  But the updated ILST confirmed that

23  SVB had a $12 billion deficit at the 30-day mark:

24

25

26

27

28

*Cumulative Liquidity Impacts as of May 31, 2022*[2]

| Scenario | Combined Scenario | | | |
|---|---|---|---|---|
| Time Horizon | O/N | D30 | D90 | 1Y |
| Inflows | $23B | $67B | $113B | $114B |
| Outflows | $8B | $79B | $116B | $111B |
| Net Impact (Operational Shortfall) | $14B | $(12)B | $(4)B[3] | $4B |

124.    SVB downplayed that the 30-day deficit was a mere "operational shortfall," meaning that SVB had the liquidity but a shortfall arose from deficiencies in SVB's contingent funding options and current capabilities for executing those options.  In contrast, the 90-day deficit of $4 billion was a "real shortfall," meaning that SVB did not have sufficient liquidity to meet the projected outflows.  Despite these alarming results, the Officer Defendants concealed SVB's liquidity deficits while publicly representing the artifice of ample liquidity, with Beck unequivocally announcing on July 21, 2022 that SVB had "no intention" of liquidating the debt investments in light of "the overall liquidity of the balance sheet":

[Christopher Edward McGratty Keefe, Bruyette, & Woods, Inc., Research Division – Head of United States Bank Research & MD:] Okay.  Great.  And then maybe my follow-up would be, you guys moved your bond portfolio to held to maturity a lot sooner than others in protected book.  Can you walk me through a scenario where you would have to or be allowed to reverse that?  And if so, I assume there will be a mark on that?

[Beck:] Yes, Chris, we have no expectation or intention of doing that.  If we take a look just as the overall liquidity of the balance sheet, we're in a really solid position.  So no intention to do it.

125.    As clients' cash burn continued to erode deposits in Q3 2022, SVB's internal liquidity stress test shortfalls also increased.  As of July 31, 2022, the models showed a shortfall of approximately $18 billion for the 30-day point at August 31, 2022 and approximately $23 billion for the 90-day point at September 30, 2022.

126.    But even these multi-billion dollar deficits were understated.  At the time of the Bank's failure, the Federal Reserve was in the midst of an annual horizontal liquidity review, which would evaluate the adequacy of liquidity positions and the effectiveness of liquidity risk

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 41

management practices and liquidity stress testing on the largest financial institutions.  During that assessment, the Federal Reserve supervisors uncovered that SVB had used unsupported deposit outflow speed assumptions in its ILST, assuming without basis that a material portion of deposit outflows during a stress event would not occur until days 31-90.  This assumption was particularly unreasonable given that the vast majority of the Bank's deposits were uninsured, with approximately 94% of deposits uninsured at year-end 2022.  Uninsured deposits are significantly volatile in times of stress and expose banks to significant flight risk, as uninsured depositors are more likely to move their cash elsewhere.  If additional outflows from days 31-90 were included inside 30 days, as they should have been, SVB's 30-day deficit would have been up to ***an additional $27 billion***.

127.    Rather than work to actually address the liquidity position, SVB stuck with its playbook and simply manipulated the modeling assumptions in SVB's internal liquidity stress test in October 2022 by using what the Federal Reserve has described as "materially less-conservative" methodologies relating to unfunded lending commitments and intraday liquidity.[29]  By doing so, SVB manufactured a superficial reduction of the modeled liquidity shortfalls by approximately $8 billion and $5 billion, respectively.  As the Federal Reserve put it in its April 2023 report: "***Changing model assumptions, rather than improving the actual liquidity position, is not an appropriate way to restore compliance with limits***."[30]

**E.  The Officer Defendants Caused SVB to Misclassify Tens of Billions of Dollars in Investment Securities as Held-to-Maturity in Violation of Generally Accepted Accounting Principles**

128.    As discussed *supra*, the Officer Defendants designated more than $90 billion of SVB's investment securities as "held-to-maturity," which comprised a remarkable 75% of its total investment securities portfolio and 46% of its total assets.  This concentration and classification of long-term investments far exceeded any of SVB's peers.  For instance, in 2022, SVB's HTM portfolio as a percentage of its total securities portfolio was nearly three times that of the average

---

[29]   April 2023 Federal Reserve Report at 58.

[30]   *Id.*

large banking organization.  When represented as a percentage of its total assets, the size of SVB's HTM portfolio was quadruple the average.

129.    It was critical that the Officer Defendants' classifications of SVB's investment debt securities complied with GAAP.  If they did not comply, SVB would have been required to account for the securities at fair value and recognize the nearly $15 billion in losses that its HTM securities incurred by year-end 2022, wiping out almost 90% of SVB's tier-1 capital.

130.    Unbeknownst to investors, the Officer Defendants' classification of SVB's long-duration securities portfolio as held-to-maturity was improper and violated GAAP.  GAAP are the official standards for accounting, and are accepted by the SEC and recognized by the accounting profession as promulgating the conventions, rules, and procedures constituting accepted accounting practices at a particular time.  Financial statements that are not prepared according to GAAP "will be presumed to be misleading or inaccurate."[31]

131.    GAAP ordinarily requires the recognition and reporting of assets at their current value.  This general rule of reporting assets at present market value applies to AFS securities.  But as to HTM securities, GAAP provides a narrow exception, permitting such securities to be recognized and reported at amortized cost, rather than fair value.[32]  Thus, gains and losses in the fair value of HTM-designated investments do not impact a company's book equity.

132.    Given the favorable treatment under the HTM exception, the exception is narrow and "highly restrictive" by design, "result[ing] in relatively few debt securities being classified in this category."[33]  To qualify for the HTM designation, a banking firm "must be justified for each

---

[31]  17 C.F.R. §210.4-01(a)(1).

[32]  ASC 320-10.

[33]  Ernst & Young LLP ("EY"), *Financial Reporting Developments, A Comprehensive Guide: Certain Investments in Debt and Equity Securities* (May 2023), at 19, https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---certain-investments-in-debt-a ("EY Guide"); PricewaterhouseCoopers ("PwC"), *Loans and Investments Guide* (Sept. 2022), §3.3.1, https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/loans_an d_investment/loans_and_investment_US/chapter_3_accounting__1_US/33_classification_of_US .html ("PwC Guide").

investment in a debt security."[34]  As to each, the bank must have both the positive intent **and** ability to hold the securities to maturity.  The test for the intent element "is distinct from [a] mere absence of an intent to sell," and a bank's basis for classifying its securities as HTM must be assessed at acquisition and re-assessed each financial reporting period.[35]  As to the ability element, the HTM classification is only appropriate if the bank can reliably determine that its HTM securities will not need to be "available to be sold in response to . . . [c]hanges in market interest rates and related changes in the security's prepayment risk," and "[n]eeds for liquidity."[36]  "[I]f an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would not be appropriate," and the bank is required to assess whether relevant facts and circumstances have changed since its last financial statement.  As accounting firm EY has explained, one ramification of these stringent requirements is that "entities that use an active asset-liability management program to manage interest rate risk will find it difficult to classify securities as held to maturity if those securities are subject to sale to satisfy the objectives of the asset-liability program."[37]

133.    Thus, SVB was permitted to classify securities as HTM only if it had reliable evidentiary support that it was in fact able to hold the securities in the HTM portfolio for their full duration.  To make this determination, SVB was required by GAAP to ensure that its designation of securities as HTM was "consistent with its investment strategies, liquidity projections, capital adequacy, tax planning strategies, asset/liability management strategies, etc."[38]  This determination requires evaluation of several sources of information, including "board and investment committee

---

[34]  ASC 320-10-25-3; KPMG, *Investments Handbook* (Sept. 2022), at 109, https://frv.kpmg.us/reference-library/2022/handbook-investments.html (Sept. 2022), ("KPMG Guide").

[35]  ASC 320-10-25-3.

[36]  ASC 320-10-25-4.

[37]  EY Guide at 22.

[38]  KPMG Guide at 138.

1  resolutions," "regulatory capital requirements," and "operating and cash flow projections."[39]  As

2  the accounting firm PwC has explained, an entity's "intent and ability to hold a debt security to

3  maturity is typically evidenced through . . . projections of liquidity and capital adequacy," among

4  other things.[40]

5       134.    By classifying its investment securities as held-to-maturity, the Officer Defendants

6  inherently represented that SVB possessed effective and reliable liquidity risk management and

7  controls that allowed them to reliably and accurately conclude that SVB had sufficient alternative

8  liquidity sources such that it in fact had the positive intent and ability to hold its $90+ billion in

9  HTM securities until maturity.  But as described *supra*, throughout the Relevant Period, the Officer

10  Defendants could not – and did not – reliably establish, as GAAP requires, that SVB possessed the

11  requisite positive intent and ability to hold to maturity the massive debt securities portfolio that

12  they classified as held-to-maturity.  As a result, the Officer Defendants falsely reported SVB's

13  financial performance, including by overstating the value of SVB's HTM securities, understating

14  losses to SVB's accumulated other comprehensive income ("AOCI"), and artificially inflating

15  SVB's stockholder equity.

16       135.    As the Examiners found and so informed the Officer Defendants, SVB did not have

17  internal controls in place to assess whether SVB could in fact hold its HTM securities to maturity.

18  The lack of such internal controls prevented SVB from reliably determining its liquidity needs

19  and, thus, ensuring that it could hold its $90+ billion in HTM securities to maturity.

20       136.    SVB also lacked the controls necessary for reliable "liquidity projections" and

21  assessments of its "need for liquidity."  Therefore, the Officer Defendants did not have the ability

22  to reliably and accurately determine with evidentiary support that SVB's multi-billion dollar

23  investments would not need to be "available to be sold in response to . . . [n]eeds for liquidity," as

24  required by GAAP.  In particular:

25

26

---

[39]  *Id.* at 109.

[40]  PwC Guide, §3.3.1.

(a)     SVB suffered from several weaknesses in its liquidity risk management, calling into serious question "the reliability of [SVB's] liquidity buffer" and the adequacy of its "liquidity buffer under stress."

(b)     SVB's internal liquidity stress testing was inadequate and did not sufficiently stress SVB's liquidity exposure.  Additionally, SVB's ILST utilized unreliable and deficient key assumptions that were not appropriate for the Company.

(c)     SVB's liquidity risk limits and supporting processes were insufficient in light of SVB's size and complexities of activities.  The measures that the Company used "d[id] not reflect correlations or stress outcomes."

(d)     SVB's contingency funding plan was ineffective, including because it failed to assess potential funding sources and needs in stress, did not sufficiently test potential funding sources, and utilized unrealistic assumptions concerning available funding resources.  As a result, the Officer Defendants could not: reliably assess whether SVB was under liquidity stress; determine the funding available in varying levels of stress; or respond quickly to a stress event.

137.    The Officer Defendants did not have sufficient evidence that the investment securities would not need to be "available to be sold in response to . . . [c]hanges in market interest rates,"[41] as SVB lacked the controls necessary to reliably assess and manage its exposure to interest rate changes.  As discussed *supra*, SVB was unable to generate real time or weekly updates about what was happening to its securities portfolio and the response of its portfolio to rising interest rates and broader macroeconomic conditions.  SVB suffered from several weaknesses that made its interest rate risk management "not reliable,"[42] including:

(a)     SVB's interest rate risk policy did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, articulate model back-testing

---

[41]   ASC 320-10-25-4.

[42]   November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Becker and Beck (SVB 2022 CAMELS Examination Supervisory Letter).

requirements, or the ongoing reporting requirements for threshold breaches over prolonged periods; and did not describe how limits were set and calibrated;

        (b)    interest rate risk limits had not been reviewed for potential recalibration or that the current level of the limits had been supported since at least 2018;

        (c)    SVB failed to appropriately design an interest rate risk model;

        (d)    the Officer Defendants manipulated the ALM Model's assumptions to artificially reduce the modeled risk in response to such breaches; and

        (e)    SVB failed to assess the impact of changes in interest rates on its liquidity stress testing.

138. The long duration of SVB's HTM securities further compounded the known weaknesses in SVB's controls around liquidity and interest rate risk. Prior to the Relevant Period, SVB controlled market risk by investing in short-duration securities. But by year-end 2022, SVB's total HTM portfolio had a weighted average duration of 6.2 years, more than double the weighted average duration of SVB's investments portfolio at year-end 2017 when it was 3.0 years. This made it even more critical for the Officer Defendants to reliably establish SVB's ability to hold its securities to maturity, while simultaneously exacerbating SVB's inability to do so in light of the Company's rampant control weaknesses.

**F.**    **As the Relevant Truth About the Financial Impact of SVB's Deficient Governance and Risk Controls Was Revealed, Investors Suffer Substantial Damages**

139. The relevant truth began to emerge on July 21, 2022 when the Officer Defendants reported significant net losses and lowered SVB's estimated net interest income. The Officer Defendants attributed these reductions on the Q2 2022 conference call that day to "unprecedented Fed tightening" of interest rates. This disclosure surprised the market because the Officer Defendants had repeatedly represented that SVB had effective controls and modeling in place around interest rate risk, and that rising interest rates would "benefit" SVB. Following this news, the price of SVB stock fell $74.81 per share, more than 17%, from a close of $436.17 per share on July 21, 2022, to close at $361.36 per share on July 22, 2022.

140.     SVB's disclosure, however, did not fully reveal the relevant truth concealed by the Officer Defendants' misleading statements and omissions.  The Officer Defendants continued to make false statements and conceal additional facts concerning SVB's control deficiencies and precarious state.  Indeed, Becker falsely reassured investors by opening SVB's earnings call that day touting SVB's "ample liquidity and strong capital" and emphasizing that the Company's financial results announced that day did not "change our view" of SVB.  And when questioned about SVB's designation of nearly $96 billion in securities as held-to-maturity, Beck steadfastly assured investors that "we have no expectation or intention of [selling].  If we take a look just a[t] the overall liquidity of the balance sheet, we're in a really solid position.  So no intention to do it."

141.     These false assurances gave investors the misleading impression that SVB had sufficient liquidity and risk management and could reliably determine that they could hold the $96 billion in HTM securities through their maturity dates.  Unknown to investors at the time, the Federal Reserve continued to identify weaknesses in SVB's controls, including **on the same day** that the Officer Defendants held their July 21, 2022 conference call.  That day, the Federal Reserve communicated to  SVB's Board, including Becker, that, "[i]n the time leading up to SVB crossing the $100 billion consolidated assets threshold, [SVB] experienced significant growth but did not maintain a risk management function commensurate with the growing size and complexity of the firm."

142.     On October 20, 2022, the Officer Defendants again announced disappointing financial results and the need to reduce further SVB's 2022 financial estimates, driven by the impact of increased interest rates.  Following this news, the price of SVB common stock plummeted $72.43 per share, or approximately 24%, from a close of $302.46 per share on October 20, 2022, to close at $230.03 per share on October 21, 2022.  The market was again surprised by this news, as the Officer Defendants had repeatedly asserted they had the effective controls and modeling in place such that they fully understood interest rate risk and the impact of changing rates on SVB's finances.

143.     The Officer Defendants blunted the impact of the disclosures with additional false representations regarding the strength of SVB's risk management.  In the same press release

1  announcing SVB's Q3 2022 results, Becker assured investors that SVB was "well equipped to
2  manage these conditions."  And when an analyst specifically pressed the Officer Defendants
3  during the October 20, 2022 earnings call about SVB's ability to hold its more than $90 billion
4  HTM securities, Beck again responded unequivocally that "[t]here is no intent to restructure the
5  held-to-maturity portfolio" and "to be really clear, like we have no intent to restructure that
6  portfolio at this time."  Beck would reiterate this sentiment on December 7, 2022.

7       144.    In truth, the Officer Defendants did not have the necessary basis to make these
8  positive representations.  Indeed, by the time of SVB's Q3 2022 earnings release, the Federal
9  Reserve had already informed them that it was initiating an enforcement action against the Bank
10 due to its failure to remediate its severe risk and control deficiencies.  And less than three weeks
11 after resoundingly denying any intention to restructure SVB's debt investments on October 20,
12 2022, SVB management raised the liquidity issues and possible strategies to address them to
13 SVB's Board on November 8-9, 2022, including restructuring the HTM securities and selling the
14 AFS ones:

15

16

17

18

19

20

21

22

23

24

25

26     145.    In March 2023, the relevant truth concealed by the Officer Defendants' false and
27 misleading statements and omissions was revealed.  After trading closed on March 8, 2023, SVB
28 stunned the market by disclosing in an earnings release that the Bank would sell "substantially all

of its available for sale securities portfolio" for a $1.8 billion loss and would need to raise another approximately $2.25 billion through various stock offerings to shore up the Bank's liquidity.  SVB also admitted that, even with the capital raise, there would be a "payback period of approximately three years" to make up for the loss.  SVB also disclosed that it was lowering its net interest income guidance for both Q1 2023 and the full year.  In addition, SVB disclosed that the Bank had "been in dialogue" with credit agency Moody's Investor Service, which was "considering" ratings actions against SVB, including a downgrade of SVB's credit rating.  Moody's made good on that conversation that evening and downgraded SVB's credit rating, citing a "'deterioration in the bank's funding, liquidity and profitability.'"[43]

146.    Following these disclosures, SVB's stock price declined more than $161 per share, or more than 60%, from a close of more than $267 per share on March 8, 2023, to close at just over $106 per share on March 9, 2023.

147.    SVB's customers also reacted negatively to these disclosures.  In the span of eight hours, depositors attempted to withdraw more than $40 billion from their accounts at SVB on March 9, 2023.  By the close of business on March 9, SVB had a negative cash balance of nearly $1 billion and was insolvent.

148.    On March 10, 2023, before the market opened, the Nasdaq exchange suspended trading in SVB stock, explaining that trading would "remain halted until SVB Financial Group has fully satisfied Nasdaq's request for additional information."[44]  Before trading resumed, however, the Federal Reserve, the FDIC, and California Department of Financial Protection & Innovation ("DFPI") seized control of the Bank.  Trading remained suspended until March 28, 2023, at which time the price of SVB common stock continued its precipitous decline from before trading had

---

[43]    Rohan Goswami & Ari Levy, *Silicon Valley Bank's struggles spell further trouble for beleaguered tech startup market*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/silicon-valley-banks-struggles-signal-more-trouble-for-tech-startups.html.

[44]    NASDAQ press release, *Nasdaq Halts SVB Financial Group* (Mar. 10, 2023), https://www.nasdaq.com/press-release/nasdaq-halts-svb-financial-group-2023-03-10.

been halted, ultimately closing that day at $0.40, inflicting significant harm on Plaintiffs and other SVB investors.

## V.  THE OFFICER DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.  Misrepresentations and Omissions Concerning SVB's Internal Controls and Preparedness for Large Financial Institution Status

149.    On November 5, 2020, SVB filed with the SEC a quarterly report on Form 10-Q ("Q3 2020 Form 10-Q").  The Q3 2020 Form 10-Q incorporated by reference the Risk Factors contained in SVB's February 28, 2020 FY 2019 Form 10-K.  Those incorporated Risk Factors stated that:

> We have implemented a risk management framework to identify and manage our risk exposure.  This framework is comprised of various processes, systems and strategies, and is designed to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks.  Our framework also includes financial, analytical, forecasting or other modeling methodologies, which involve management assumptions and judgment.  In addition, our Board of Directors, in consultation with management, has adopted a risk appetite statement, which sets forth certain thresholds and limits to govern our overall risk profile.

The Q3 2020 Form 10-Q presented the alternative as a hypothetical, stating that "*[i]f* our risk management framework is not effective, we could suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.  The Officer Defendants signed each of these Forms 10-K.  Beck also signed each of these Forms 10-Q.

150.    The Risk Factors incorporated into the Q3 2020 Form 10-Q also stated that "[w]e rely on quantitative models to measure risks and to estimate certain financial values."  The Form 10-Q asserted that "[q]uantitative models may be used to help manage certain aspects of our business and to assist with certain business decisions, including . . . measuring the fair value of

financial instruments when reliable market prices are unavailable, estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk."  The Form 10-Q presented the ineffectiveness of these models as only a hypothetical, stating: "Although we employ strategies to manage and govern the risks associated with our use of models, they may not be effective or fully reliable."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.[45]

151.    In addition, the Q3 2020 Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Becker and Beck, stating that they had designed appropriate "disclosure controls and procedures . . . to ensure that material information" about SVB and the Bank was "made known to" them.  They also attested that they had "[e]valuated the effectiveness" of SVB's "disclosure controls and procedures," and any material changes to the Company's internal control over financial reporting.  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

152.    The Risk Factors incorporated by reference into the Q3 2020 Form 10-Q posited, as a hypothetical, that: "If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results."  These statements were

---

[45]   The February 24, 2023 FY 2022 Form 10-K stated: "We rely on quantitative and qualitative models to measure risks and to estimate certain financial values."  The Form 10-K asserted that "[q]uantitative and qualitative models may be used to help manage certain aspects of our business and to assist with certain business decisions, including . . . measuring the fair value of financial instruments when reliable market prices are unavailable, estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk."

1   repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-

2   Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v)

3   March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022

4   Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023

5   FY 2022 Form 10-K.

6       153.   On March 1, 2021, SVB filed with the SEC an annual report on Form 10-K ("FY

7   2020 Form 10-K").  The FY 2020 Form 10-K stated that "the Chief Executive Officer and Chief

8   Financial Officer have concluded that the Company's disclosure controls and procedures were

9   effective" and "the Company's internal control over financial reporting was effective."  These

10   statements were repeated in SVB's: (i) March 1, 2022 FY 2021 Form 10-K; and (ii) February 24,

11   2023 FY 2022 Form 10-K.

12       154.   On March 4, 2021, SVB filed with the SEC a Schedule 14A Proxy Statement

13   summarizing SVB's FY 2020 performance.  The Proxy Statement stated: "Oversight of the

14   Company's risk management is one of the Board's key priorities and is carried out by the Board

15   as a whole . . . ."  This statement was repeated in SVB's March 4, 2022 Schedule 14A Proxy

16   Statement.

17       155.   On April 22, 2021, Becker and Beck convened a conference call with investors and

18   analysts to discuss SVB's Q1 2021 financial results.  On the call, analysts questioned SVB's

19   substantial growth and preparedness for the heightened regulatory requirements and supervision

20   that attaining large financial institution status entailed.  In response, Becker assured that SVB had

21   been preparing for it for years:

22           It's not as if the infrastructure has been static.  We continue to add capabilities, and
            ***we do kind of every quarter look to reinforce and add to it***.  The growth that we've
23          seen over the last 12 months, ***once we started seeing it, we started to really, I'll
            call it, start to double down on more infrastructure, thinking about getting ready***
24          ***for LFI, large financial institution, improving our risk management***
            ***infrastructure across the board from a technology perspective.  So this has been***
25          ***what we have been working on for quite a while***.  It's just gotten accelerated given
            the growth that we have seen over the last 12 months.
26
                                    *       *       *
27
            So one is domestically, obviously, when you cross $100 billion, you move into LFI.
28          And so we've obviously done that.  We've done it faster than we thought we were

going to.  ***And we saw that coming and we started preparing for it last year, and that will be things that we're doing that Dan can give you more perspective on or a better perspective on over the next quarters and years to make sure that we're compliant with all the LFI requirements***.

156.    On July 22, 2021, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q2 2021 financial results.  On the call, in responding to a question about SVB's eventual transition to a Category III bank, Becker stated:

> When you head to a Category III, Dan will get into the capital and the liquidity and what are the requirements around that, but I should say, overall, the bar is raised across all facets of risk controls.  ***And we – and this isn't a surprise to us.  We certainly expected to be crossing LFI status.  We had working groups and plans that we're building around that***.  Now it became faster than we expected at the end, but ***we were certainly preparing for it.  But the 2 biggest areas that we need to be ready for and are getting ready for and working hard at it is in just overall risk and controls***.

157.    On March 4, 2022, SVB filed with the SEC a Schedule 14A Proxy Statement summarizing SVB's FY 2021 performance.  The Proxy Statement stated: "Under the Board and committee oversight outlined above, we are focused on, and continually invest in, our risk management and control environment.  Our business teams, supported by our risk, compliance, legal, finance and internal audit functions, work together to identify and manage risks applicable to our business, as well as to enhance our control environment."

158.    On January 19, 2023, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q4 2022 financial results.  When asked about expense growth on the call, Becker noted one area to be "risk management, which, again, we continue to enhance as we are in this LFI status.  And both expectations and just our own needs are increased."

159.    On March 3, 2023, SVB filed with the SEC a Schedule 14A Proxy Statement summarizing SVB's FY 2022 performance.  The Proxy Statement stated:

> The Board oversees the Company's management of the most significant enterprise-wide risks.  Risk management is carefully considered by the Board in its oversight of the Company's strategy and business, including financial, reputational, regulatory, legal and compliance implications.  The Board oversees risk management directly, as well as through its other committees, particularly the Risk Committee.

The Proxy Statement also stated that "[o]ur business teams, supported by our risk, compliance, legal, finance and internal audit functions, work together to identify and manage risks applicable to our business, as well as to enhance our control environment."

160.    The statements detailed in ¶¶149-159 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Officer Defendants include:

**Information Known to the Officer Defendants Prior to November 5, 2020**

(a)    Beginning in December 2016, the Examiners communicated to the Officer Defendants on an annual basis that SVB's governance and risk management framework was deficient, with the Officer Defendants and SVB management failing to, *inter alia*: "consistently ensure that key assumptions and procedures used in measuring and monitoring risks are sufficiently documented to allow for effective challenge and validation" (2016 CAMELS Report (dated Mar. 7, 2017)); and establish "a credible, independent, and complete" line of defense risk management framework (2018 CAMELS Report (dated Mar. 6, 2019)).  The Officer Defendants' failure to "completely establish[] a credible, independent second line of defense" was reiterated to them in a May 8, 2020 letter from the Examiners.

(b)    SVB's internal audit had not subjected SVB's contingency funding plans to review since 2019 despite the changes in the Company's liquidity risk profile.

(c)    Becker and Beck were aware that SVB had already received one MRA issued by the Examiners on June 5, 2019 and another MRA and MRIA issued by the Examiners on June 3, 2020 for governance and risk control deficiencies, which deficiencies requiring attention were still open at the time of the Bank's failure.

**Information Known to the Officer Defendants Prior to March 1, 2021**

(d)    In addition to the facts contained in ¶¶(a)-(c) above, by late 2020, SVB still had not fully implemented a line of defense framework or created an enterprise-wide internal controls process, processes that the Examiners underscored as "fundamental to the Board and management's ability to plan for and respond to risks arising from changing business conditions,

1  new activities, accelerated growth, and increasing complexity." The Officer Defendants were

2  informed of these findings during a February 4, 2021 meeting with the Examiners.

3         (e)    Becker and Beck were aware that SVB had received an additional two

4  MRAs and two MRIAs issued by the Examiners on February 11, 2021 for governance and risk

5  control deficiencies, which deficiencies requiring attention were still open at the time of the Bank's

6  failure.

7  **Information Known to the Officer Defendants Prior to November 8, 2021**

8         (f)    In addition to the facts contained in ¶¶(a)-(e) above, by late 2021, SVB still

9  had not fully implemented a line of defense framework, with the Federal Reserve underscoring to

10 the Officer Defendants that SVB "lacks effective independent review oversight and challenge of

11 its liquidity risk management framework." These deficiencies were communicated to the Officer

12 Defendants during an October 22, 2021 meeting and in a November 2, 2021 letter. On November

13 2, 2021, the Federal Reserve required that SVB "immediately establish an effective process for

14 reviewing and challenging liquidity risk management practices" given the severity of the issues,

15 and issued four MRAs and two MRIAs relating thereto. These supervisory findings requiring

16 remediation were still open at the time of the Bank's failure.

17 **Information Known to the Officer Defendants Prior to August 8, 2022**

18        (g)    In addition to the facts contained in ¶¶(a)-(f) above, no later than May 31,

19 2022, Becker and Beck were aware of "[t]he concerns noted in board oversight coupled with the

20 risk management weaknesses raise concerns about the Firm's governance and controls." In

21 particular, the Examiners told the Officer Defendants that:

22               (i)    SVB's Board failed to provide effective oversight of senior

23 management's implementation of LFI readiness initiatives or even "foundational risk management

24 program principles applicable for all banks, irrespective of size";

25               (ii)   SVB's Board had failed to challenge senior management or hold

26 senior management accountable for failing to execute a sound risk management program;

27               (iii)  SVB's risk management framework was not comprehensive, did not

28 incorporate coverage for all risk stripes, did not address foundational enterprise level risk

management matters (such as issues management and escalation), and was not commensurate to SVB's size and complexity;

(iv)    SVB *still* had not implemented a second line of defense; and

(v)    SVB's internal audit was not effective, having failed to hold senior management accountable (exhibiting a slow and reactive approach to testing SVB's LFI readiness transition plan and risk management programs) and had failed to provide sufficient information to allow the Audit Committee to fulfill its oversight responsibilities.

(h)    Becker and Beck were aware that SVB had received an additional three MRIAs for governance and controls issues on May 31, 2022, which deficiencies requiring attention were still open at the time of the Bank's failure.

**Information Known to the Officer Defendants Prior to November 7, 2022**

(i)    In addition to the facts contained in ¶¶(a)-(h) above, no later than August 17, 2022, Becker was aware that the Examiners were initiating a private enforcement action against SVB to hold its "board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management." The planned enforcement action was driven by the "significant deficiencies in [SVB and the Bank's] oversight by their respective boards of directors and senior management and the Firm's risk management program, information technology program, liquidity risk management program, and internal audit program."

(j)    On October 7, 2022, SVB had been issued another two MRIAs and two MRAs relating to governance and controls deficiencies, which deficiencies requiring attention were still open at the time of the Bank's failure.

(k)    That, based on the facts contained in ¶¶(a)-(j) above, SVB was not prepared for LFI status. As the Federal Reserve has described it, the Officer Defendants had "failed to establish a risk-management and control infrastructure suitable for the size and complexity of SVB[] when it was a $50 billion firm, let alone when it grew to be a $200 billion firm."

(l)    That, in light of the facts contained ¶¶(a)-(j) above, SVB's "risk management framework" and quantitative models were not effective.  Thus, the Officer Defendants' statements presenting them as hypothetical risks were materially misleading.

**B.    Misrepresentations and Omissions Concerning SVB's Liquidity Management**

161.    The November 5, 2020 Q3 2020 Form 10-Q emphasized SVB's liquidity management, stating that "[t]he objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations . . . and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions."  The Form 10-Q also asserted that SVB "regularly assess[es] the amount and likelihood of projected funding requirements through a review of factors such as historical deposit volatility and funding patterns, present and forecasted market and economic conditions, individual client funding needs and existing and planned business activities," and that "we routinely conduct liquidity stress testing as part of our liquidity management practices."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

162.    On April 22, 2021, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q1 2021 financial results.  On the call, analysts were particularly interested in discussing SVB's substantial investments in HTM securities during Q1 2021.  One analyst questioned "how high can that [the percentage of assets in investment securities] go?"  In response, Beck assured that while SVB's "continued objective is to continue to progressively put that excess liquidity to work," the Company maintained adequate liquidity in the short-term via its AFS securities, stating that:

> [W]e've got enough short-term liquidity in that AFS, available for sale, portfolio. That's to the extent that we need to dip into that liquidity, we can certainly do it. So we're protecting at least on the short term with what we've got in available for

sale, and we're certainly investing both in the longer duration and held to maturity and what we're doing in the available-for-sale portfolio.

163.     On January 20, 2022, Becker and Beck convened a conference call with investors and analysts to discuss SVB's FY 2021 results.  In answering a question about the impact of rate hikes on SVB's net interest income, Beck told investors that the Company was "still bullish on liquidity."

164.     On May 6, 2022, SVB filed with the SEC a quarterly report on Form 10-Q ("Q1 2022 Form 10-Q").  The Q1 2022 Form 10-Q emphasized SVB's liquidity management, asserting that SVB "maintain[s] a liquidity risk management and monitoring process designed to ensure appropriate liquidity to meet expected and contingent funding needs under both normal and stress environments, subject to the regular supervisory review process."  This statement was repeated in SVB's: (i) August 8, 2022 Q2 2022 Form 10-Q, (ii) November 7, 2022 Q3 2022 Form 10-Q, and (iii) February 24, 2023 FY 2022 Form 10-K.

165.     On July 21, 2022, SVB issued a release containing the Company's results for the second quarter ended June 30, 2022 (the "Q2 2022 Release").  The Q2 2022 Release contained a CEO Letter ("July 21, 2022 CEO Letter"), signed by Becker, which stated that SVB was "better positioned than at any point in our history to support our clients" in light of the Company's "high-quality, liquid balance sheet."

166.     Also on July 21, 2022, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q2 2022 results, during which Becker reiterated that "[w]e have a high-quality balance sheet with ample liquidity and strong capital."

167.     On October 20, 2022, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q3 2022 financial results.  On the call, Becker steadfastly maintained that "[w]e continue to see strength and momentum in our underlying business."

168.     Even as SVB was incurring billions of unrealized losses on its HTM securities portfolio, Beck was adamant on the October 20, 2022 call that "[t]here is no intent to restructure the held-to-maturity portfolio."  Indeed, later in the call, in response to an analyst's question about whether there was anything "you could do to alleviate some of this market-driven pressure on the

earnings and ROA," Beck doubled down and stated, "we talked about the investment securities portfolio, the available-for-sale investment securities portfolio – to be really clear, like we have no intent to restructure that portfolio at this time."

169.    On December 7, 2022, SVB participated in a conference call during the Goldman Sachs US Financial Services Conference.  During the call, an analyst noted that "there's been discussion in the investor community that if there's pressure on the funding you may need to sell securities in the held-to-maturity portfolio" and asked Beck to "put to rest why you don't see this as a risk for the company and why you have funding – you have capacity on the balance sheet." In response, Beck laid out in detail the various funding sources SVB had available such that SVB would not need to sell the HTM portfolio.

170.    On January 19, 2023, SVB issued a release containing the Company's results for the fourth quarter and full year ended December 31, 2022 (the "FY 2022 Release").  The FY 2022 Release contained a CEO Letter ("January 19, 2023 CEO Letter"), signed by Becker.  In the CEO Letter, Becker maintained that SVB "remain[ed] well-positioned to support our clients and navigate current market conditions" in light of the Company's "high-quality, liquid balance sheet[,] strong capital ratios[,] and multiple levers to manage liquidity."

171.    On January 19, 2023, Becker and Beck convened a conference call with analysts and investors to discuss the Company's Q4 2022 results.  During the call, Becker tempered concerns by claiming that SVB could rely on its liquidity and strong balance sheet, stating "[w]e're prepared if [economic conditions] don't improve, again, which is important.  And even if the market challenges are prolonged or get worse, it's important to note we have a high-quality, very liquid balance sheet . . . ."

172.    Analysts were particularly curious about whether Defendants were contemplating "any actions" with respect to the AFS securities.  In response, Beck repeatedly denied any "wholesale change" was on the horizon, claiming instead that SVB might consider "small sales" opportunistically:

> ***So I wouldn't say there's any desire for a wholesale change in the available-for-sale portfolio***.  But periodically, and with an opportunistic lens on payback period, we can do these small sales that, to some degree, can be offset by warrant gains and

things along those lines.   So thinking about it from a tangible book value perspective, but at the same time, looking opportunistically in payback period.

Beck also made clear that there were no immediate plans to sell more AFS securities, and any actions would be "protective of tangible book value" and limited to available for sale (*i.e.*, restructuring of the HTM securities was not contemplated):

> [John G. Pancari Evercore ISI Institutional Equities, Research Division – Senior MD & Senior Equity Research Analyst:] Got it.  Got it.  All right.  And then any actions considered for your available-for-sale securities portfolio at this point?
>
> [Beck:] . . . Very clear that we're only talking about available for sale.  In the quarter, we did opportunistically sell $1 billion worth of treasury securities at a very short payback period with limited impact to tangible book value, considering that we also had some warrant gains in the quarter. . . .
>
> [Pancari:] Right. So – but nothing immediately planned beyond that $1 billion, but (inaudible)?
>
> [Beck:] No.  And again, anything we're talking about is within available for sale, and it's opportunistic and protective of tangible book value.

173.    On February 21, 2023, the *Financial Times* published an article quoting statements that Becker made to the publication.  Becker stated: "'We can comfortably say we have so much liquidity available to us in case something happens.  We think deposits will stabili[z]e, but if not, we can protect ourselves if we need to. . . . ***We have ample liquidity to support lots of scenarios that may get worse and worse***.'"  Becker also confirmed that "he has 'no intention of using or selling' the [HTM] securities."

174.    The statements detailed in ¶¶161-173 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Officer Defendants include:

**Information Known to the Officer Defendants Prior to November 5, 2020**

(a)    The Officer Defendants had been repeatedly warned by the Examiners about SVB's liquidity and liquidity governance shortcomings.  on December 14, 2016, Becker was informed that the Bank had "insufficient documentation of the capital buffer methodology and governance over the capital planning process."  On December 20, 2018, the Examiners had flagged for Becker and Beck that SVB "[m]anagement supplements daily cash flows with overnight or short-term borrowings" access to which may become restricted during certain periods of the day,

and required that SVB "management and the Board . . . establish appropriate limits or target buffers for operating cash balances that incorporate consideration of risk posed by large depositors and other operating cash needs."

        (b)     The Officer Defendants had not in fact "regularly assess[ed] the amount and likelihood of projected funding requirements through a review of factors," as evidenced by the fact that SVB's internal audit had not subjected SVB's contingency funding plans to review since 2019.

**Information Known to the Officer Defendants Prior to March 1, 2021**

        (c)     In addition to the facts contained in ¶¶(a)-(b) above, no later than February 4, 2021, the Officer Defendants were aware that SVB's testing failed to "provide short term insight into the interim of one to 30 days."  That same day, Becker and Beck were "encouraged to reassess the Bank's measurement needs, particularly as record levels of IBBB [interest-bearing bank balances] are potentially deployed into the investment or loan portfolio."

**Information Known to the Officer Defendants Prior to November 8, 2021**

        (d)     In addition to the facts contained in ¶¶(a)-(c) above, the Officer Defendants were informed on October 22, 2021 that SVB suffered "foundational shortcomings in three key areas: (i) internal liquidity stress testing (ILST), (ii) the liquidity limits framework, and (iii) the contingency funding plan (CFP)," which resulted in the Officer Defendants receiving on November 2, 2021 four MRAs and two MRIAs for deficiencies that the Officer Defendants had not remediated by the time of the Bank's failure.  In particular:

        (i)     SVB's ILST was fundamentally flawed because: (A) it utilized key assumptions based on incomparable (and less conservative) peer benchmarks, specifically, banks largely with a retail deposit base subject to FDIC insurance coverage, in contrast to SVB's deposit base largely comprising uninsured commercial deposits; and (B) the design contained assumptions tailored to less conservative capital stress testing (which are designed to test macroeconomic events and thus concern a longer time horizon), not the more immediate impact of a liquidity stress, which is the purpose of ILST testing.

1    (ii)    SVB lacked effective liquidity risk identification, measurement, and

2 monitoring systems or processes commensurate with the complexity and business activities of the

3 Company.

4    (iii)    SVB's contingency funding plan was deficient on multiple grounds,

5 which negatively impacted the Officer Defendants' ability to assess whether the Company was

6 under liquidity stress and their ability to respond quickly to a real stress event, as well as what

7 funding was available in varying levels of stress.

8    (iv)    The Officer Defendants had been informed that they "need[ed] to

9 enhance the Liquidity Risk Management project plan," as SVB's liquidity risk management project

10 plan failed to account for these and other weaknesses identified during the Federal Reserve's

11 August 16-27, 2021 examination.

12 **Information Known to the Officer Defendants Prior to July 21, 2022**

13    (e)    In addition to the facts contained in ¶¶(a)-(d) above, SVB was required to

14 maintain a 30-day liquidity buffer based on ILST results.  However, when SVB ran its ILST on or

15 around May 31, 2022, the test modeled an "operational" shortfall of approximately $12 billion for

16 the 30-day point and a "real" shortfall (*i.e.*, SVB did not have sufficient liquidity to meet the

17 projected outflows) of approximately $4 billion for the 90-day point.  But even those deficits were

18 understated because SVB had used unsupported deposit outflow speed assumptions in its ILST,

19 assuming without basis that a material portion of deposit outflows during a stress event would not

20 occur until days 31-90, which resulted in the 30-day deficit being understated by up to an additional

21 $27 billion.

22 **Information Known to the Officer Defendants Prior to August 8, 2022**

23    (f)    In addition to the facts contained in ¶¶(a)-(e) above, SVB client cash burn

24 continued such that, when run on or around July 31, 2022, SVB's ILST test modeled a 30-day

25 shortfall of approximately $18 billion for the 30-day point and approximately $23 billion for the

26 90-day point.  But even those deficits were understated because SVB had used unsupported deposit

27 outflow speed assumptions in its ILST, assuming without basis that a material portion of deposit

28 outflows during a stress event would not occur until days 31-90, which resulted in the 30-day

deficit being understated by up to an additional $27 billion.  In response, the Officer Defendants simply manipulated the assumptions utilized in SVB's ILST model in October 2022 to artificially reduce the modeled liquidity shortfall.  As the Federal Reserve put it: "Changing modeling assumptions, rather than improving the actual liquidity position, is not an appropriate way to restore compliance with limits."

**Information Known to the Officer Defendants Prior to November 7, 2022**

(g)     In addition to the facts contained in ¶¶(a)-(f) above, in an August 19, 2022 letter to Beck, the Federal Reserve underscored that SVB's model risk management permitted "application of material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls," presenting a "safety and soundness concern" (including the risk of "inaccurate capital projections") and "preventing firm management and the board of directors from making informed capital planning decisions."

(h)     In October 2022 the Officer Defendants simply manipulated the assumptions utilized in SVB's ILST model to artificially reduce the modeled liquidity shortfall. As the Federal Reserve put it: "Changing modeling assumptions, rather than improving the actual liquidity position, is not an appropriate way to restore compliance with limits."

**Information Known to the Officer Defendants Prior to December 7, 2022**

(i)     In addition to the facts contained in ¶¶(a)-(h) above, in November 2022 the Officer Defendants had raised to SVB's full Board that they were "evaluating two separate securities repositioning strategies," including selling the entire AFS securities portfolio at an up to $20 billion loss.

C.     **Misrepresentations and Omissions Concerning SVB's Interest Rate Risk Management**

175.   The November 5, 2020 Q3 2020 Form 10-Q emphasized SVB's interest rate risk management, stating that "[r]elevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, are monitored on an ongoing basis."  The Form 10-Q stated that "[i]nterest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding

channels and capital market activities.  In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk."  The Form 10-Q also claimed:

> We utilize a simulation model to perform sensitivity analysis on the [EVE] and [NII] under a variety of interest rate scenarios, balance sheet forecasts and business strategies.  The simulation model provides a dynamic assessment of interest rate sensitivity which is embedded within our balance sheet.  Rate sensitivity measures the potential variability in economic value and [NII] relating solely to changes in market interest rates over time.  **We review our interest rate risk position and sensitivity to market interest rates regularly**.

These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

176.    The March 1, 2021 FY 2020 Form 10-K explained the model simulation and sensitivity analysis conducted to test NII and EVE:

> Both EVE and NII measures rely upon the use of models to simulate cash flow behavior for loans and deposits.  **These models were developed internally and are based on historical balance and rate observations**.  Investment portfolio cash flow is based on a combination of third-party prepayment models and internally managed prepayment vectors depending on security type.  **As part of our ongoing governance structure, each of these models and assumptions are periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors**.

These statements were repeated in SVB's: (i) May 10, 2021 Q1 2021 Form 10-Q, (ii) August 6, 2021 Q2 2021 Form 10-Q, (iii) November 8, 2021 Q3 2021 Form 10-Q, (iv) March 1, 2022 FY 2021 Form 10-K, (v) May 6, 2022 Q1 2022 Form 10-Q, (vi) August 8, 2022 Q2 2022 Form 10-Q, (vii) November 7, 2022 Q3 2022 Form 10-Q, and (viii) February 24, 2023 FY 2022 Form 10-K.[46]

---

[46] This statement was slightly altered in the 2022 Form 10-K, as follows:

"Both EVE and NII measures rely upon the use of models to simulate cash flow behavior for loans and deposits.  These models were developed internally and are based on historical balance and rate observations.  As part of our ongoing governance structure, each of these models and assumptions are periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors."

177.    Based on these models and their assumptions, the Officer Defendants reported EVE and NII sensitivity exposure to a market interest rate shock of 200 bps as follows:

| Date | Filing | EVE | NII |
|---|---|---|---|
| March 1, 2021 | FY 2020 Form 10-K | -15.4% | 29.2% |
| May 10, 2021 | Q1 2021 Form 10-Q | -22.7% | 31.1% |
| August 6, 2021 | Q2 2021 Form 10-Q | -22.8% | 33.7% |
| November 8, 2021 | Q3 2021 Form 10-Q | -30.9% | 27.7% |
| March 1, 2022 | FY 2021 Form 10-K | -27.7% | 22.9% |
| May 6, 2022 | Q1 2022 Form 10-Q | -30.4% | 21% |
| August 8, 2022 | Q2 2022 Form 10-Q | -22.9% | 13.5% |
| November 7, 2022 | Q3 2022 Form 10-Q | -29.5% | 5.5% |
| February 24, 2023 | FY 2022 Form 10-K | OMITTED | 3.5% |

178.    On April 22, 2021, SVB issued a release containing the Company's results for the first quarter ended March 31, 2021 (the "Q1 2021 Release").  The Q1 2021 Release contained a CEO Letter ("April 22, 2021 CEO Letter"), signed by Becker, which confirmed to investors that SVB was "[w]ell-positioned for rising rates":

**Well-positioned for rising rates**

***We continue to take a proactive approach to interest rate risk management***.  In recent years, we have successfully deployed strategies to provide protection against low rates – including receive-fixed interest rate swaps and loan floors – that have helped to sustain our net interest income.  As the economic environment continues to evolve, ***we are well-positioned for rising rates***, with an asset-sensitive balance sheet.  More than 90 percent of our loans are tied to short-term rates and two thirds of our deposits are non-interest bearing.  We also have approximately $3.0 billion to $3.5 billion in securities rolling off our investment portfolio each quarter and we will take advantage of opportunities to deploy liquidity at higher rates.

179.    On April 22, 2021, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q1 2021 financial results.  On the call, analysts noted that SVB had historically been "one of the most asset-sensitive banks in the country" and questioned: "All the actions you're taking with the held to maturity and the swaps and adding the duration, I mean, broadly speaking, how much are you changing the rate profile of the company?"  Beck responded that "we remain quite asset-sensitive" and confirmed that "to the extent that we see rate movements, we would still benefit in a strong way from it."

180.    On July 22, 2021, SVB issued a release containing the Company's results for the second quarter ended June 30, 2021 (the "Q2 2021 Release").  The Q2 2021 Release contained a CEO Letter ("July 22, 2021 CEO Letter"), signed by Becker, which reiterated that SVB "remain[ed] well-positioned for rising rates."  Moreover, the CEO Letter assured that SVB "ha[s] actively positioned our securities portfolio to create flexibility and mitigate the risk of rising long-term rates through hedges, duration targeting and shifting the mix toward held-to-maturity investments."

181.    On July 22, 2021, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q2 2021 financial results.  When directly asked on the call for his "view of what the negatives would be to your business in an inflationary environment," Becker deflected: "I appreciate the question, but I also don't want to dismiss the first part, the positive part of the question, which is we would benefit significantly from increasing rates" in the form of "net interest income expansion" and "fee-based expansion because of the size of the portfolio and the additional basis points we would get on those funds."

182.    On October 21, 2021, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q3 2021 financial results.  On the call, Becker was bullish as to SVB's ability to generate strong, sustainable NII growth despite SVB's large balance sheet:

> [Steven A. Alexopoulos JPMorgan Chase & Co, Research Division – MD and Head of Mid-Cap & Small-Cap Banks:] Yes. Okay.  Greg, regarding the line in the CEO letter where you say the balance sheet has reached the size or you can generate strong, sustainable NII growth without the help from rates.  Typically, a larger balance sheet stunts growth potential at a bank.  It doesn't make it better.  How does this create a more sustainable NII growth outlook?
>
> *       *       *
>
> [Becker:] Now what you didn't ask and – but I will answer is this which is what we're really excited about is, at some point, we certainly believe that there will be some rate increases.  And we have a slide in the deck that goes through and talks about how spring loaded the balance sheet actually is for additional NII if we do see rate increases in Slide 19, and you can go through that and look at every 0.25% increase in the balance sheet the way it is right now is $106 million, again, modeled in on an annualized pretax basis for each 25 basis point increase.
>
> But in addition to that, with the first 25 basis point increase, we also expect somewhere between $195 million and $225 million of increased core fee income generated from the large balance sheet funds that we have.  So again, one 25 basis point increase, you could see revenue growth of roughly $311 million to – I'm

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          - 67 -

> sorry, yes, $311 million to roughly $325 million or $330 million.  So normalize after this, when the second rate increase happens, but the balance sheet is clearly spring loaded.  So we're happy that we can continue to grow NII in a low-rate environment, but we're even more bullish when we do start to see some rate increases.

Beck echoed these sentiments later in the call, stating that he believed growth in net interest income and profitability was "going to continue even at the size and scale of the balance sheet to generate that strong return in both a flat rate environment as well as a higher rate environment."

183.    On January 20, 2022, SVB issued a release containing the Company's results for the fourth quarter and full year ended December 31, 2021 (the "FY 2021 Release").  The FY 2021 Release touted only upside from anticipated interest rate increases, stating: "'If interest rate increases materialize as the markets predict, we would expect them to significantly add to our earnings on top of our already positive 2022 outlook, while opening up additional investment opportunities.'"

184.    On January 20, 2022, Becker and Beck convened a conference call with investors and analysts to discuss SVB's FY 2021 financial results.  On the call, Beck stated that "the margin compression that we've been seeing by putting money to work underneath the securities yield seems to be abating in this better rate environment."  Beck assured investors that, with respect to the impact that higher interest rates would have on deposit behavior, any changes in deposits would be consistent with the Company's models:

> [W]e're watching that and modeling sensitivities to that.  All in, in our rate sensitivity, we've got a 60% deposit beta, and that's on the interest-bearing balances that we have in the portfolio, which is consistent with the last cycle.  And we've effectively, for conservatism, modeled a faster beta in some of these net interest income assumptions, meaning that they would take place sooner in the rate cycle than we experienced during the last hike.
>
> So we feel like we've got some measure of conservatism in there just to take into consideration the fact the Fed could move faster and client behavior could be different this time.  But that's how we're getting comfortable with that all-in $100 million to $130 million annualized pretax net interest income number.

185.    On April 21, 2022, SVB issued a release containing the Company's results for the first quarter ended March 31, 2022 (the "Q1 2022 Release").  The Q1 2022 Release contained a CEO Letter ("April 21, 2022 CEO Letter"), signed by Becker.  In the CEO Letter, Defendants "[r]aised 2022 revenue outlook given current higher rate environment – additional potential upside

if rates increase." They assured investors that SVB was "[w]ell-positioned to withstand potential impacts of public market volatility," stating: "While rising rates benefit us from a revenue perspective, they also highlight the effectiveness of our proactive interest rate risk management, through which we actively mitigated AFS AOCI risk to support Tangible Book Value as rates increased in Q1, while taking the opportunity to monetize a portion of our fair value hedges and rebalance the fixed income securities portfolio at higher yields."

186.    On April 21, 2022, Becker and Beck convened a conference call with analysts and investors to discuss SVB's Q1 2022 results. Despite the fact that, unbeknownst to investors at this time, the Officer Defendants altered SVB's risk models that same month to artificially reduce the modeled risk relating to rising interest rates, Becker opened the call by stating that SVB has "meaningful revenue upside if the forward rate curve plays out."

187.    When asked explicitly on the April 21, 2022 call about the interest rate risk associated with the fact that "2/3 of [SVB's] held-to-maturity book has maturities of over 10 years," Beck reassured investors and analysts that a 200 or 300 bps increase was within the Company's models, saying "we've played through a lot of that already." Beck answered similarly when asked about what would happen if the Federal Reserve funds rate rose to 2.5%, stating: "[W]hile the margin is clearly lower [than it was in 2018], the opportunity to be able to drive sustainable core net interest income growth is much stronger than what we had during that last tightening cycle."

188.    The May 6, 2022 Q1 2022 Form 10-Q stated that: "the underlying models and assumptions are subject to regular performance testing and recalibration, and as such we are reviewing how the underlying assumptions on our deposit model impact deposit decay, curtailment, and pricing behavior." The Form 10-Q maintained that changes to the ALM Model and its assumptions were part of a rigorous process grounded in fact and that the modifications thereto are made "in response to relevant market conditions, competition or business circumstances." The Form 10-Q stated that changes would be implemented the following quarter as a result of this review, which would result in a reduction of risk to EVE in the 100 and 200 bps upward rate shock scenarios.

189.     On July 21, 2022, Becker and Beck convened a conference call with investors and analysts to discuss SVB's Q2 2022 financial results.  On the call, despite the more difficult economic environment that had materialized over the first half of 2022, Beck remained steadfast in affirming SVB's management of interest rate risk, stating: "I think we're still well positioned to the upside for higher rates."

190.     On August 8, 2022, SVB filed with the SEC a quarterly report on Form 10-K ("Q2 2022 Form 10-Q").  The Q2 2022 Form 10-Q confirmed that changes to the model and its assumptions were part of a rigorous process grounded in fact, stating that:

> The model simulations and calculations . . . will change regularly as the composition of earning assets and funding liabilities change (including the impact of changes in the value of interest rate derivatives, if any), as interest rate environments evolve, and as we change our assumptions in response to relevant market conditions, competition, or business circumstances.

The Form 10-Q noted that "the EVE results in the table above for both December 31, 2021 and June 30, 2022 reflect updates to our deposit model that were deployed during the second quarter of 2022 which impacted our underlying assumptions for deposit decay, curtailment, and pricing behavior."  The Form 10-Q claimed this result was "[c]onsistent with our expectations" that "the EVE profile of our balance sheet at December 31, 2021 showed a reduction in risk for +100 and +200bps instantaneous parallel shift scenarios."

191.     On September 12, 2022, SVB participated in the Barclays 20th Annual Global Financial Services Conference.  In response to a question about whether interest rate hikes would be additive, Beck confirmed that "[i]t should be additive."

192.     The statements detailed in ¶¶175-191 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by Becker and Beck include:

**Information Known to the Officer Defendants Prior to November 5, 2020**

(a)     The Officer Defendants were cautioned, in the February 14, 2018 CAMELS Report, that SVB's Treasury function (the business unit responsible for SVB's securities

portfolios) "has grown in complexity over the past several years, and examination and audit findings point to a need for ongoing and independent monitoring and challenge for market risk."

   (b) SVB's interest rate policy limits had not been reviewed for potential recalibration or otherwise supported since at least 2018, and SVB's internal audit had not subjected the Company's contingency funding plans to review since 2019.

   (c) SVB's interest rate risk policy did not specify: scenarios to run, how assumptions should be analyzed, how to conduct sensitivity analysis, model back-testing requirements, how limits were set and calibrated, or ongoing reporting requirements for threshold breaches over prolonged periods.

   (d) EVE at risk in a +100 bps shock scenario had exceeded SVB's outer policy limits in September and October 2020.

**Information Known to the Officer Defendants Prior to March 1, 2021**

   (e) In addition to the facts contained in ¶¶(a)-(d) above, no later than December 2020, SVB's internal audit found that SVB's ALM Model used incorrect data inputs, inadequate governance of interest rate risk models, and inaccurate NII position.

   (f) During a February 4, 2021 meeting with the Examiners, the Officer Defendants were informed that EVE was modeled to decrease in response to interest rate increases, "exceed[ing] the outer policy limit." Indeed, EVE at risk in a +100 bps shock scenario had exceeded SVB's outer policy limits in November 2020 and February 2021.

**Information Known to the Officer Defendants Prior to November 8, 2021**

   (g) In addition to the facts contained in ¶¶(a)-(f) above, the Officer Defendants were aware, no later than October 22, 2021, that SVB's stress testing did not delineate deposits by product type, deposit classification, or customer type, thus treating all deposits as behaving similarly in stress, even though SVB management acknowledged to the Federal Reserve that outflows of commercial deposits actually vary in times of stress and "[a]ssuming all deposits to behave similarly is unrealistic and potentially understates outflows under stress." As a result, SVB was in fact unable to differentiate deposit behaviors through outflow assumptions.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 71

(h)      EVE at risk in a +100 bps shock scenario had exceeded SVB's outer policy limits for each month between March 2021 and November 2021, except for June 2021.

**Information Known to the Officer Defendants Prior to March 1, 2022**

(i)      In addition to the facts contained in ¶¶(a)-(h) above, according to the January 2022 BlackRock risk control report commissioned by SVB, which analyzed how SVB's securities portfolios would respond to various factors including rising interest rates and broader macroeconomic conditions, and how that would affect SVB's capital and liquidity, SVB lagged behind peer banks on each of the 11 factors considered and was "'substantially below'" them on 10 out of 11, earning what was dubbed a "'gentlemen's C.'"

(j)      "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."[47]

(k)      SVB's substantial investments in HTM securities did not actually protect book value without reducing risk to SVB's book equity, but rather put EVE at substantial risk in excess of SVB's outer policy limits.  EVE at risk in a +100 bps shock continued to exceed SVB's outer policy limits in December 2021, January 2022, and February 2022.

**Information Known to the Officer Defendants Prior to July 21, 2022**

(l)      In addition to the facts contained in ¶¶(a)-(k) above, SVB's ALM Model and its assumptions were unreliable and modeled risk that was directionally inconsistent with SVB's actual performance, as Becker and Beck simply manipulated the assumptions in April 2022 to artificially reduce the modeled risk to EVE, which change was unsubstantiated given recent deposit growth, lack of historical data, and rapid increases in rates that shorten deposit duration.

(m)      As a result of the model manipulation discussed in ¶(l) above, beginning with the August 8, 2022 Q2 2022 Form 10-Q, EVE risk at a +200 bps rate shock was artificially reduced more than six-fold, and EVE at risk in a +100 bps shock temporarily within SVB's internal

---

[47]   Antoine Gara & Brooker Masters, *Silicon Valley Bank was warned by BlackRock that risk controls were weak*, Fin. Times (Mar. 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

1   policy limits in April and May 2022.  However, the manipulation did not address the reality of

2   SVB's deteriorating EVE; thus, notwithstanding the artificial reduction, EVE at risk again

3   exceeded SVB's outer policy limits beginning in June 2022.

4   **Information Known to the Officer Defendants Prior to February 24, 2023**

5        (n)     In the November 15, 2022 CAMELS Report, which was sent to the Officer

6   Defendants, the Examiners faulted SVB's "interest rate risk (IRR) simulations" as "not reliable"

7   and "requir[ing] improvements."  The simulations' results were "directionally inconsistent with

8   internal projections and IRR simulations, calling into question the reliability of IRR modeling and

9   the effectiveness of risk management practices."  The Examiners issued a new MRA concerning

10  SVB's "unreliable" interest rate risk simulation and modeling, which deficiencies requiring

11  attention was still open at the time of the Bank's failure.

12       (o)     As a result of ¶¶(a)-(n) above, SVB's NII and EVE metrics in ¶177 included

13  in each of SVB's Forms 10-Q and Forms 10-K filed with the SEC between March 1, 2021 and

14  February 24, 2023 were false or misleading.

15       **D.    Misrepresentations and Omissions Concerning SVB's AFS and HTM
              Securities**
16
17  193.    Throughout the Relevant Period, SVB filed its financial results with the SEC, in

18  which the Officer Defendants reported that the Company had classified certain securities as held-

19  to-maturity.  In particular, they reported the following amounts of HTM securities as of the end of

20  the respective quarter or fiscal year:

| Date | Filing | HTM |
|------|--------|-----|
| November 5, 2020 | Q3 2020 Form 10-Q | $13.0 billion |
| March 1, 2021 | FY 2020 Form 10-K | $16.6 billion |
| May 10, 2021 | Q1 2021 Form 10-Q | $41.2 billion |
| August 6, 2021 | Q2 2021 Form 10-Q | $60.0 billion |
| November 8, 2021 | Q3 2021 Form 10-Q | $82.4 billion |
| March 1, 2022 | FY 2021 Form 10-K | $98.2 billion |
| May 6, 2022 | Q1 2022 Form 10-Q | $98.7 billion |
| August 8, 2022 | Q2 2022 Form 10-Q | $95.8 billion |
| November 7, 2022 | Q3 2022 Form 10-Q | $93.3 billion |

| Date | Filing | HTM |
|------|--------|-----|
| February 24, 2023 | FY 2022 Form 10-K | $91.3 billion |

194.    In each of the SEC filings identified in ¶193 above, the Officer Defendants represented that the HTM securities were "purchased with the positive intent and ability to hold to its maturity," in accordance with GAAP.

195.    The April 22, 2021 CEO Letter emphasized that the Officer Defendants' management of SVB's AFS and HTM securities "position[ed] the securities portfolio for higher rates" and provided "additional balance sheet flexibility":

> We have also taken actions, through the addition of $10 billion of receive floating interest rate swaps, to position the securities portfolio for higher rates, along with the designating $3 billion in investment securities from available-for-sale (AFS) to held-to-maturity (HTM).  This also has the benefit of protecting tangible book value against fluctuations in other comprehensive income and provides additional balance sheet flexibility.

196.    On May 10, 2021, SVB filed with the SEC a quarterly report on Form 10-Q ("Q1 2021 Form 10-Q").  The Q1 2021 Form 10-Q reported that SVB re-designated $2.9 billion of securities from AFS to HTM.

197.    According the Q1 2021 Form 10-Q, the "decision to re-designate the securities was based on our ability and intent to hold these securities to maturity."  The Form 10-Q asserted that the Officer Defendants considered "future liquidity needs and sources of funding" as "[f]actors . . . in assessing the ability to hold these securities to maturity."  The Form 10-Q stated that "[HTM] securities are carried on the balance sheet at amortized cost and the changes in the value of these securities, other than an allowance for credit losses, are not reported on the financial statements." These statements were repeated in SVB's: (i) August 6, 2021 Q2 2021 Form 10-Q, (ii) November 8, 2021 Q3 2021 Form 10-Q, (iii) March 1, 2022 FY 2021 Form 10-K, and (iv) February 24, 2023 FY 2022 Form 10-K.

198.    On August 6, 2021, SVB filed with the SEC a quarterly report on Form 10-Q ("Q2 2021 Form 10-Q").  The Q2 2021 Form 10-Q reported that SVB re-designated $5.7 billion of AFS securities to HTM securities.

199.    On November 8, 2021, SVB filed with the SEC a quarterly report on Form 10-Q ("Q3 2021 Form 10-Q").  On March 1, 2022, SVB filed with the SEC an annual report on Form 10-K ("FY 2021 Form 10-K").  Both the Q3 2021 Form 10-Q and FY 2021 Form 10-K reported that SVB re-designated $8.8 billion of AFS securities to HTM securities during the nine months ended September 30, 2021 and the year ended December 31, 2021, respectively.

200.    The statements detailed in ¶¶193-199 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Officer Defendants include:

(a)    SVB's interest rate risk policy did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, articulate model back-testing requirements, or the ongoing reporting requirements for threshold breaches over prolonged periods; and did not describe how limits were set and calibrated.

(b)    Interest rate risk limits had not been reviewed for potential recalibration or that the current level of the limits had been supported since at least 2018, and SVB's internal audit had not subjected SVB's contingency funding plans to review since 2019.

(c)    SVB failed to appropriately design an interest rate risk model.  No later than December 2020, SVB's internal audit found that SVB's ALM Model used incorrect data inputs, inadequate governance of interest rate risk models, and inaccurate NII position.

(d)    The Officer Defendants manipulated the ALM Model's assumptions in April 2022 to artificially reduce the modeled risk in response to breaches of SVB's internal policy limits relating to EVE at risk in interest rate shock scenarios.  They also manipulated SVB's ILST in October 2022 to artificially reduce the modeled deficits during a stress event.

(e)    No later than February 4, 2021, the Officer Defendants were aware that SVB's testing failed to "provide short term insight into the interim of one to 30 days."  That same day, Becker and Beck were "encouraged to reassess the Bank's measurement needs, particularly as record levels of IBBB [interest-bearing bank balances] are potentially deployed into the investment or loan portfolio."

(f)     No later than October 22, 2021, Becker and Beck were aware that SVB's ILST was fundamentally flawed because: (A) it utilized key assumptions based on incomparable (and less conservative) peer benchmarks; (B) the design contained assumptions tailored to less conservative capital stress testing (which are designed to test macroeconomic events and thus concern a longer time horizon), not the more immediate impact of a liquidity stress, which is the purpose of ILST testing; and (C) inappropriately treated all deposits as behaving similarly in stress, even though the acknowledged that outflows of commercial deposits vary in times of stress.

(g)     SVB's contingency funding plan was also deficient, which negatively impacted the Officer Defendants' ability to assess whether the Company was under liquidity stress and their ability to respond quickly to a real stress event, as well as what funding was available in varying levels of stress.  Becker and Beck were aware of this no later than October 22, 2021. Notably, less than a year later in May 2022, when SVB's ILST would show a $12 billion deficit at the 30-day mark of a stress event, SVB would characterize that deficit as an "operational shortfall" attributable to deficiencies in the Company's contingency funding options.  The deficits modeled by the ILST, however, were understated due to the use of unsupported assumptions relating to deposit outflow speed in a stress event.  Had appropriate assumptions been used, the deficit would have increased by up to an additional $27 billion.

(h)     According to the January 2022 BlackRock risk control report, "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."[48]

(i)     That, based on the facts stated in ¶¶(a)-(h) above, the Officer Defendants could not – and did not – reliably establish, as GAAP requires, that SVB possessed the requisite "positive intent and ability to hold to its maturity" the massive debt securities portfolio that they classified as held-to-maturity.  As a result, the Officer Defendants falsely reported SVB's financial

---

[48]   Antoine Gara & Brook Masters, *Silicon Valley Bank was warned by BlackRock that risk controls were weak*, Fin. Times (Mar. 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

performance, including by overstating the value of SVB's HTM securities, understating losses to SVB's AOCI, and artificially inflating SVB's stockholder equity.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    The Officer Defendants' Personal Involvement in and Knowledge of SVB's Risk Management Issues Establishes Their Scienter

201.    Evidence of Becker and Beck's awareness and/or reckless disregard of the systemic governance, liquidity, and risk management issues that led to SVB's failure is overwhelming.  As he would admit on May 16, 2023 in testimony to the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Becker "was personally involved" in SVB's interactions with the Examiners concerning "the areas of governance, controls, and second line risk management."

202.    As an insured depository institution, both the Bank and SVB were subject to regular examinations by the Federal Reserve and the California Department of Business Oversight.  The examinations of the Bank focused on evaluating and rating its capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk ("CAMELS").  The letters memorializing the findings and results of these examinations are referred to herein as "CAMELS Reports."  Meanwhile, the examinations of SVB as the Bank's holding company focused on assessing the organization's overall risk management and consolidated financial condition. Following each examination, the Officer Defendants were informed of the Examiners' findings and results contemporaneously during meetings with and/or letters and reports from the Examiners.  These letters and reports were confidential and not made public until April 2023 – after the Bank failed and SVB filed for bankruptcy.

203.    These letters and reports demonstrate that coming into and throughout the Relevant Period, Becker and Beck were personally and repeatedly warned about the facts that they misrepresented to and/or concealed from investors.  In nearly every annual inspection, the Federal Reserve issued new supervisory findings in the form of MRAs or MRIAs that required SVB and the Officer Defendants to take particular actions to remediate specific issues.  Between 2019 and 2022, the Federal Reserve issued no fewer than 54 supervisory findings.  The Officer Defendants' responses to issues identified by the Examiners led the Examiners to ultimately conclude that SVB

"[m]anagement may lack the ability or willingness to effectively address weaknesses within appropriate time frames." Indeed, at the time the Bank failed, SVB and the Bank had a total of 31 unresolved supervisory findings, ***29 of which related to capital planning, liquidity risk management, governance, and risk control***.

204. In particular, based on the results of these examinations, the findings and results of which were transmitted to the Officer Defendants via letters, reports, and meetings, Becker and Beck each were aware of the following facts relating to risk management, liquidity and capital planning, and interest rate risk management.

(a) On December 14, 2016, Becker and Bank management met with the Examiners to discuss the findings and results from their 2016 CAMELS examination. As summarized in the March 7, 2017 CAMELS Report sent to Becker and SVB's Board, the Bank had "insufficient documentation of the capital buffer methodology and governance over the capital planning process."

(b) On March 16, 2017, Becker and SVB management met with the Examiners to discuss the findings and results from their 2016 examination of SVB. Those findings and results, summarized in a June 14, 2017 letter sent to Becker and SVB's Board, included "weaknesses in model risk management and governance practices." In particular, SVB required several years to implement a risk management framework. The Examiners also found that "[t]he compliance function currently relies on business units to self-regulate and assess their own compliance to policy and regulatory requirements," a system that was "prone to errors and omissions."

(c) On December 12, 2017, the Officer Defendants met with the Examiners to discuss the findings and results from their 2017 CAMELS examination. The February 14, 2018 CAMELS Report, sent to Becker and SVB's Board, admonished on several topics, including:

(i) Risk management: Defendants Becker and Beck were specifically cautioned about "the bank's rapid growth," which the Examiners noted "have placed a strain on the compliance and Enterprise Risk Management functions with respect to oversight and challenge," resulting in "weaknesses . . . in management's ability to effectively identify and monitor key risks as well as ensure compliance with bank policies, regulatory rules and supervisory

1   guidance."  The Examiners also observed the ineffectiveness of SVB's CRO, calling out a lack of

2   evidence that she was providing adequate "oversight or challenge to business decisions."

3                       (ii)      Interest rate risk management: SVB's Treasury function "has grown

4   in complexity over the past several years, and examination and audit findings point to a need for

5   ongoing and independent monitoring and challenge for market risk."

6                       (iii)     Capital planning: Bank "[m]anagement is required to strengthen the

7   capital adequacy assessment and planning methodology to support capital actions and decisions."

8   The Bank's capital planning failed to "include sufficient analysis to ensure that material risks at

9   the firm are appropriately considered in capital actions and decisions."

10                      (d)      In a June 13, 2018 letter to Becker and SVB's Board, which memorialized

11  findings and results from the Examiners' 2017 examination of SVB, the Examiners reiterated their

12  observations from the 2017 CAMELS examination that the Company's "risk monitoring processes

13  may not provide management with sufficient information to identify and monitor key risks and

14  vulnerabilities."

15                      (e)      On December 20, 2018, the Officer Defendants met with the Examiners to

16  discuss the findings and results from their 2018 CAMELS examination.  The March 6, 2019

17  CAMELS Report, sent to Becker and the Bank's Board, included:

18                      (i)      Risk management framework: "[M]anagement's continued

19  attention is required to bring the Bank's risk management framework to an appropriate maturity

20  level."  The Examiners specifically called out the continued need to design, implement, and build

21  out the Bank's compliance function, Policies and Procedures Office, ERM Program Office, and

22  second line of defense.  These shortcomings prevented compliance teams from "fully assess[ing]

23  first line controls" or "independently monitor[ing] and test[ing] compliance with laws, regulations,

24  and supervisory expectations."

25                      (ii)      Model risk management: Other than the program relating to the

26  Bank's one Bank Secrecy Act model, "no ongoing monitoring program has been defined or

27  provided for the other *30 models* being used in production."  In other words, the Bank did not have

28  ongoing monitoring programs in place for 29 out of 30 models, including its models relating to

1  interest rate risk and liquidity.  The March 6, 2019 CAMELS Report included an MRA requiring

2  the Officer Defendants to remedy weaknesses in SVB's model risk management.

3             (iii)     Liquidity: Bank management had "not formally addressed the risk

4  of . . . funding  concentrations or developed a supportable level of operating cash commensurate

5  with the variability of large  depositors and operating cash needs."  Indeed, the Examiners observed

6  that Bank management managed "operating cash balances . . . tightly," including by

7  "supplement[ing] daily cash flows with overnight or short-term borrowings" through channels,

8  access to which could "become restricted during certain periods of the day."  This compounded

9  the liquidity risk posed by the Bank's highly concentrated customer base.  In addition, the

10  Examiners called the Officer Defendants' attention to SVB's "growing HTM portfolio," and

11  advised them "to consider how the Bank's contingent liquidity profile could be impacted by

12  restricted or lack of access to the repo market in periods of severe stress."

13             (f)     During a February 12, 2019 meeting with Beck, and in an April 11, 2019

14  letter to Becker and SVB's Board, the Examiners reiterated that SVB "[m]anagement has not yet

15  established a credible, independent, and complete second line of defense aligned with the

16  Company's risk management framework and commensurate with its growth and risk profile."

17             (g)     On September 23, 2019, Becker and other SVB senior executives met with

18  the Federal Reserve to discuss the results of its inspection of SVB's Corporate Governance and

19  Global Risk Management activities.  During that review, the Federal Reserve again found, and

20  communicated to Becker, weaknesses in SVB's model risk management and enterprise risk

21  management controls monitoring, which raised the risk that SVB's Board and senior management

22  had an insufficient "view/perspective into aggregate residual risk exposures."

23             (h)     In a November 19, 2019 letter to Becker and SVB's Board, the Federal

24  Reserve memorialized the results from its inspection of SVB's Corporate Governance and Global

25  Risk Management discussed in September 2019.  The Target Corporate Governance Supervisory

26  Letter included a new MRA concerning the weaknesses in SVB's model risk management,

27  including SVB's failure to provide a "transparent and repeatable process for setting capital limits

28  and buffers."  The Federal Reserve stated that this failure created the risk that SVB's "board and

1    senior management may rely on stress testing results that do not accurately reflect the risk

2    appetite."  The Federal Reserve also issued an MRA requiring SVB to take action to remedy the

3    weaknesses in SVB's enterprise risk management controls monitoring.

4              (i)    On January 17, 2020, the Officer Defendants met with the Examiners to

5    discuss the findings and results from their 2019 CAMELS examination.  During this meeting,

6    "emphasis was placed on capital planning specific to the organization's unique risk profile . . . and

7    risk management (FLoD [first line of defense] governance practices, SLoD [second line of

8    defense] challenge role])."  The April 13, 2020 CAMELS Report to Becker and SVB's Board again

9    highlighted weaknesses in the Bank's "governance, risk monitoring, and reporting," including the

10   continued need to build out the second line of defense.  As to capital planning, "transparency

11   around major assumptions and identification of and rational for management overrides" was

12   needed.  The Examiners also observed that the Bank's "IRR policy has not been reviewed and

13   approved since April 2018."

14             (j)    The Officer Defendants' continued failure to "completely establish[] a

15   credible, independent second line of defense" was reiterated to SVB "management" during a

16   February 6, 2020 meeting and to Beck in a May 8, 2020 letter following the Examiners' 2019

17   examination of SVB.

18             (k)    On February 4, 2021, the Officer Defendants met with the Examiners to

19   discuss the results of their 2020 CAMELS examination.  The May 3, 2021 CAMELS Report to

20   Beck and SVB's Board included the following:

21             (i)    Risk management framework: The Examiners yet again called out

22   the Officer Defendants' "slow" development and implementation of a three lines of defense

23   framework, a framework which was "fundamental to the Board and management's ability to plan

24   for and respond to risks arising from changing business conditions, new activities, accelerated

25   growth, and increasing complexity."  The Examiners stated that the Bank's "[m]anagement has

26   been reactive as opposed to proactive in certain risk identification aspects" and cautioned that

27   "[r]isk management practices are being outpaced by the Bank's significant asset growth and

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 81 -

1    require enhancement."  The May 3, 2021 CAMELS Report included two new MRAs requiring the

2    Officer Defendants to take action to remediate SVB's deficient risk management practices.

3            (ii)    Interest rate risk management: The Examiners observed that EVE

4    was modeled to decrease in response to interest rate increases, "exceed[ing] the outer policy limit."

5    The Officer Defendants were "encouraged to formalize the process of monitoring, tracking, and

6    escalating action plans."

7            (iii)    Liquidity: The Bank's liquidity model did not "provide short term

8    insight into the interim of one to 30 days."  As a result, the Officer Defendants were "encouraged

9    to reassess the Bank's measurement needs, particularly as record levels of IBBB are potentially

10   deployed into the investment or loan portfolio."  The Officer Defendants' failure to heed this

11   warning would contribute to the multi-billion-dollar liquidity deficits that SVB's internal liquidity

12   stress test would model one year later in 2022.

13           (l)    The Federal Reserve restated to the Officer Defendants SVB's risk

14   management framework shortcomings during a June 2, 2021 meeting with SVB management and

15   in a July 9, 2021 letter to Becker and SVB's Board.  In particular, the Federal Reserve stated that

16   "a three lines of defense model adopted in 2018 continues to lack needed traction; FLoD controls

17   programs are insufficient and inconsistent, and the Enterprise Risk Management (ERM) program

18   remains ineffective."  The Federal Reserve called deficiencies with SVB's line of defense

19   framework "thematic weakness[es]," and stated that "[a]t this point, the system of internal controls

20   does not provide adequate coverage of SVB[]'s key risks and business activities."  In the July 9,

21   2021 letter, the Federal Reserve downgraded its assessment of SVB's internal controls, adding that

22   SVB still failed to remediate the MRAs issued against it concerning deficiencies in its risk

23   management controls.

24           (m)    On October 22, 2021, SVB management met with the Examiners to discuss

25   the results of their 2021 liquidity review.  The results of this examination were memorialized in a

26   November 2, 2021 letter to the Officer Defendants, which results are detailed *supra*, ¶118.  The

27   November 2, 2021 letter included two new MRIAs and four new MRAs concerning "foundational

28   shortcomings" in "key areas" related to SVB's liquidity risk management.

(n)     On May 23 and 27, 2022, SVB's Board, internal audit, and management met with the Examiners to discuss the results of their examination focusing on SVB's governance and risk management.  The results of this examination were memorialized in a May 31, 2022 letter to Becker and SVB's Board, which results are detailed *supra*, ¶79.  The May 31, 2022 letter included three new MRIAs concerning systemic weaknesses in SVB's risk management.

(o)     On July 21, 2022, Becker and SVB's Board met with the Examiners to discuss the results of their supervisory work during 2021 and the first half of 2022.  In the August 17, 2022 letter to Becker and SVB's Board that memorialized these findings, the Examiners made clear that, "[i]n the time leading up to SVB crossing the $100 billion consolidated assets threshold, the firm experienced significant growth but did not maintain a risk management function commensurate with the growing size and complexity of the firm."  The Examiners reiterated that "thematic, root cause deficiencies" existed relating to "ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."  The Examiners stated that these "deficiencies are not correctable in the normal course of business"; as a result, the Examiners informed Becker that they would initiate a private enforcement action.

(p)     In an August 19, 2022 letter to Beck, the Federal Reserve memorialized its review of aspects of SVB's capital planning processes since attaining LFI status.  The Federal Reserve found that SVB's model risk management permitted "application of material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls."  These weaknesses presented a "safety and soundness concern," including the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions."

(q)     On November 14, 2022, Bank "management" met with the Examiners to discuss the results of their 2022 CAMELS examination.  In the November 15, 2022 CAMELS Report sent to the Officer Defendants, the Examiners faulted the Bank's "interest rate risk (IRR) simulations" as "not reliable" and "requir[ing] improvements."  The simulations' results were "directionally inconsistent with internal projections and IRR simulations, calling into question the

reliability of IRR modeling and the effectiveness of risk management practices."  The Examiners issued a new MRA concerning SVB's "unreliable" interest rate risk simulation and modeling.

(r)    In a December 27, 2022 letter to Becker and SVB's Board, the Federal Reserve memorialized its findings and recommendations concerning SVB's internal audit and risk management practices since 2020.  The Federal Reserve described "material weaknesses" in SVB's "risk assessment process" and noted that SVB still had not remediated the Federal Reserve's MRIA issued in May 2022.

**B.**    **The Officer Defendants Had Motive to Commit the Fraud**

    **1.**    **SVB's Compensation Structure Incentivized the Officer Defendants to Commit Fraud**

205.    During the Relevant Period, Becker and Beck profited handsomely by causing SVB to report record-breaking growth, while avoiding financial repercussions as a result of the undisclosed and increasing interest rate risk to which the Company was exposed.  SVB's corporate incentive compensation structure, comprised of cash and stock awards, emphasized the performance of the Company's Return on Average Equity ("ROE") and was structured in such a way as to incentivize and facilitate Defendants' misconduct.

206.    Two-thirds of Becker's and Beck's Incentive Cash Program ("ICP") awards during the Relevant Period were based on the ROE metric, which, according to the Company's Schedule 14A Definitive Proxy Statements, was altered so as to ignore impact of moving interest rates on the Company's investments and therefore remove from consideration any unrealized losses in the Company's securities portfolio due to rising interest rates.  The Company's calculation of ROE in relation to determining ICP bonuses was therefore designed to capture the benefits of the Company's income without reflecting the interest rate risk to which Becker and Beck exposed the Company's securities portfolio.

207.    During the Relevant Period, Beck and Becker were eligible for increasingly large ICP bonuses in relation to the Company's ROE performance:

|  | Target Payout as a Percentage of Base Salary | | Maximum Payout as a Percentage of Target | |
|---|---|---|---|---|
| Defendant | Becker | Beck | Becker | Beck |
| FY 2020 | 130% | 100% | 200% | 200% |
| FY 2021 | 150% | 100% | 200% | 200% |
| FY 2022 | 200% | 125% | 200% | 200% |

208.    Becker and Beck were also awarded cash and stock incentives as a result of the Company's ROE performance in relation to peer institutions.  One-third of Becker and Beck's ICP awards during the Relevant Period were based on ROE relative to peers.  These awards were also subject to generous multipliers, and Becker and Beck were eligible to receive up to 200% of their target ICP award if SVB fell in the top four[49] positions among its peers with respect to ROE.

209.    Becker and Beck's stock awards were also tied to SVB's placement among peers with respect to ROE.  In 2019, Becker and Beck, along with the other executive officers, were awarded a special one-time executive equity ("SEE") award, comprised of performance-based restricted stock units ("PSRUs").  One half, or 50%, of the SEE award was based on ROE relative to peers.

210.    In each of the following three years, the Company continued to award stock bonuses based, in part, on ROE relative to peers.  In 2020, 2021, and 2022, one half, or 50%, of Becker and Beck's stock awards were based on the Company's ROE relative to peers.

211.    All of these stock awards, including the SEE award in 2019, were subject to a multiplier of up to 150% of the target award if SVB fell within the top four[50] positions relative to its peers with respect to ROE.

212.    As detailed in the Company's annual Schedule 14A Definitive Proxy Statements, SVB paid Becker in excess of $38 million from FY 2020 through FY 2022:

---

[49]   In 2021, Becker and Beck were eligible for the 200% multiplier if SVB fell in the top five positions among peers with respect to ROE.

[50]   In 2021, Becker and Beck were eligible for the 150% multiplier if SVB fell in the top five positions among peers with respect to ROE.

| | Salary | Cash ICP Award | Stock Award | Stock Option Award | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY 2020 | $1,007,692 | $1,690,000 | $3,573,032 | $1,245,305 | $19,172 | $7,535,201 |
| FY 2021 | $1,040,385 | $3,000,000 | $4,238,529 | $1,622,657 | $20,561 | $9,922,132 |
| FY 2022 | $1,090,385 | $1,500,000 | $5,282,550 | $2,021,857 | $19,849 | $9,914,641 |
| **Total:** | **$3,138,462** | **$6,190,000** | **$13,094,111** | **$4,889,819** | **$59,582** | **$27,371,974** |

213.    Beck reaped over $13 million from FY 2020 through FY 2022:

| | Salary | Cash ICP Award | Stock Award | Stock Option Award | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY 2020 | $604,616 | $830,000 | $992,397 | $345,882 | $4,176 | $2,777,071 |
| FY 2021 | $680,769 | $1,400,000 | $1,199,285 | $459,072 | $20,561 | $3,759,687 |
| FY 2022 | $740,385 | $625,000 | $1,584,901 | $606,515 | $19,526 | $3,576,327 |
| **Total:** | **$2,025,770** | **$2,855,000** | **$3,776,583** | **$1,411,469** | **$44,263** | **$10,113,085** |

### 2.    The Officer Defendants Engaged in Suspicious Stock Sales During the Relevant Period

214.    During the Relevant Period, the Officer Defendants capitalized on SVB's artificially inflated stock price by dumping tens-of-millions of dollars of their personally held shares on investors.  Becker sold 57,758 of his SVB shares, netting $29.5 million.  Meanwhile, Beck sold 12,740 of his SVB shares, netting more than $6.6 million.

215.    Becker and Beck's trading activity was highly suspect, particularly as the Bank's collapse neared.  Less than two months prior to SVB's March 8 announcement that it would sell its entire AFS portfolio at a massive $1.8 billion loss, Becker and Beck, on January 26, 2023 and January 24, 2023, respectively, established 10b5-1 trading plans.  Pursuant to these trading plans, on February 27, 2023, less than two weeks before the March 8 announcement, Becker and Beck off-loaded a significant number of SVB shares that netted them combined proceeds of more than $4 million.

216.    The Officer Defendants' insider sales were suspiciously timed to take advantage of their knowledge of material, non-public information.  As discussed *supra*, Becker and Beck unequivocally assured investors on October 20, 2022, December 7, 2022, and February 21, 2023, that they had "no intent to restructure that [AFS or HTM] portfolio at this time."  However, they were actively contemplating restructuring both portfolios, having privately raised the scenarios to

1  SVB's Board on December 7, 2022.  But just six days after their last public assurance, on February

2  27, 2023, the two Officer Defendants offloaded more than $4 million worth of shares.  Less than

3  two weeks later, SVB announced the bombshell news that it would sell its entire AFS portfolio at

4  a $1.8 billion loss, causing a run on the bank, which ultimately rendered SVB stock virtually

5  worthless mere weeks later.

6       217.    Defendants Becker and Beck have been heavily criticized for their suspiciously

7  timed insider sales, and the DOJ and SEC are both investigating the Officer Defendants' stock

8  sales.  In short, the Officer Defendants had 35 million reasons to commit fraud.  Their insider sales

9  support the already strong inference of scienter.

10  **VII.    LOSS CAUSATION**

11       218.    The fraud alleged herein was the proximate cause of the economic loss suffered by

12  Plaintiffs.  There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price

13  declines) described herein.

14       219.    The market for SVB common stock was open, well-developed, and efficient during

15  the Relevant Period.  Throughout the Relevant Period, SVB common stock traded at artificially

16  inflated prices as a direct result of the Officer Defendants' materially false and misleading

17  statements and omissions of material fact, which were widely disseminated to the securities

18  market, investment analysts, and the investing public.  Plaintiffs purchased or otherwise acquired

19  SVB common stock at artificially inflated prices relying upon the integrity of the market price of

20  SVB common stock, and were damaged thereby.

21       220.    When the relevant truth and its impact on SVB's financial results and prospects

22  entered the market through a series of partial disclosures and/or when the foreseeable risks

23  previously concealed by the Officer Defendants' material misrepresentations and omissions

24  materialized, the price of SVB common stock significantly dropped, as the artificial inflation came

25  out of the stock price over time.  As a result of their purchases of SVB common stock during the

26  Relevant Period, Plaintiffs suffered economic loss, *i.e.*, damages, under federal securities laws.

27       221.    The corrective impact of the partial disclosures during the Relevant Period alleged

28  herein, however, was tempered by the Officer Defendants' ongoing false and misleading

statements and omissions that was designed to and did continue to conceal the true nature of Defendants' fraud.  Each partial disclosure did not, on its own, fully remove the inflation from SVB's share price, because it only partially revealed the nature and extent of the fallout from the Officer Defendants' previously concealed misconduct.   The Officer Defendants' ongoing misrepresentations and omissions maintained the price of SVB securities at artificially inflated levels, even after the partial disclosures.

222.    The disclosures that corrected the market price of SVB shares are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

223.    On July 21, 2022, the Company announced disappointing Q2 2022 financial results and slashed its FY 2022 financial guidance.  Among other things, SVB lowered its expected NII growth by almost 20% to the mid-forties (down from its April 2022 guidance projecting growth in the low fifties).  SVB attributed the reduced growth projection to "unprecedented Fed tightening" and "meaningfully slowed . . . PE and VC investment."  This disclosure surprised the market because the Officer Defendants had repeatedly represented that SVB had effective governance and controls in place around interest rate risk, and that interest rate increases would "benefit" SVB. Analysts noted with surprise that SVB's losses were much more than expected.

224.    In response to this news, the price of SVB common stock declined $74.81 per share, or more than 17%, from a close of $436.17 per share on July 21, 2022 to close at $361.36 per share on July 22, 2022.

225.    SVB's disclosure, however, did not reveal the full relevant truth concealed by the Officer Defendants' misleading statements and omissions.  To the contrary, the Officer Defendants continued to make false statements and conceal additional facts concerning SVB's governance and control deficiencies and precarious state, which statements were designed to, and did, cause the price of SVB securities to continue to trade at artificially inflated prices.  Indeed, Becker opened SVB's earnings call that day by touting the Company's "ample liquidity and strong capital," emphasizing that SVB's disappointing financial results announced that day did not "change [his] view" on SVB.

226.    Unbeknownst to investors, the Federal Reserve continued to consistently identify weaknesses in SVB's controls, including by informing the Officer Defendants the very same day as SVB's Q2 2022 conference call that, "[i]n the time leading up to SVB crossing the $100 billion consolidated assets threshold, [SVB] experienced significant growth but did not maintain a risk management function commensurate with the growing size and complexity of the firm."  The Federal Reserve emphasized to the Officer Defendants the significance of these failures, stating that it was "imperative that [SVB's] board of directors and management work diligently to remediate these important deficiencies."[51]

227.    On October 20, 2022, SVB again announced disappointing financial results, this time for Q3 2022.  It also again announced the need to reduce further its 2022 financial estimates, driven by the impact of increased interest rates.

228.    On this news, the price of SVB common stock fell an additional $72.43 per share, or approximately 24%, from a close of $302.46 per share on October 20, 2022 to close at $230.03 per share on October 21, 2022.  The market was again surprised by this news, as the Officer Defendants had repeatedly claimed that they had the effective controls and modeling in place to fully understand interest rate risk and the impact of changing rates on SVB's finances and had steadfastly represented that SVB was poised to benefit from increased interest rates.

229.    The Officer Defendants continued to soften the impact of the disclosures, making additional false assurances regarding the strength of SVB's controls around interest risk management and liquidity.  In the same press release announcing SVB's quarterly results, Becker attributed SVB's third quarter results to external forces, misleadingly representing that SVB was "well equipped to manage these conditions."  And when an analyst specifically questioned SVB's ability to hold its $90+ billion in HTM securities, Beck resoundingly stated: "There is no intent to restructure the held-to-maturity portfolio" and "to be really clear, like we have no intent to restructure that portfolio at this time."

---

[51]   August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Becker (SVBFG and SVB 2021 Supervisory Ratings Letter) ("formally communicat[ing] the ratings [the Federal Reserve] presented to the Firm's board on July 21, 2022").

230.     After trading closed on March 8, 2023, SVB made several announcements, which were related to and directly and proximately caused by SVB's concealed control deficiencies and liquidity issues.  First, SVB was forced to sell "substantially all of its available for sale securities portfolio" for a $1.8 billion loss.  Second, even after the sale of its entire AFS portfolio, SVB's liquidity shortfall resulting from rising interest rates was so severe that the Company needed to raise another approximately $2.25 billion through stock offerings.  SVB also admitted that, even with the capital raise, there would be a "payback period of approximately three years" to make up for this loss.  Third, SVB was lowering its net interest income guidance for both Q1 2023 and the full year.  Finally, credit agency Moody's Investor Service was "considering" ratings actions against SVB, including a downgrade of SVB's credit rating.  That evening, Moody's in fact downgraded SVB's credit rating, citing a "'deterioration in the bank's funding, liquidity and profitability.'"

231.     Analysts described SVB's announcements as surprising, disappointing, and inconsistent with its guidance from less than two months prior.  Given the Officer Defendants' adamant denials in recent weeks and months that any restructuring of the securities portfolios was not necessary or contemplated, analysts were particularly bewildered by the announced portfolio restructure.  As a result, several analysts downgraded their ratings of SVB.

232.     On this news, the price of SVB shares plummeted by $161.79, or more than 60%, from a close of $267.83 per share on March 8, 2023, to close at $106.04 per share on March 9, 2023.  Similarly, the price of SVB Series 5.25 preferred stock plummeted $4.27 per share, or more than 21%, from a close of $19.50 per share on March 8, 2023 to close at $15.23 per share on March 9, 2023.

233.     SVB's customers also reacted quickly and negatively to these disclosures and the reality about SVB that they exposed.  In a single day, depositors attempted to pull $42 billion from the Bank, and the withdrawal requests for the following day ratcheted up to $100 billion.  The bank run pushed the Bank into insolvency.  On March 10, 2023, before the market opened, the Nasdaq exchange suspended trading in SVB stock, explaining that trading would "remain halted

1   until SVB Financial Group has fully satisfied Nasdaq's request for additional information."[52]

2   Before trading resumed, however, the Federal Reserve, the FDIC, and California DFPI seized

3   control of SVB.  On March 14, 2023, *The Wall Street Journal* reported that the DOJ and the SEC

4   are investigating, among other things, "stock sales that SVB Financial's officers made in the days

5   before the bank failed."  On March 17, 2023, SVB filed for Chapter 11 Bankruptcy protection.

6   Trading remained suspended until March 28, 2023, at which time the price of SVB common stock

7   continued its precipitous decline from before trading had been halted, ultimately closing that day

8   at $0.40.

9   **VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
        FRAUD ON THE MARKET**

10

11          234.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

    fraud-on-the-market doctrine in that:

12

13          •       the Officer Defendants concealed facts during the Relevant Period;

14          •       the Officer Defendants' omissions and misrepresentations were material;

15          •       SVB stock traded in an efficient market, was liquid, and traded with substantial
                    trading volume during the Relevant Period;

16

17          •       the Company's stock was traded on the Nasdaq and was covered by multiple
                    analysts;

18
            •       the misrepresentations and omissions alleged would tend to induce a reasonable
19                  investor to misjudge the value of the Company's stock; and

20          •       Plaintiffs purchased and/or sold SVB securities between the time the Officer
                    Defendants concealed or misrepresented material facts and the time the true facts
21                  were disclosed, without knowledge of the omitted or misrepresented facts.

22          235.    Based upon the foregoing, Plaintiffs are entitled to a presumption of reliance upon

23   the integrity of the market.

24          236.    Alternatively, Plaintiffs are entitled to the presumption of reliance established by

25   the U.S. Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as the

26

27   _____
    [52] NASDAQ press release, *Nasdaq Halts SVB Financial Group* (Mar. 10, 2023),
28   https://www.nasdaq.com/press-release/nasdaq-halts-svb-financial-group-2023-03-10.

Officer Defendants omitted material information in their Relevant Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5
Against the Officer Defendants**

237.　The Exchange Act Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

238.　This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

239.　During the Relevant Period, Defendants Becker and Beck made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants Becker and Beck's untrue statements of material fact intended to, and, throughout the Relevant Period, did: (i) deceive the investing public, including the Exchange Act Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of SVB securities; and (iii) cause the Exchange Act Plaintiffs to purchase SVB securities at artificially inflated prices.  In furtherance of this wrongful course of conduct, Defendants Becker and Beck, and each of them, took the actions set forth herein.

240.　Pursuant to the above wrongful course of conduct, each of the Officer Defendants named herein participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, releases, and other statements described above, including statements made to securities analysts and the media that were designed to influence the market for SVB securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SVB's operations and prospects.

241.　By virtue of their positions at SVB, Defendants Becker and Beck acted with knowledge of and/or had access to the relevant facts such that the acts and omissions alleged herein were committed willfully or with reckless disregard for the truth.

242.    Information showing that Defendants Becker and Beck acted knowingly or with deliberate recklessness is peculiarly within the Officer Defendants' knowledge and control.  As the senior managers of SVB, the Officer Defendants named herein had knowledge of the details of SVB's internal affairs.

243.    Defendants Becker and Beck are directly and indirectly liable for the wrongs complained of herein.  Because of their positions of control and authority, Defendants Becker and Beck were able to and did, directly or indirectly, control the content of the statements of SVB.  As officers of a publicly held company, Defendants Becker and Beck had a duty to disseminate timely, accurate, and truthful information with respect to SVB's businesses, operations, future financial condition, and future prospects.

244.    As a result of the Officer Defendants' misconduct, the market price of SVB securities was artificially inflated throughout the Relevant Period.  In ignorance of the adverse facts concerning SVB's business and financial condition (which were concealed by Defendants Becker and Beck), the Exchange Act Plaintiffs purchased or acquired SVB securities at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Officer Defendants, and were damaged thereby.

245.    Had the Exchange Act Plaintiffs known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices paid.  At the time of the purchases and/or acquisitions by the Exchange Act Plaintiffs, the true value of SVB securities was substantially lower than the prices paid by the Exchange Act Plaintiffs.  The market price of SVB securities declined upon public disclosure of the facts alleged herein to the injury of the Exchange Act Plaintiffs.

246.    By reason of the conduct alleged herein, Defendants Becker and Beck knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

247.    As a direct and proximate result of the Officer Defendants' wrongful conduct, the Exchange Act Plaintiffs suffered damages in connection with their purchases of the Company's

securities during the Relevant Period, as the truth about SVB's operations and prospects began to be disclosed to the investing public.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

248.    The Exchange Act Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

249.    During the Relevant Period, by virtue of their positions as officers and/or directors of SVB, each of the Individual Defendants was a controlling person of SVB within the meaning of §20(a) of the Exchange Act.  The Director Defendants, as individuals and as a group, also were controlling persons of Becker and Beck within the meaning of §20(a) of the Exchange Act.

250.    In their capacities as senior corporate officers and/or directors of SVB, the Individual Defendants oversaw the operation and management of SVB, and conducted, directed, and participated, directly and indirectly, in the conduct of SVB's business affairs.  As described herein, Becker and Beck violated §10(b) of the Exchange Act.  By virtue of the acts and omissions of its senior officers and executives, including Becker and Beck, SVB violated §10(b) of the Exchange Act; however, Plaintiffs bring no claims against SVB in this action.  The Individual Defendants had the power to direct the actions of, and exercised the same to cause, Becker, Beck, and SVB to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over SVB's operations and possessed the power to control the specific activities which comprise the primary violations about which the Exchange Act Plaintiffs complain.  Throughout the Relevant Period, the Individual Defendants exercised their power and authority to cause Becker, Beck, and SVB to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of SVB, and the Director Defendants were "controlling persons" of Becker and Beck within the meaning of §20(a) of the Exchange Act.  By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

IX.    **SECURITIES ACT ALLEGATIONS**

A.    **The Relevant Offerings**

251.    The Securities Act Plaintiffs purchased securities traceable to the Registration Statement used by Defendants to complete each of the following offerings of newly issued SVB securities:

- January 28, 2021 1.800% Senior Notes due 2031 ("January 2021 1.8% Senior Notes Offering");

- January 28, 2021 Depositary Shares, representing a 1/100th ownership interest in a share of SVB Series B Non-Cumulative Perpetual Preferred Stock ("January 2021 Series B Depositary Shares Offering");

- May 10, 2021 2.100% Senior Notes due 2028 ("May 2021 2.1% Senior Notes Offering");

- May 10, 2021 Depositary Shares, representing a 1/100th ownership interest in a share of SVB Series C Non-Cumulative Perpetual Preferred Stock ("May 2021 Series C Depositary Shares Offering");

- October 27, 2021 1.800% Senior Notes due 2026 ("October 2021 1.8% Senior Notes Offering");

- October 27, 2021 Depositary Shares, representing a 1/100th ownership interest in a share of SVB Series D Non-Cumulative Perpetual Preferred Stock ("October 2021 Series D Depositary Shares Offering");

- October 27, 2021 Depositary Shares, representing a 1/100th ownership interest in a share of SVB Series E Non-Cumulative Perpetual Preferred Stock ("October 2021 Series E Depositary Shares Offering"); and

- April 28, 2022 4.345% Senior Fixed Rate/Floating Rate Notes due 2028 and 4.570% Senior Fixed Rate/Floating Rate Notes due 2033 (collectively referred to herein as the "April 2022 Offering").

252.    The Underwriter Defendants and Individual Defendants are collectively referred to herein as "Defendants."

253.    On November 15, 2019, SVB filed with the SEC a shelf registration statement on Form S-3 ASR (the "Registration Statement").  The Registration Statement authorized the sale of SVB securities, including senior debt securities, subordinated debt securities, common stock, and preferred stock.  The Registration Statement was declared effective on November 15, 2019.

254.    The Registration Statement incorporated by reference all §§13(a), 13(c), 14, or 15(d) of the Exchange Act reports or documents filed by SVB subsequent to the dates of the Registration Statement until each respective "offering is completed."  During the Relevant Period, SVB filed prospectuses with the SEC in connection with the Registration Statement on Forms 424B2 and 424B5, which prospectuses were incorporated therein.

255.    On January 28, 2021, Defendants caused to be filed with the SEC a prospectus on Form 424B2 (the "January 2021 1.8% Senior Notes Prospectus") pursuant to which Defendants, caused to be offered and sold $500 million in 1.800% Senior Notes due 2031.  The January 2021 1.8% Senior Notes Prospectus was incorporated into and formed part of the Registration Statement.  The January 2021 1.8% Senior Notes Prospectus and the Registration Statement, along with the documents incorporated by reference therein, are collectively referred to herein as the "January 2021 1.8% Senior Notes Offering Materials."

256.    On January 28, 2021, Defendants caused to be filed with the SEC a prospectus on Form 424B2 (the "January 2021 Series B Depositary Shares Prospectus") pursuant to which Defendants caused to be offered and sold $750 million in Depositary Shares, representing a 1/100th ownership interest in a share of SVB Series B Non-Cumulative Perpetual Preferred Stock. The January 2021 Series B Depositary Shares Prospectus was incorporated into and formed part of the Registration Statement.  The January 2021 Series B Depositary Shares Prospectus and the Registration Statement are collectively referred to herein as the "January 2021 Series B Depositary Shares Offering Materials."

257.    On May 10, 2021, Defendants caused to be filed with the SEC a prospectus on Form 424B2 (the "May 2021 2.1% Senior Notes Prospectus") pursuant to which Defendants caused to be offered and sold $500 million in 2.100% Senior Notes due 2028.  The May 2021 2.1% Senior Notes Prospectus was incorporated into and formed part of the Registration Statement.  The May 2021 2.1% Senior Notes Prospectus and the Registration Statement are collectively referred to herein as the "May 2021 2.1% Senior Notes Offering Materials."

258.    On May 10, 2021, Defendants caused to be filed with the SEC a prospectus on Form 424B2 (the "May 2021 Series C Depositary Shares Prospectus") pursuant to which

1   Defendants caused to be offered and sold $1 billion in Depositary Shares, representing a 1/100th

2   ownership interest in a share of SVB Series C Non-Cumulative Perpetual Preferred Stock.  The

3   May 2021 Series C Depositary Shares Prospectus was incorporated into and formed part of the

4   Registration Statement.  The May 2021 Series C Depositary Shares Prospectus and the

5   Registration Statement are collectively referred to herein as the "May 2021 Series C Depositary

6   Shares Offering Materials."

7   259.    On October 27, 2021, Defendants caused to be filed with the SEC a prospectus on

8   Form 424B2 (the "October 2021 1.8% Senior Notes Prospectus") pursuant to which Defendants

9   caused to be offered and sold $650 million in 1.800% Senior Notes due 2026.  The October 2021

10  1.8% Senior Notes Prospectus was incorporated into and formed part of the Registration

11  Statement.  The October 2021 1.8% Senior Notes Prospectus and the Registration Statement are

12  collectively referred to herein as the "October 2021 1.8% Senior Notes Offering Materials."

13  260.    On October 27, 2021, Defendants caused to be filed with the SEC a prospectus on

14  Form 424B2 (the "October 2021 Series D Depositary Shares Prospectus") pursuant to which

15  Defendants caused to be offered and sold $1 billion in Depositary Shares, representing a 1/100th

16  ownership interest in a share of SVB Series D Non-Cumulative Perpetual Preferred Stock.  The

17  October 2021 Series D Depositary Shares Prospectus was incorporated into and formed part of the

18  Registration Statement.  The October 2021 Series D Depositary Shares Prospectus and the

19  Registration Statement are collectively referred to herein as the "October 2021 Series D Depositary

20  Shares Offering Materials."

21  261.    On October 27, 2021, Defendants caused to be filed with the SEC a prospectus on

22  Form 424B2 (the "October 2021 Series E Depositary Shares Prospectus") pursuant to which

23  Defendants caused to be offered and sold $600 million in Depositary Shares, representing a

24  1/100th ownership interest in a share of SVB Series E Non-Cumulative Perpetual Preferred Stock.

25  The October 2021 Series E Depositary Shares Prospectus was incorporated into and formed part

26  of the Registration Statement.  The October 2021 Series E Depositary Shares Prospectus and the

27  Registration Statement are collectively referred to herein as the "October 2021 Series E Depositary

28  Shares Offering Materials."

262.   On April 28, 2022, Defendants caused to be filed with the SEC a prospectus on Form 424B2 (the "April 2022 Prospectus") pursuant to which Defendants caused to be offered and sold $350 million in 4.345% Senior Fixed Rate/Floating Rate Notes due 2028 and $450 million in 4.570% Senior Fixed Rate/Floating Rate Notes due 2033.   The April 2022 Prospectus was incorporated into and formed part of the Registration Statement.   The April 2022 Prospectus and the Registration Statement are collectively referred to herein as the "April 2022 Offering Materials."

263.   The January 2021 1.8% Senior Notes Offering Materials, January 2021 Series B Depositary Shares Offering Materials, May 2021 2.1% Senior Notes Offering Materials, May 2021 Series C Depositary Shares Offering Materials, October 2021 1.8% Senior Notes Offering Materials, October 2021 Series D Depositary Shares Offering Materials, October 2021 Series E Depositary Shares Offering Materials, and April 2022 Offering Materials are collectively referred to herein as the "Offering Materials."

264.   The January 2021 1.8% Senior Notes Prospectus, January 2021 Series B Depositary Shares Prospectus, May 2021 2.1% Senior Notes Prospectus, May 2021 Series C Depositary Shares Prospectus, October 2021 1.8% Senior Notes Prospectus, October 2021 Series D Depositary Shares Prospectus, and April 2022 Prospectus are collectively referred to herein as the "Prospectuses."   The Prospectuses each incorporated by reference all §§13(a), 13(c), 14, or 15(d) of the Exchange Act reports or documents filed by SVB subsequent to the dates of the Prospectuses until each respective offering was complete.   In addition, the Prospectuses each incorporated various documents that SVB had previously filed with the SEC.   In particular:

(a)   the January 2021 1.8% Senior Notes Prospectus and January 2021 Series B Depositary Shares Prospectus each incorporated by reference SVB's November 5, 2020 Q3 2020 Form 10-Q;

(b)   the May 2021 2.1% Senior Notes Prospectus and May 2021 Series C Depositary Shares Prospectus each incorporated by reference SVB's March 1, 2021 FY 2020 Form 10-K;

(c)     October 2021 1.8% Senior Notes Prospectus, October 2021 Series D Depositary Shares Prospectus, and October 2021 Series E Depositary Shares Prospectus each incorporated by reference SVB's March 1, 2021 FY 2020 Form 10-K, May 10, 2021 Q1 2021 Form 10-Q, August 6, 2021 Q2 2021 Form 10-Q, and April 22, 2021 Release; and

(d)     the April 2022 Prospectus incorporated by reference SVB's March 1, 2022 FY 2021 Form 10-K.

**B.      The Offering Materials Contained Untrue Statements of Material Fact and/or Omitted Facts Necessary to Make the Statements Made Therein Not False or Misleading**

**1.      Untrue Statements and Omissions About SVB's Internal Controls**

265.    On November 5, 2020, SVB filed with the SEC a quarterly report on Form 10-Q ("Q3 2020 Form 10-Q").  The Q3 2020 Form 10-Q incorporated by reference the Risk Factors contained in SVB's February 28, 2020 FY 2019 Form 10-K, which stated that:

> We have implemented a risk management framework to identify and manage our risk exposure.  This framework is comprised of various processes, systems and strategies, and is designed to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks.  Our framework also includes financial, analytical, forecasting or other modeling methodologies, which involve management assumptions and judgment.  In addition, our Board of Directors, in consultation with management, has adopted a risk appetite statement, which sets forth certain thresholds and limits to govern our overall risk profile.

The Form 10-Q presented the alternative as a hypothetical, stating that "[i]f our risk management framework is not effective, we could suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

266.    The Risk Factors incorporated into the Q3 2020 Form 10-Q also stated that "[w]e rely on quantitative models to measure risks and to estimate certain financial values."  The Form

10-Q asserted that "[q]uantitative models may be used to help manage certain aspects of our business and to assist with certain business decisions, including . . . measuring the fair value of financial instruments when reliable market prices are unavailable, estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk."  The Form 10-Q presented the ineffectiveness of these models as only a hypothetical, stating: "Although we employ strategies to manage and govern the risks associated with our use of models, they may not be effective or fully reliable."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.[53]

267.   In addition, the Q3 2020 Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Becker and Beck, stating that they had designed appropriate "disclosure controls and procedures . . . to ensure that material information" about SVB and the Bank was "made known to" them.  They also attested that they had "[e]valuated the effectiveness" of SVB's "disclosure controls and procedures," and any material changes to the Company's internal control over financial reporting.  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

---

[53]   In the February 24, 2023 FY 2022 Form 10-K, the statement read: "We rely on quantitative and qualitative models to measure risks and to estimate certain financial values."  The Form 10-K asserted that "[q]uantitative and qualitative models may be used to help manage certain aspects of our business and to assist with certain business decisions, including . . . measuring the fair value of financial instruments when reliable market prices are unavailable, estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk."

268.    The Risk Factors incorporated by reference into the Q3 2020 Form 10-Q posited, as a hypothetical, that: "If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

269.    The March 1, 2021 FY 2020 Form 10-K stated that "the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective" and "the Company's internal control over financial reporting was effective." These statements were repeated in SVB's: (i) March 1, 2022 FY 2021 Form 10-K; and (ii) February 24, 2023 FY 2022 Form 10-K.

270.    The statements in ¶¶265-269 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

**Prior to November 5, 2020**

(a)    Beginning in December 2016, the Examiners communicated to SVB's Board and management on an annual basis that SVB's governance and risk management framework was deficit, with SVB management failing to, *inter alia*: "consistently ensure that key assumptions and procedures used in measuring and monitoring risks are sufficiently documented to allow for effective challenge and validation" (2016 CAMELS Report (dated Mar. 7, 2017)); and establish "a credible, independent, and complete" line of defense risk management framework (2018 CAMELS Report (dated Mar. 6, 2019)).  SVB's failure to "completely establish[] a credible, independent second line of defense" was reiterated to SVB's Board in a May 8, 2020 letter from the Examiners.

(b)    SVB's internal audit had not subjected SVB's contingency funding plans to review since 2019 despite the changes in the Company's liquidity risk profile.

1         (c)     SVB had already received one MRA issued by the Examiners on June 5,

2  2019 and another MRA and MRIA issued by the Examiners on June 3, 2020 for governance and

3  risk control deficiencies, which deficiencies requiring attention were still open at the time of the

4  Bank's failure.

5  **Prior to March 1, 2021**

6         (d)     In addition to the facts contained in ¶¶(a)-(c) above, by late 2020, SVB still

7  had not fully implemented a line of defense framework or created an enterprise-wide internal

8  controls process, processes that the Examiners underscored as "fundamental to the Board and

9  management's ability to plan for and respond to risks arising from changing business conditions,

10  new activities, accelerated growth, and increasing complexity."

11         (e)     SVB had received an additional two MRAs and two MRIAs issued by the

12  Examiners on February 11, 2021 for governance and risk control deficiencies, which deficiencies

13  requiring attention were still open at the time of the Bank's failure.

14  **Prior to November 8, 2021**

15         (f)     In addition to the facts contained in ¶¶(a)-(e) above, by late 2021, SVB still

16  had not fully implemented a line of defense framework, with the Federal Reserve underscoring to

17  Defendants that SVB "lacks effective independent review oversight and challenge of its liquidity

18  risk management framework."  These deficiencies were identified during an August 16-27, 2021

19  examination and communicated to SVB management during an October 22, 2021 meeting and in

20  a November 2, 2021 letter.  On November 2, 2021, the Federal Reserve required that SVB

21  "immediately establish an effective process for reviewing and challenging liquidity risk

22  management practices" given the severity of the issues, and issued four MRAs and two MRIAs

23  relating thereto.  These supervisory findings requiring remediation were still open at the time of

24  the Bank's failure.

25  **Prior to August 8, 2022**

26         (g)     In addition to the facts contained in ¶¶(a)-(f) above, on May 31, 2022, in a

27  letter sent to SVB's Board, the Examiners stated that "[t]he concerns noted in board oversight

28

coupled with the risk management weaknesses raise concerns about the Firm's governance and controls."  In particular, the Examiners found:

(i)      SVB's Board failed to provide effective oversight of senior management's implementation of LFI readiness initiatives or even "foundational risk management program principles applicable for all banks, irrespective of size";

(ii)      SVB's Board had failed to challenge senior management or hold senior management accountable for failing to execute a sound risk management program;

(iii)      SVB's risk management framework was not comprehensive, did not incorporate coverage for all risk stripes, did not address foundational enterprise level risk management matters (such as issues management and escalation), and was not commensurate to SVB's size and complexity;

(iv)      SVB *still* had not implemented a second line of defense; and

(v)      SVB's internal audit was not effective, having failed to hold senior management accountable (exhibiting a slow and reactive approach to testing SVB's LFI readiness transition plan and risk management programs) and had failed to provide sufficient information to allow the Audit Committee to fulfill its oversight responsibilities.

(h)      SVB had received an additional three MRIAs for governance and controls issues on May 31, 2022, which deficiencies requiring attention were still open at the time of the Bank's failure.

(i)      That, based on the facts contained in ¶¶(a)-(h) above, SVB was not prepared for LFI status.  As the Federal Reserve describes it, "[i]n the time leading up to SVB crossing the $100 billion consolidated assets threshold, the firm . . . did not maintain a risk management function commensurate with the growing size and complexity of the firm."  2021 Supervisory Ratings Letter at 1-2.

**Prior to November 7, 2022**

(j)      On August 17, 2022, Becker was aware that the Examiners were initiating a private enforcement action against SVB to hold its "board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and

risk management."  The planned enforcement action was driven by the "significant deficiencies in [SVB and the Bank's] oversight by their respective boards of directors and senior management and the Firm's risk management program, information technology program, liquidity risk management program, and internal audit program."

(k)     On October 7, 2022, SVB had been issued another two MRIAs and two MRAs relating to governance and controls deficiencies, which deficiencies requiring attention were still open at the time of the Bank's failure.

## 2.     Untrue Statements and Omissions About SVB's Liquidity Risk Management

271.    The November 5, 2020 Q3 2020 Form 10-Q emphasized SVB's liquidity management, stating that "[t]he objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations . . . and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions."  The Q3 2020 Form 10-Q also asserted that SVB "regularly assess[es] the amount and likelihood of projected funding requirements through a review of factors such as historical deposit volatility and funding patterns, present and forecasted market and economic conditions, individual client funding needs, and existing and planned business activities," and that "we routinely conduct liquidity stress testing as part of our liquidity management practices."  These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3 2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

272.    The May 6, 2022 Q1 2022 Form 10-Q discussed SVB's liquidity management, claiming that SVB "maintain[s] a liquidity risk management and monitoring process designed to ensure appropriate liquidity to meet expected and contingent funding needs under both normal and stress environments, subject to the regular supervisory review process."  This statement was

repeated in SVB's: (i) August 8, 2022 Q2 2022 Form 10-Q, (ii) November 7, 2022 Q3 2022 Form 10-Q, and (iii) February 24, 2023 FY 2022 Form 10-K.

273.    On July 21, 2022, SVB filed a Form 8-K with the SEC discussing financial results for Q2 2022.  The Form 8-K included a CEO Letter, which stated that SVB was "***better positioned than at any point in our history to support our clients***" in light of the Company's "***high-quality, liquid balance sheet***."

274.    On January 19, 2023, SVB filed a Form 8-K with the SEC discussing financial results for FY 2022.  The Form 8-K stated that SVB "remain[ed] well-positioned to support our clients and navigate current market conditions" in light of the Company's "high-quality, liquid balance sheet[,] strong capital ratios[,] and multiple levers to manage liquidity."

275.    The statements in ¶¶271-274 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

**Prior to November 5, 2020**

(a)    SVB's management and Board had been repeatedly warned by the Examiners about SVB's liquidity shortcomings.  On December 14, 2016, Becker was informed that the Bank had "insufficient documentation of the capital buffer methodology and governance over the capital planning process."  On December 20, 2018, the Examiners had flagged for Becker and Beck that SVB "[m]anagement supplements daily cash flows with overnight or short-term borrowings" access to which may become restricted during certain periods of the day, and required that SVB "management and the Board . . . establish appropriate limits or target buffers for operating cash balances that incorporate consideration of risk posed by large depositors and other operating cash needs."

(b)    SVB had not in fact "regularly assess[ed] the amount and likelihood of projected funding requirements through a review of factors," as evidenced by SVB's internal audit having not subjected the Company's contingency funding plans to review since 2019.

**Prior to March 1, 2021**

(c)    In addition to the facts contained in ¶¶(a)-(b) above, by December 17, 2020 and February 4, 2021, Examiners had flagged for SVB's management and Board, respectively,

that the Company's testing failed to "provide short term insight into the interim of one to 30 days." SVB was "encouraged to reassess the Bank's measurement needs, particularly as record levels of IBBB [interest-bearing bank balances] are potentially deployed into the investment or loan portfolio."

**Prior to November 8, 2021**

(d)     In addition to the facts contained in ¶¶(a)-(c) above, SVB's management and Board were informed on October 22, 2021 and November 2, 2021, respectively, that SVB suffered "foundational shortcomings in three key areas: (i) internal liquidity stress testing (ILST), (ii) the liquidity limits framework, and (iii) the contingency funding plan (CFP)," which resulted in SVB receiving four MRAs and two MRIAs on November 2, 2021 that were still open at the time of the Bank's failure.  In particular:

(i)     SVB's ILST was fundamentally flawed because: (A) it utilized key assumptions based on incomparable (and more conservative) peer benchmarks, specifically, banks largely with a retail deposit base subject to FDIC insurance coverage, in contrast to SVB's deposit base largely comprising uninsured commercial deposits; and (B) the design contained assumptions tailored to minimal capital stress testing (which are designed to test macroeconomic events and thus concern a longer time horizon), not the more immediate impact of a liquidity stress, which is the primary purpose of ILST testing.

(ii)     SVB did not have in place effective liquidity risk identification, measurement, and monitoring systems or processes commensurate with the complexity and business activities of the Company.

(iii)     SVB's contingency funding plan was deficient on multiple grounds, negatively impacting SVB management's ability to assess whether the Company was under liquidity stress and their ability to respond quickly to a real stress event, as well as what funding was available in varying levels of stress.

(iv)     SVB's management and Board had been informed that they "need[ed] to enhance the Liquidity Risk Management project plan," as SVB's liquidity risk

1   management project plan failed to account for these and other weaknesses identified during the

2   Federal Reserve's August 16-27, 2021 examination.

3   **Prior to July 21, 2022**

4      (e) In addition to the facts contained in ¶¶(a)-(d) above, SVB was required to

5   maintain a 30-day liquidity buffer based on internal stress testing results.  However, SVB did not

6   have a liquidity buffer.  When SVB ran its ILST on or around May 31, 2022, the test modeled an

7   "operational" shortfall of approximately $12 billion for the 30-day point (meaning SVB had

8   sufficient liquidity, but could not access it due to deficiencies with its contingency funding plan)

9   and a "real" shortfall of approximately $4 billion for the 90-day point (meaning SVB did not have

10  sufficient liquidity to cover the projected outflows).  But even those deficits were understated

11  because SVB had used unsupported deposit outflow speed assumptions in its ILST, assuming

12  without basis that a material portion of deposit outflows during a stress event would not occur until

13  days 31-90, which resulted in the 30-day deficit being understated by up to an additional $27

14  billion.

15  **Prior to August 8, 2022**

16     (f) In addition to the facts contained in ¶¶(a)-(e) above, SVB client cash burn

17  continued such that, when run on or around July 31, 2022, SVB's ILST test modeled a 30-day

18  shortfall of approximately $18 billion for the 30-day point and approximately $23 billion for the

19  90-day point.  But even those deficits were understated because SVB had used unsupported deposit

20  outflow speed assumptions in its ILST, assuming without basis that a material portion of deposit

21  outflows during a stress event would not occur until days 31-90, which resulted in the 30-day

22  deficit being understated by up to an additional $27 billion.  In response, the Officer Defendants

23  simply manipulated the assumptions utilized in SVB's ILST model in October 2022 to artificially

24  reduce the modeled liquidity shortfall.

25  **Prior to November 7, 2022**

26     (g) In addition to the facts contained in ¶¶(a)-(f) above, in an August 19, 2022

27  letter to Beck, the Federal Reserve underscored that SVB's model risk management permitted

28  "application of material qualitative adjustments with known conceptual soundness weaknesses and

inadequate compensating controls," presenting a "safety and soundness concern" (including the risk of "inaccurate capital projections") and "preventing firm management and the board of directors from making informed capital planning decisions."

(h)    In October 2022, the Officer Defendants altered the assumptions utilized in SVB's ILST model to artificially reduce the modeled liquidity shortfall.  As the Federal Reserve put it: "Changing modeling assumptions, rather than improving the actual liquidity position, is not an appropriate way to restore compliance with limits."

**Prior to December 7, 2022**

(i)    In addition to the facts contained in ¶¶(a)-(g) above, SVB management had raised to SVB's Board in November 2022 that they were "evaluating two separate securities repositioning strategies," including selling the entire AFS securities portfolio at an up to $20 billion loss.

### 3.    Untrue Statements and Omissions About SVB's Interest Rate Risk Management

276.    The November 5, 2020 Q3 2020 Form 10-Q emphasized SVB's interest rate risk management, stating that "[r]elevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, are monitored on an ongoing basis."   The Form 10-Q stated that "[i]nterest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities.  In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk."  The Form 10-Q also claimed:

> We utilize a simulation model to perform sensitivity analysis on the [EVE] and [NII] under a variety of interest rate scenarios, balance sheet forecasts and business strategies.  The simulation model provides a dynamic assessment of interest rate sensitivity which is embedded within our balance sheet.  Rate sensitivity measures the potential variability in economic value and [NII] relating solely to changes in market interest rates over time.  *We review our interest rate risk position and sensitivity to market interest rates regularly*.

These statements were repeated in SVB's: (i) March 1, 2021 FY 2020 Form 10-K, (ii) May 10, 2021 Q1 2021 Form 10-Q, (iii) August 6, 2021 Q2 2021 Form 10-Q, (iv) November 8, 2021 Q3

2021 Form 10-Q, (v) March 1, 2022 FY 2021 Form 10-K, (vi) May 6, 2022 Q1 2022 Form 10-Q, (vii) August 8, 2022 Q2 2022 Form 10-Q, (viii) November 7, 2022 Q3 2022 Form 10-Q, and (ix) February 24, 2023 FY 2022 Form 10-K.

277.   The March 1, 2021 FY 2020 Form 10-K explained the model simulation and sensitivity analysis conducted to test NII and EVE:

> Both EVE and NII measures rely upon the use of models to simulate cash flow behavior for loans and deposits. ***These models were developed internally and are based on historical balance and rate observations***. Investment portfolio cash flow is based on a combination of third-party prepayment models and internally managed prepayment vectors depending on security type. ***As part of our ongoing governance structure, each of these models and assumptions are periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors***.

These statements were repeated in SVB's: (i) May 10, 2021 Q1 2021 Form 10-Q, (ii) August 6, 2021 Q2 2021 Form 10-Q, (iii) November 8, 2021 Q3 2021 Form 10-Q, (iv) March 1, 2022 FY 2021 Form 10-K, (v) May 6, 2022 Q1 2022 Form 10-Q, (vi) August 8, 2022 Q2 2022 Form 10-Q, (vii) November 7, 2022 Q3 2022 Form 10-Q, and (viii) February 24, 2023 FY 2022 Form 10-K.[54]

278.   Based on these models and their assumptions, SVB reported EVE and NII sensitivity exposure to a market interest rate shock of 200 bps as follows:

---

[54]   This statement was slightly altered in the 2022 Form 10-K, as follows:

"Both EVE and NII measures rely upon the use of models to simulate cash flow behavior for loans and deposits.  These models were developed internally and are based on historical balance and rate observations.  As part of our ongoing governance structure, each of these models and assumptions are periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors."

| Date | Filing | EVE | NII |
|---|---|---|---|
| March 1, 2021 | FY 2020 Form 10-K | -15.4% | 29.2% |
| May 10, 2021 | Q1 2021 Form 10-Q | -22.7% | 31.1% |
| August 6, 2021 | Q2 2021 Form 10-Q | -22.8% | 33.7% |
| November 8, 2021 | Q3 2021 Form 10-Q | -30.9% | 27.7% |
| March 1, 2022 | FY 2021 Form 10-K | -27.7% | 22.9% |
| May 6, 2022 | Q1 2022 Form 10-Q | -30.4% | 21% |
| August 8, 2022 | Q2 2022 Form 10-Q | -22.9% | 13.5% |
| November 7, 2022 | Q3 2022 Form 10-Q | -29.5% | 5.5% |
| February 24, 2023 | FY 2022 Form 10-K | OMITTED | 3.5% |

279.    On July 22, 2021, SVB filed a Form 8-K with the SEC containing SVB's financial results for Q2 2021.  The Form 8-K included a CEO Letter, which reiterated that SVB "remain[ed] well-positioned for rising rates."  The CEO Letter also assured investors that SVB "ha[s] actively positioned our securities portfolio to create flexibility and mitigate the risk of rising long-term rates through hedges, duration targeting and shifting the mix toward held-to-maturity investments."

280.    On January 20, 2022, SVB filed a Form 8-K with the SEC containing SVB's financial results for FY 2021.  The Form 8-K touted only upside from anticipated interest rate increases, stating: "If interest rate increases materialize as the markets predict, we would expect them to significantly add to our earnings on top of our already positive 2022 outlook, while opening up additional investment opportunities."

281.    On April 21, 2022, SVB filed a Form 8-K with the SEC containing SVB's financial results for Q1 2022.  The Form 8-K included a CEO Letter, which reported that SVB "[r]aised 2022 revenue outlook given current higher rate environment – additional potential upside if rates increase."   The CEO Letter assured investors that the Company was "[w]ell-positioned to withstand potential impacts of public market volatility," stating: "While rising rates benefit us from a revenue perspective, they also highlight the effectiveness of our proactive interest rate risk management, through which we actively mitigated AFS AOCI [other comprehensive income] risk to support Tangible Book Value as rates increased in Q1, while taking the opportunity to monetize

a portion of our fair value hedges and rebalance the fixed income securities portfolio at higher yields."

282.    The May 6, 2022 Q1 2022 Form 10-Q stated that: "the underlying models and assumptions are subject to regular performance testing and recalibration, and as such we are reviewing how the underlying assumptions on our deposit model impact deposit decay, curtailment, and pricing behavior."  The Form 10-Q maintained that changes to the ALM Model and its assumptions were part of a rigorous process grounded in fact and that the modifications thereto are made "in response to relevant market conditions, competition or business circumstances."  The Form 10-Q stated that changes would be implemented the following quarter as a result of this review, which would result in a reduction of risk to EVE in the 100 and 200 bps upward rate shock scenarios.

283.    The August 8, 2022 Q2 2022 Form 10-Q confirmed that changes to the model and its assumptions were part of a rigorous process grounded in fact, stating that:

> The model simulations and calculations . . . will change regularly as the composition of earning assets and funding liabilities change (including the impact of changes in the value of interest rate derivatives, if any), as interest rate environments evolve, and as we change our assumptions in response to relevant market conditions, competition, or business circumstances.

The Form 10-Q represented that "the EVE results in the table above for both December 31, 2021 and June 30, 2022 reflect updates to our deposit model that were deployed during the second quarter of 2022 which impacted our underlying assumptions for deposit decay, curtailment, and pricing behavior."  The Form 10-Q claimed this result was "[c]onsistent with our expectations" that "the EVE profile of our balance sheet at December 31, 2021 showed a reduction in risk for +100 and +200bps instantaneous parallel shift scenarios."

284.    The statements in ¶¶276-283  were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

**Prior to November 5, 2020**

(a)    SVB's management and Board were cautioned, in the February 14, 2018 CAMELS Report, that SVB's Treasury function (the business unit responsible for SVB's securities

1    portfolios) "has grown in complexity over the past several years, and examination and audit

2    findings point to a need for ongoing and independent monitoring and challenge for market risk."

3           (b)    SVB's interest rate policy limits had not been reviewed for potential

4    recalibration or otherwise supported since at least 2018, and SVB's internal audit had not subjected

5    the Company's contingency funding plans to review since 2019.

6           (c)    SVB's interest rate risk policy did not specify: scenarios to run, how

7    assumptions should be analyzed, how to conduct sensitivity analysis, model back-testing

8    requirements, how limits were set and calibrated, or ongoing reporting requirements for threshold

9    breaches over prolonged periods.

10          (d)    EVE at risk in a +100 bps shock scenario had exceeded SVB's outer policy

11   limits in September and October 2020.

12   **Prior to March 1, 2021**

13          (e)    In addition to the facts contained in ¶¶(a)-(d) above, no later than December

14   2020, SVB's internal audit found that SVB's models used incorrect data inputs, inadequate

15   governance of interest rate risk models, and inaccurate NII position.

16          (f)    During a February 4, 2021 meeting with the Examiners, the Officer

17   Defendants were informed that EVE was modeled to decrease in response to interest rate increases,

18   "exceed[ing] the outer policy limit."  Indeed, EVE at risk in a +100 bps shock scenario had

19   exceeded SVB's outer policy limits in November 2020 and February 2021.

20   **Prior to November 8, 2021**

21          (g)    In addition to the facts contained in ¶¶(a)-(f) above, SVB management was

22   aware by October 22, 2021, that SVB's stress testing did not delineate deposits by product type,

23   deposit classification, or customer type, thus treating all deposits as behaving similarly in stress,

24   even though SVB management acknowledged to the Federal Reserve that outflows of commercial

25   deposits actually vary in times of stress and "[a]ssuming all deposits to behave similarly is

26   unrealistic and potentially understates outflows under stress."  As a result, SVB was in fact unable

27   to differentiate deposit behaviors through outflow assumptions.

28

1           (h)     EVE at risk in a +100 bps shock scenario had exceeded SVB's outer policy

2 limits for each month between March 2021 and November 2021, except for December 2020,

3 January 2021, and June 2021.

4 **Prior to March 1, 2022**

5           (i)     In addition to the facts contained in ¶¶(a)-(h) above, according to the

6 January 2022 BlackRock risk control report commissioned by SVB, which analyzed how SVB's

7 securities portfolios would respond to various factors including rising interest rates and broader

8 macroeconomic conditions, and how that would affect SVB's capital and liquidity, SVB lagged

9 behind peer banks on each of the 11 factors considered and was "'substantially below'" them on

10 10 out of 11, earning what was dubbed a "'gentlemen's C.'"

11           (j)     "SVB was unable to generate real time or even weekly updates about what

12 was happening to its securities portfolio" and the response of its portfolio to "rising interest rates

13 and broader macroeconomic conditions."[55]

14           (k)     SVB's substantial investments in HTM securities did not actually protect

15 book value without reducing risk to SVB's book equity, but rather put EVE at substantial risk in

16 excess of SVB's outer policy limits.  EVE at risk in a +100 bps shock scenario had exceeded

17 SVB's outer policy limits for each month between December 2021 and February 2022.

18 **Prior to July 21, 2022**

19           (l)     In addition to the facts contained in ¶¶(a)-(k) above, SVB's ALM Model

20 and its assumptions were unreliable and modeled risk that was directionally inconsistent with

21 SVB's actual performance, as the Officer Defendants simply manipulated the assumptions in April

22 2022 to artificially reduce the modeled risk to EVE, which change was unsubstantiated given

23

24

25

26

___

[55]   Antoine Gara & Brooke Masters, *Silicon Valley Bank was warned by BlackRock that risk controls were weak*, Fin. Times (Mar. 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

1   recent deposit growth, lack of historical data, and rapid increases in rates that shorten deposit

2   duration.

3          (m)   As a result of the model manipulation discussed in ¶(l) above, beginning

4   with the August 8, 2022 Q2 2022 Form 10-Q, EVE risk at a +200 bps rate shock was artificially

5   reduced more than six-fold, and EVE at risk in a +100 bps shock temporarily within SVB's internal

6   policy limits in April and May 2022.  However, the manipulation did not address the reality of

7   SVB's deteriorating EVE; thus, notwithstanding the artificial reduction, EVE at risk again

8   exceeded SVB's outer policy limits in June 2022.

9   **Prior to February 24, 2023**

10         (n)   In the November 15, 2022 CAMELS Report, which was sent to the Officer

11  Defendants and SVB's Board, the Examiners faulted SVB's "interest rate risk (IRR) simulations"

12  as "not reliable" and "requir[ing] improvements."  The simulations' results were "directionally

13  inconsistent with internal projections and IRR simulations, calling into question the reliability of

14  IRR modeling and the effectiveness of risk management practices."  The Examiners issued a new

15  MRA concerning SVB's "unreliable" interest rate risk simulation and modeling, which

16  deficiencies requiring attention was still open at the time of the Bank's failure.

17         (o)   As a result of ¶¶(a)-(l) above, SVB's NII and EVE metrics in ¶278 included

18  in each of SVB's Forms 10-Q and Forms 10-K filed with the SEC between March 1, 2021 and

19  February 24, 2023 were false or misleading.

20         **4.   Untrue Statements and Omissions About SVB's Designation of
            Investment Securities as Held-to-Maturity**

21

22         285.   Throughout the Relevant Period, SVB filed its financial results with the SEC, in

23  which the Individual Defendants reported that the Company had classified certain securities as

24  held-to-maturity.  In particular, they reported the following amounts of HTM securities as of the

25  end of the respective quarter or fiscal year:

26

27

28

| Date | Filing | HTM |
|---|---|---|
| November 5, 2020 | Q3 2020 Form 10-Q | $13.0 billion |
| March 1, 2021 | FY 2020 Form 10-K | $16.6 billion |
| May 10, 2021 | Q1 2021 Form 10-Q | $41.2 billion |
| August 6, 2021 | Q2 2021 Form 10-Q | $60.0 billion |
| November 8, 2021 | Q3 2021 Form 10-Q | $82.4 billion |
| March 1, 2022 | FY 2021 Form 10-K | $98.2 billion |
| May 6, 2022 | Q1 2022 Form 10-Q | $98.7 billion |
| August 8, 2022 | Q2 2022 Form 10-Q | $95.8 billion |
| November 7, 2022 | Q3 2022 Form 10-Q | $93.3 billion |
| February 24, 2023 | FY 2022 Form 10-K | $91.3 billion |

286.    On April 22, 2021, SVB filed a Form 8-K with the SEC.  The Form 8-K included a CEO Letter which emphasized that SVB's management of its AFS and HTM securities "position[ed] the securities portfolio for higher rates" and provided "additional balance sheet flexibility":

> We have also taken actions, through the addition of $10 billion of receive floating interest rate swaps, to position the securities portfolio for higher rates, along with the designating $3 billion in investment securities from available-for-sale (AFS) to held-to-maturity (HTM).  This also has the benefit of protecting tangible book value against fluctuations in other comprehensive income and provides additional balance sheet flexibility.

287.    The May 10, 2021 Q1 2021 Form 10-Q reported that SVB re-designated $2.9 billion of securities from AFS to HTM.

288.    According to the Q1 2021 Form 10-Q, the "decision to re-designate the securities was based on our ability and intent to hold these securities to maturity."  The Form 10-Q asserted that the Officer Defendants considered "future liquidity needs and sources of funding" as "[f]actors . . . in assessing the ability to hold these securities to maturity."  The Form 10-Q stated that "[HTM] securities are carried on the balance sheet at amortized cost and the changes in the value of these securities, other than an [allowance for credit losses or ACL], are not reported on the financial statements."  These statements were repeated in SVB's: (i) August 6, 2021 Q2 2021 Form 10-Q, (ii) November 8, 2021 Q3 2021 Form 10-Q, (iii) March 1, 2022 FY 2021 Form 10-K, and (iv) February 24, 2023 FY 2022 Form 10-K.

289.   The August 6, 2021 Q2 2021 Form 10-Q reported that SVB re-designated $5.7 billion of AFS securities to HTM securities.

290.   The November 8, 2021 Q3 2021 Form 10-Q and March 1, 2022 FY 2021 Form 10-K reported that SVB re-designated $8.8 billion of AFS securities to HTM securities during the nine months ended September 30, 2021 and the year ended December 31, 2021, respectively.

291.   The statements in ¶¶285-290 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

(a)   SVB's interest rate risk policy did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, articulate model back-testing requirements, or the ongoing reporting requirements for threshold breaches over prolonged periods; and did not describe how limits were set and calibrated.

(b)   Interest rate risk limits had not been reviewed for potential recalibration or that the current level of the limits had been supported since at least 2018, and SVB's internal audit had not subjected SVB's contingency funding plans to review since 2019.

(c)   SVB failed to appropriately design an interest rate risk model.  No later than December 2020, SVB's internal audit found that SVB's ALM Model used incorrect data inputs, inadequate governance of interest rate risk models, and inaccurate NII position.

(d)   The Officer Defendants manipulated the ALM Model's assumptions in April 2022 to artificially reduce the modeled risk in response to breaches of SVB's internal policy limits relating to EVE at risk in interest rate shock scenarios.  They also manipulated SVB's ILST in October 2022 to artificially reduce the modeled deficits during a stress event.

(e)   No later than February 4, 2021, the Officer Defendants were aware that SVB's testing failed to "provide short term insight into the interim of one to 30 days."  That same day, Becker and Beck were "encouraged to reassess the Bank's measurement needs, particularly as record levels of IBBB [interest-bearing bank balances] are potentially deployed into the investment or loan portfolio."

(f)   No later than October 22, 2021, Becker and Beck were aware that SVB's ILST was fundamentally flawed because: (A) it utilized key assumptions based on incomparable

1   (and less conservative) peer benchmarks; (B) the design contained assumptions tailored to less

2   conservative capital stress testing (which are designed to test macroeconomic events and thus

3   concern a longer time horizon), not the more immediate impact of a liquidity stress, which is the

4   purpose of ILST testing; and (C) inappropriately treated all deposits as behaving similarly in stress,

5   even though the acknowledged that outflows of commercial deposits vary in times of stress.

6           (g)     SVB's contingency funding plan was also deficit, which negatively

7   impacted the Officer Defendants' ability to assess whether the Company was under liquidity stress

8   and their ability to respond quickly to a real stress event, as well as what funding was available in

9   varying levels of stress.   Becker and Beck were aware of this no later than October 22, 2021.

10  Notably, less than a year later in May 2022, when SVB's ILST would show a $12 billion deficit

11  at the 30-day mark of a stress event, SVB would characterize that deficit as an "operational

12  shortfall" attributable to deficiencies in the Company's contingency funding options.   The deficits

13  modeled by the ILST, however, were understated due to the use of unsupported assumptions

14  relating to deposit outflow speed in a stress event.   Had appropriate assumptions been used, the

15  deficit would have increased by up to an additional $27 billion.

16          (h)     According to the January 2022 BlackRock risk control report, "SVB was

17  unable to generate real time or even weekly updates about what was happening to its securities

18  portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic

19  conditions."[56]

20          (i)     That, based on the facts stated in ¶¶(a)-(h) above, the Officer Defendants

21  could not – and did not – reliably establish, as GAAP requires, that SVB possessed the requisite

22  "positive intent and ability to hold to maturity" the massive debt securities portfolio that they

23  classified as held-to-maturity.   As a result, the Officer Defendants falsely reported SVB's financial

24  performance, including by overstating the value of SVB's HTM securities, understating losses to

25  SVB's AOCI, and artificially inflating SVB's stockholder equity.

26

---

27  [56]  Antoine Gara & Brook Masters, *Silicon Valley Bank was warned by BlackRock that risk
controls were weak*, Fin. Times (Mar. 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-
28  4a65-adbd-01e5de2c5053.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**For Violation of §11 of the Securities Act**
**Against All Defendants**

292.    The Securities Act Plaintiffs repeat and reallege each and every allegation contained in ¶¶13-34, 36-59, and 251-291 as if fully set forth herein.

293.    The Securities Act Plaintiffs purchased SVB securities traceable to the Registration Statement.  This claim is brought against each of the Defendants named in this action pursuant to §11 of the Securities Act, 15 U.S.C. §77k.  Defendants' liability under this Count is predicated on the participation of each of the Defendants in the offerings, which offerings were consummated pursuant to Offering Materials which contained untrue statements and omissions of material fact.

294.    This claim is based on strict liability and does not sound in fraud.  The Securities Act Plaintiffs do not assert in this Count that any Defendant committed intentional or reckless misconduct or that any Defendant acted with scienter or fraudulent intent.  The Securities Act Plaintiffs disclaim any allegations of scienter or fraudulent intent with respect to these non-fraud claims, including challenged statements of opinion or belief in the Offering Materials alleged to have been materially misstated statements of opinion or belief.

295.    The Offering Materials, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading at the time the relevant parts became effective.

296.    Non-Party SVB is the issuer of the securities purchased by the Securities Act Plaintiffs traceable to the Registration Statement.

297.    The Individual Defendants, except for Burr, Daniels, and Davis, signed the Registration Statement.  In addition, each of the Individual Defendants signed SVB's SEC filings incorporated by reference into the Registration Statement and were directly involved in or responsible for providing the untrue statements contained in and/or omissions from the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving

that information.  As such, the Individual Defendants each had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials and ensure that they were true and that there were no omissions of material fact that were required to be stated therein or otherwise rendered the statements made in the Offering Materials either false or misleading. None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts.  Had they done so, the Individual Defendants would have known of the material misstatements and omissions alleged herein.  As such, each Individual Defendant is liable for the material omissions from and materially inaccurate statements contained in (or incorporated by reference into) the Offering Materials and the failure of the Offering Materials to be complete and accurate.

298.    The Underwriter Defendants served as the underwriters of the offerings as detailed in ¶¶52-53 and 255-262 above.  The Underwriter Defendants participated in the drafting and dissemination of the offering documents in connection with the particular offerings set forth in ¶¶52-53 and 255-262 above and, as such, are liable for the material omissions from and materially inaccurate statements contained in (or incorporated by reference into) the Offering Materials and the failure of the Offering Materials to be complete and accurate.

299.    As stated in ¶¶20-29 above, the Securities Act Plaintiffs acquired SVB securities traceable to the Offering Materials and did so without knowledge of the untruths and/or omissions alleged herein.

300.    By virtue of the foregoing, each Defendant violated §11 of the Securities Act.

301.    The Securities Act Plaintiffs purchased SVB securities traceable to the Registration Statement as stated in ¶¶20-29 above and are entitled to relief under §11, including damages as measured by the provisions of §11(e), from Defendants and each of them, jointly and severally.

302.    This claim is brought within one year after the Securities Act Plaintiffs' discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's securities were sold in connection with the offerings.

303.     By reason of such conduct, Defendants are liable pursuant to §11 of the Securities Act.  As a direct and proximate result of the wrongful conduct, the Securities Act Plaintiffs suffered damages in connection with their purchases of SVB securities as detailed in ¶251 above.

## COUNT IV

**For Violation of §15 of the Securities Act
Against the Individual Defendants**

304.     The Securities Act Plaintiffs repeat and reallege each and every allegation contained in ¶¶13-34, 36-59, and 251-303 above as if fully set forth herein.

305.     This claim is brought against each of the Individual Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Securities Act Plaintiffs, who purchased SVB securities traceable to the Registration Statement.

306.     This claim does not sound in fraud.  The Securities Act Plaintiffs do not assert in this Count that any of the Individual Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.

307.     During their tenures as officers and/or directors of Company, the Individual Defendants were controlling persons of non-defendants SVB and the Bank, within the meaning of the Securities Act.  The Director Defendants, as individuals and as a group, also were controlling persons of Becker, Beck, and Hon within the meaning of the Securities Act.

308.     The Individual Defendants, by virtue of their positions of control and authority and their direct participation in and/or awareness of SVB's and the Bank's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of SVB and its employees and executives including Becker, Beck, and Hon, or cause SVB to issue, offer, and/or sell securities pursuant to the defective Offering Materials.  As described herein, the Individual Defendants violated §11 of the Securities Act.  By virtue of the acts and omissions of its senior officers and directors, including Becker and Beck, SVB violated §11 of the Securities Act; however, TIAA brings no claims against SVB in this action.

309.     The Individual Defendants had the power to, and did, control the decision-making of SVB, including the content and issuance of the statements contained (and/or incorporated by

reference) in the Offering Materials.  They were provided with or had unlimited access to copies of the Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected.  The Individual Defendants, except for Burr, Daniels, and Davis, signed the Registration Statement (and certain of the Company's SEC filings incorporated by reference in the Offering Materials) which could not have become effective without their approval.  Each of the Individual Defendants were directly involved in or responsible for providing the false or misleading information contained in the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

310.    The Individual Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

311.    By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, the Securities Act Plaintiffs suffered damages in connection with their purchases of the Company's shares.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

B.    Awarding Plaintiffs pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

C.    Awarding further equitable, injunctive, and such other relief as this Court may deem just and proper.

1

## JURY DEMAND

2      Plaintiffs hereby demand a trial by jury.

3    DATED: January 25, 2024                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
4                                              DARREN J. ROBBINS
                                               LUKE O. BROOKS
5                                              ERIKA L. OLIVER
                                               JACK ABBEY GEPHART
6

7                                                    s/ Luke O. Brooks
                                                   LUKE O. BROOKS
8
                                               655 West Broadway, Suite 1900
9                                              San Diego, CA  92101-8498
                                               Telephone:  619/231-1058
10                                             619/231-7423 (fax)
                                               darrenr@rgrdlaw.com
11                                             lbrooks@rgrdlaw.com
                                               eoliver@rgrdlaw.com
12                                             jgephart@rgrdlaw.com

13                                             ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
14                                             SHAWN A. WILLIAMS
                                               Post Montgomery Center
15                                             One Montgomery Street, Suite 1800
                                               San Francisco, CA  94104
16                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
17
                                               Attorneys for Plaintiffs
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 122